```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK - CIVIL TERM - PART 3
 2   ------------------------------------------------X
     JEFFREY SIMPSON, individually and derivatively,
 3   as managing member of JJ ARCH LLC, suing
     derivatively as managing member of ARCH REAL
 4   ESTATE HOLDINGS LLC, and JJ ARCH LLC,

 5                                      Plaintiffs,
                   -against-
 6
     JARED CHASSEN and FIRST REPUBLIC BANK,
 7
                                      Defendants.
 8   ------------------------------------------------X
     JARED CHASSEN, individually and derivatively
 9   on behalf of JJ ARCH LLC, as member, and
     derivatively on behalf of ARCH REAL ESTATE
10   HOLDINGS LLC, as member of JJ ARCH,

11             Counterclaim Plaintiff,

12             -against-

13   JEFFREY SIMPSON and YJ SIMCO LLC,,

14             Counterclaim Defendants.

15             -and-

16   JJ ARCH LLC and ARCH REAL ESTATE HOLDINGS LLC,

17             Nominal Defendants.
     ------------------------------------------------X
18   608941 NJ, INC.,

19                                      Plaintiff,

20             -against-

21   JEFFREY SIMPSON, JJ ARCH LLC and ARCH REAL
     ESTATE HOLDINGS LLC,
22
                                      Defendants,
23             -and-

24   ARCH REAL ESTATE HOLDINGS LLC,

25                                      Nominal Defendant.
     ------------------------------------------------X
```

```
 1   Index No. 158055/23        60 Centre Street
     ORAL ARGUMENT             New York, N.Y.
 2   (Motion to Compel)        May 12, 2025


 3


 4   B E F O R E:


 5        HONORABLE JOEL M. COHEN,
                         Justice
 6


 7
     A P P E A R A N C E S:
 8
          MAIDEN LANE LAW GROUP
 9        Attorney(s) for the Plaintiff-Defendant-
          Counterclaim Defendant Jeffrey Simpson
10            BY:  BENJAMIN ROBERT RAJOTTE, ESQ.
                      - and -
11        LORENC LAW LLC
          Attorney(s) for the Plaintiff-Defendant-
12        Counterclaim Defendant Jeffrey Simpson
              BY:   ROBERT C. LORENC, ESQ.
13                (via Microsoft Teams)


14


15
          SCHWARTZ LAW PLLC
16        Attorney(s) for the Defendant-Counterclaim Plaintiff
          Jared Chassen
17            BY:  ALLEN SCHWARTZ, ESQ.


18


19        OLSHAN FROME WOLOSKY LLP
          Attorneys for the Nominal Defendant-Defendant
20        Arch Real Estate Holdings LLC
              BY:   JONATHAN T. KOEVARY, ESQ.
21                (via Microsoft Teams)


22


23        HAYNES and BOONE, LLP
          Attorneys for the Plaintiff 608941 NJ, INC.
24            BY:   LESLIE C. THORNE, ESQ.
                  (via Microsoft Teams)
25
```

```
1   (Appearances continued:)

2

3
        FARRELL FRITZ P.C.
4       Proposed Attorneys for the Court-Appointed Receiver
            BY:  MARTIN G. BUNIN, ESQ.
5

6

7

8                                   ALAN F. BOWIN, CSR, RMR, CRR
                                    Official Court Reporter
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Proceedings                                                    4

1                    THE COURT:  All right.  Good afternoon, everybody.

2                    Let's just start with attendance, starting with the

3          plaintiff.

4                    MR. RAJOTTE:  Good afternoon, your Honor.

5                    Benjamin Rajotte, for the Plaintiff, Mr. Jeffrey

6          Simpson, who is to my left (indicating).

7                    THE COURT:  Mr. Lorenc, do you want to enter an

8          appearance, for now?

9                    MR. LORENC:  Yes, your Honor.

10                    Good afternoon, your Honor.

11                    Rob Lorenc for Mr. Simpson.

12                    THE COURT:  Okay.

13                    And for the defendants ...?

14                    MR. SCHWARTZ:  Good afternoon, your Honor.

15                    Allen Schwartz, on behalf of Jared Chassen.

16                    MR. HUEBSCHER:  Good afternoon, your Honor.

17                    Eric Huebscher, the temporary receiver in these

18          matters.

19                    MR. KOEVARY:  Good afternoon, your Honor.

20                    Jonathan Koevary, Olshan Frome Wolosky, for AREH,

21          Arch Real Estate Holdings.

22                    MS. THORNE:  Leslie Thorne, on behalf of 608941 NJ,

23          Inc.

24                    THE COURT:  Can I just ask everybody else who's on

25          the line to go on "Mute" when you're not speaking?

1          Counsel ...?

2          MR. BUNIN:  Good afternoon, your Honor.

3          Marty Bunin, from Farrell Fritz, on behalf of Eric

4    Huebscher as receiver.

5          THE COURT:  Okay.  Just a couple of preliminary

6    things to take care of:

7          Mr. Lorenc, I saw that you've filed a motion to

8    withdraw by order to show cause, and my recollection is that

9    this is effectively a renewal of a motion you had made

10   earlier, which I granted, or -- well, I didn't grant, but

11   solely on the ground that withdrawing in advance of the

12   evidentiary hearing would be prejudicial.

13         Since that's no longer the case and there is

14   substitute counsel, I'm prepared to just grant your motion,

15   if you want to just restate it orally, but just on the

16   papers that you have, rather than going through the briefing

17   process, unless there are any objections.

18         There's no need for any stay because there is

19   substitute counsel.

20         Does anybody have any objection to Mr. Lorenc

21   withdrawing?

22         (No audible response.)

23         THE COURT:  All right.  Absent any objection,

24   Mr. Lorenc, your motion will be granted on the papers.

25         Again, I do appreciate you hanging in for the --

Proceedings                                                6

1      for the evidentiary hearing, which -- I thought it was

2      extremely helpful for there to be counsel for that, so I

3      appreciate that.

4              And so it will be granted for the reasons stated in

5      your motion.

6              MR. LORENC:  Thank you, your Honor.

7              THE COURT:  You're free to stay, if you want to,

8      for this hearing, or not, at your choice.

9              MR. LORENC:  Thank you, your Honor.  I appreciate

10     that.

11             (Mr. Lorenc's identifier remained on-screen.)

12             THE COURT:  So the initial question that was

13     raised over the weekend about this hearing, which has been

14     scheduled for a while, was:  There were certain filings

15     made, I believe, on Friday.  While not called Notices of

16     Removal, it sounded like that's what was going on.  There

17     are a couple of issues with that.  I'll just raise a couple

18     of the threshold issues, and there are other, more

19     substantive ones.

20             The first one is that Mr. Simpson has counsel in

21     this case who has noted an appearance as counsel of record.

22     Under CPLR 321(a), once that occurs, Mr. Simpson can no

23     longer make filings as a *pro se* litigant, and so all the

24     filings made on Friday are essentially procedurally

25     improper.  321(a) says that if -- "if a party appears by

1      attorney, such party may not act in person in the action

2      except by consent of the court."  So, you know, effectively,

3      the clerk's office really shouldn't even be permitting you

4      to make *pro se* filings once you have counsel.

5              But then, beyond that, the filing that was made,

6      similar to what we had last time, in that -- some action has

7      been -- appears to have been -- initiated in federal court

8      with the *pro se* office in the federal court, but to the best

9      of our knowledge, there is no docket opened in the federal

10     court, as far as we are aware.

11              And that raises a problem, because if this Court

12     were to take the position that the case has been removed

13     before there's actually a case opened in the federal court,

14     the case would essentially be nowhere; and the procedural

15     rules, I do not think, permit a situation in which the case

16     is nowhere and no party can seek relief from either court.

17              So, at a bare minimum, unless and until there is

18     actually a case opened in federal court where the federal

19     court agrees to open the case -- and in this case, there is

20     more than ample reason why they may not -- there is no

21     basis, I don't think, for me to fail to do my job, which is

22     to continue to hear the case until the federal court takes

23     jurisdiction.

24              There are also, I do have to say, and I've -- we've

25     spent some time looking into this:  The First Department has

1    noted that while, as a general rule, removal of an action

2    divests the state court of its jurisdiction over the dispute

3    while the removal is pending, the court in *Astoria Federal*

4    *Savings and Loan v. Lane*, 64 A.D.3d 454, 1st Dept. [2009],

5    found that -- followed a number of other courts around the

6    country that have carved out exceptions to the general rule,

7    focusing on situations where removal petitions were

8    frivolous, duplicative or abusive.

9              And in this case, we have, obviously, had some

10   history here; it's not quite as egregious as what was going

11   on in *Astoria Federal* where the removal was, you know, sort

12   of, ten years late and had already been rejected once by the

13   federal court.  Here --

14             The court in that case went on, even after

15   considering the federal court's remand of an earlier

16   petition -- found that the removal petition was undeniably

17   untimely, as it must be filed within 30 days after receipt

18   of a copy of the initial pleading.  And here it was, you

19   know, far -- in that case, it was far more than that.

20             Here, we have multiple problems.  First of all,

21   it's similarly untimely in that this case was pending for

22   three years or so before any removal was sought.

23             And beyond that, the statute permitting removal

24   makes it clear that only a plaintiff -- only a defendant --

25   can remove a case to federal court.

1           Not only --

2           Well, and that's clear in the statute.  It says:

3    "The defendant or defendants may remove a case ..."

4           And the Supreme Court of the United States has held

5    that even when a plaintiff becomes a counterclaim defendant,

6    that doesn't matter; you're still a plaintiff and you can't

7    remove.

8           So there are a variety of reasons why I don't think

9    that whatever it was that was filed on Friday has anything

10   that legitimately requires me, or would even permit me, to

11   just let this case dangle without any court having

12   jurisdiction.

13          So I'll permit Mr. Rajotte to respond --

14          If you'd like.

15          Mr. Rajotte, do you want to respond at all?

16          MR. RAJOTTE:  Not at this time, your Honor.

17          THE COURT:  Okay.

18          Now, look, I'm -- we have another hearing coming up

19   next week.  Today is not about the contempt motion.  The

20   only motion on for today is the motion to compel compliance

21   with the receivership order.

22          I should add one other, just, procedural point,

23   because it's been raised in some of the correspondence:

24          Removal does not eliminate state court orders.  To

25   the extent that that's been anybody's understanding, that is

1    just not -- not correct.  Under 28 USC Section 1450,

2    injunctions, orders and other proceedings had in the state

3    court prior to removal "remain in full force and effect

4    until dissolved or modified by the district court."

5            So the receivership order, which was made in this

6    court before the removal, was never invalidated by removal,

7    even if it had been done appropriately.  It's just an order

8    that's in the case that the federal court can change if it

9    wants to but did not.

10           So, during all the conduct that we're going to talk

11   about today, there is no argument, at least that I'm aware

12   of, that the receivership order somehow went up in smoke

13   just because the plaintiff in this case purportedly removed

14   the case to federal court.  Court orders don't die that way.

15   You can get an appeal -- you can do an appeal; you can try

16   to have it reversed; you can do all sorts of things, but you

17   can't just remove and then assume that it does not have any

18   force and effect.

19           So those are my preliminary points.

20           So, with that, unless anyone else has any -- anyone

21   else has anything else on the procedural or jurisdictional

22   front, then I would move on to the motion by the receiver to

23   enforce the order.

24           Does plaintiff want to be heard on anything before

25   I move to the motion?

Proceedings                                          11

1            MR. RAJOTTE:  If I may just add, for the record,

2      your Honor, on behalf of my client --

3            THE COURT:  Why don't you just -- it might be

4      easier to just do it from the lectern.

5            MR. RAJOTTE:  Okay.  Thank you.

6            (Mr. Rajotte approached the podium.)

7            MR. RAJOTTE:  I just wanted to say, in opening,

8      that it's a privilege to be here on behalf of my client and

9      before this Court.

10            THE COURT:  A pleasure to have you.

11            MR. RAJOTTE:  That being said, I know that there's

12      been a long case history that I'm jumping into anew; I'm

13      still learning.  I can only provide, at the appropriate

14      time, my observations, still learning the record, which is

15      impressive.

16            And I just wanted to just open the hearing by

17      saying that I come here in the interest only of justice and

18      of the utmost decorum and respect for this Court.

19            Thank you, your Honor.

20            THE COURT:  Thank you, sir.

21            Okay.  So I believe the movant is the receiver;

22      yes?  So ...

23            MR. BUNIN:  That's correct, your Honor.

24            Marty Bunin, Farrell Fritz, on behalf of the

25      receiver.

Proceedings                                    12

1            THE COURT:  Would you mind doing it from the

2      lectern, just so everybody can hear?

3            (Mr. Bunin approached the podium.)

4            MR. BUNIN:  Marty Bunin, from Farrell Fritz, on

5      behalf of Eric Huebscher as receiver.

6            Before I begin, present the motion, your Honor,

7      Mr. Huebscher, as a court-appointed fiduciary, if your Honor

8      will permit, would like to give the Court a status report on

9      his receivership.

10            THE COURT:  Okay.

11            Is it -- do you want to do it from -- is it --

12            MR. HUEBSCHER:  No, no, no.  That's okay.  I'm

13      recovering from hip surgery, so I'm just -- I'm tentative.

14      That's all.

15            (Mr. Huebscher approached the podium.)

16            MR. HUEBSCHER:  Good afternoon, your Honor.

17            Eric Huebscher, the appointed receiver in this

18      matter.

19            I'll be brief.  Most of the items that I'm going to

20      talk about are in the papers that we've presented.

21            After my appointment, I really tried to get an

22      assessment of the four properties that are involved.  One

23      is at 550 Metropolitan Avenue in Brooklyn; the other one

24      is at -- on -- East 89th Street in Manhattan, just east of

25      Lexington Avenue; the other one is at 225 Head of Pond Road

Proceedings                              13

1    in Water Mill; and the other one is Rêver Motors, located at

2    1640 Montauk Highway, also in Water Mill.  They're,

3    approximately, somewhere between a quarter or a half mile

4    apart.

5              With respect to -- I'll start with the easier ones

6    first and then, sort of, transition to the properties that

7    were a little bit more difficult.

8              550 Metropolitan Avenue, I was able to make contact

9    with the board president --

10             It's a condo.  The property that's in question is a

11   very, very small retail space at the base of the property.

12             I was able to make contact with the board president

13   and able to get keys to the premises, engaged Corcoran

14   who -- you entered that order, I believe, last week -- to

15   sell the property.  We've had some active bids for the

16   property, and I'm in active discussions with a secured

17   lender on that property.

18             With respect to 146 East 89th Street, we had to

19   change the locks, which we did.  We -- I hired someone to go

20   into the property to clean it because it had really been

21   left in, sort of, an abandoned condition.

22             THE COURT:  What is the -- what's the nature of the

23   property?

24             MR. HUEBSCHER:  It's a -- it's a brownstone.

25             THE COURT:  Residential?

Proceedings                                    14

 1            THE WITNESS:  Yes, residential; residential

 2    property.  It's on East 89th Street, between Third and

 3    Lexington Avenue; on the south side of East 89th Street,

 4    just east of Lexington Avenue.

 5            THE COURT:  It's vacant?

 6            MR. HUEBSCHER:  Vacant -- completely vacant --

 7    uninhabitable; and it appears to have been left in a -- I

 8    have pictures before and after our cleaning.  It appears to

 9    have been left in a manner in which you couldn't resume --

10    you know, easily resume -- reconstruction, or the

11    construction work that had been done.

12            So I hired people to go in, clean the property, to

13    position it so that we could take photos to market it, which

14    we've done.  We've listed the property.  We also actually

15    have, I believe, two or three active bids on that property

16    currently, and we're working well with the secured lender in

17    that space, as well.

18            THE COURT:  Is this the property where there's a

19    third-party investor, the -- I forgot their last name.

20            MR. HUEBSCHER:  The Peldman family.

21            It's a syndicated loan between the Peldman family

22    and -- I think it's Hirshmark Investment.  I'm -- and I've

23    talked to both of them, and they've been cooperative and

24    engaging to try to resolve that property.  So that one is

25    moving forward, as is 550 Metropolitan Avenue.

Proceedings                                    15

1          With respect to 225 Head of Pond, I went to the

2     property, changed the locks, engaged a real estate firm

3     to list it.  Subsequent to that -- and I don't have the

4     specific dates in front of me; the police reports identify

5     those dates -- I understand Mr. Simpson went back to the

6     property -- or went to the property -- changed the locks

7     that I had changed.  And then, at some point subsequent to

8     that, the sign that the real estate broker puts out in front

9     of the property was removed; it is no longer there.

10         I then --

11         That same time I made my first visit, which I think

12    was March 24th, to Rêver Motors -- and the purpose of that

13    was to introduce myself to Mr. Simpson; I wanted to take

14    custody and control of the titles of the vehicles that were

15    there; understand, you know, sort of, the lay of the land.

16    I have a lot of familiarity with, you know, how those

17    businesses operate.  That encounter was met with significant

18    resistance by Mr. Simpson.  The police were called.  He

19    called the police; I believe he said he called the FBI.  I

20    called the police.  We obtained a police report and I agreed

21    to leave the premises.

22         I then went back to 225 Head of Pond at a

23    subsequent date, re-changed the locks a second time,

24    incurring additional expense.  I then put in an alarm system

25    with central monitoring.

1          Subsequent to that, Mr. Simpson went back, entered

2     the home, changed the locks again and, the police report

3     says, he destroyed the alarm system that I had installed,

4     which was approximately $1200.

5          Given the fact that we're here today, I decided not

6     to change the locks a third time.

7          The real estate broker is ready to take pictures

8     and list it, but they're paralyzed by these events that have

9     taken place.

10          Similarly, with 1640, or Rêver Motors, we want to

11     do the same thing:  We want to go in, take control of the

12     premises, take control of all of the legal documents, find

13     out what's going on.

14          Additionally, I was able to go and serve the

15     Citizens Bank and Chase Manhattan Bank with the order --

16     the receivership order.  We took custody and control of the

17     funds that were in the Citizens Bank account, which is

18     approximately 23,000 and change.

19          I've also changed the address of record, so I can

20     start to get the mail for the properties and understand

21     what's going on in the business.

22          But those two properties and business are, you

23     know, at a standstill at this point; they're unable to do

24     anything.

25          The predominant issue that we have is that the

1    receivership order, your Honor, the way that it's

2    constructed, gives me authority, I believe; it -- it imposes

3    requirements on Mr. Simpson and the property; but law

4    enforcement is unwilling to act upon it because they believe

5    it's a civil matter.  And that goes with the Southampton

6    police, who I now have become all too familiar with,

7    including the New York State troopers that I've spoken with,

8    as well as the Suffolk County Sheriff.  And that's -- that's

9    the challenge that we have right now.

10            And those two properties have equity in them --

11            THE COURT:  Well, I'm hopeful we won't have that

12   challenge after today, but go ahead.

13            MR. HUEBSCHER:  I apologize, your Honor.

14            But those two properties have equity in them, so

15   there's value there to -- to the -- to the receivership that

16   we should be bringing back in.

17            THE COURT:  One point about the Rêver Motors:  Out

18   of all the entities, that's the only one that's actually, at

19   least on its face, an ongoing business?

20            MR. HUEBSCHER:  Correct.

21            There is no other commercial activity at any of the

22   premises.  550 Metropolitan Avenue is vacant.  146 East 89th

23   is vacant.  225 Head of Pond is vacant; at least, it was

24   when I was there the two times or -- the two times I was

25   inside the property.

1          146 -- I mean, 1640 Montauk Highway, or Rêver

2     Motors, appears to be an active business.  What condition it

3     is, what records it has, what licensure it has to operate, I

4     don't know.

5          THE COURT:  You mean, again, the Rêver Motors.

6          MR. HUEBSCHER:  Correct.  Yes, your Honor.

7          THE COURT:  So are there active people, employees,

8     managers?

9          MR. HUEBSCHER:  There appears -- there appears to

10    be employees.

11         I briefly spoke to one young man, my first time

12    that I went there, inside.

13         I went back a second time because there was one

14    police officer who had agreed with me that there was an

15    in-force receivership order.  But when I went back the

16    second time -- and given Mr. Simpson's volatility, I

17    actually brought with me my own armed security the second

18    time I went back.  I went back.  At the suggestion of the

19    Southampton police, we brought three police officers --

20    three police cars.  That was at my suggestion.

21         But even after they conferred and they looked at

22    the receivership order, they were not -- they felt they were

23    not -- in a position -- they didn't have enough force and

24    effect -- to be able to tell Mr. Simpson to leave the

25    premises, for me to take custody and control of the

Proceedings                                    19

1      property.  And so we were at a stalemate at that point.

2              And that's why Mr. Bunin filed today's motion.

3      That, part and parcel, is why we're here today.

4              THE COURT:  Okay.  I appreciate the update.

5              MR. HUEBSCHER:  Okay.  Thank you.

6              (Mr. Bunin approached the podium.)

7              MR. BUNIN:  Marty Bunin, Farrell Fritz, on behalf

8      of Eric Huebscher as receiver.

9              Your Honor, this motion is the motion of the

10     receiver to enforce your Honor's receiver order which was

11     issued and entered on March 11th.

12             Essentially, Mr. Huebscher, in his report, has

13     really described the need -- the dire need -- for this

14     order, and the purpose of the motion to enforce the order is

15     to permit Mr. Huebscher to do his job as a court-appointed

16     receiver and fiduciary.

17             As he has described with respect to two of the

18     properties, 225 Head of Pond Road in Water Mill and the

19     Rêver Motors location at 1640 Montauk Highway, he has not

20     been able to get access to the property on a continuing

21     basis or, with respect to 1640 Montauk Highway, at all.

22             And with respect to 225 Head of Pond Road, as

23     described in his affirmation, Mr. Huebscher changed the

24     lock; engaged, on a proposed basis, subject to your Honor's

25     approval, a real estate broker.  The real estate broker put

Proceedings                                    20

 1    up a sign.  Mr. Simpson removed the sign, either damaged or
 2    replaced the lock at 225 Head of Pond Road.
 3           Mr. Huebscher then went out and changed the
 4    lock again and installed an alarm system that rang in
 5    the Southampton Town Police Department's office.  And, as
 6    Mr. Huebscher described and as stated in the police report
 7    that's attached to our motion, Mr. Simpson went to the
 8    property when he found that the lock had been changed again;
 9    he called the police; the police came out.  He changed the
10    lock a second time and "destroyed" -- that's the language in
11    the police report -- the alarm system.
12           With respect to 1640 Montauk Highway, as
13    Mr. Huebscher has described, he was there on March 24th,
14    which is when he encountered the employee; got -- the
15    employee opened the drawer that contained Certificates of
16    Title, but Mr. Huebscher was able -- unable -- to inspect
17    them or take them because Mr. Simpson then appeared, started
18    yelling at him, called the police, called 911.  And after
19    the police came, they basically said, in so many words,
20    "We're not going to interpret a ten-page order appointing
21    you as receiver; this is a civil enforcement matter."
22           Mr. Huebscher went back a second time, on
23    April 14th, to 1640 Montauk Highway and, as he described,
24    essentially the same thing happened.  This time, there were
25    three police officers, including an Officer Giambone --

Proceedings                                          21

1      that's G-i-a-m-b-o-n-e -- whose police report is attached

2      to our moving papers and to Mr. Rajotte's affirmation in

3      opposition.  He read the order; and in the police report,

4      in detail, he describes that Mr. Huebscher was the duly

5      appointed receiver by your Honor, who he mentions by name;

6      that the order gives him full possession and control.  But

7      because Mr. Simpson objected, he was unable to -- to do

8      anything as -- he said -- "as police," as opposed to a civil

9      enforcement agency.

10          The police -- the Southampton Town Police

11     Department and the New York State troopers -- when

12     Mr. Huebscher contacted them, basically said, "This is a

13     civil enforcement matter; we don't do this; contact the

14     Civil Enforcement Bureau of the Suffolk County Sheriff's

15     office."

16          So, in addition to the --

17          THE COURT:  Did you contact the Civil Enforcement

18     Bureau?

19          MR. BUNIN:  We did.  I did.

20          And in fact, your Honor, I tried to do it early,

21     before we filed our order to show cause that's on today.

22     Actually, the day before, I called; I called the Suffolk

23     County Sheriff's office Civil Enforcement Bureau, and I

24     spoke at some length to one of their experienced employees

25     who said she had been working there for 20 years.  She said

1      this was a somewhat unusual request and she needed to talk

2      to her supervisor and the Suffolk County Attorney's office.

3              She got back to me the next morning, after she

4      said she would do that, and said her sergeant -- her

5      supervisor -- said that they were not willing to do anything

6      until there was a specific order entered directing them to

7      do something; and she also added that she -- her office --

8      would not contact the Suffolk County Attorney's office again

9      until and unless an order was entered.

10             So I think where your Honor was going -- and we had

11     the same thought, which was that if we could preview this

12     with the Civil Enforcement Bureau -- who both, by the way,

13     the Southampton police referred Mr. Huebscher to and the

14     state troopers referred him to -- that we could understand

15     and see exactly what kind of language in an order would be

16     acceptable to them.  But, unfortunately, we were not able to

17     do that.

18             And so, the day before we filed our order to show

19     cause, I e-mailed the Suffolk County Civil Enforcement

20     Bureau of the Sheriff's office, and including our order to

21     show cause unsigned and the motion papers; and then the next

22     morning, or the next day, after your Honor signed the order

23     to show cause, I served overnight -- you know, by overnight

24     delivery -- the full set of motion papers on the Civil

25     Enforcement Bureau and was unable to persuade the Civil

1    Enforcement Bureau to take action unless and until this

2    Court entered an order.

3            So, beyond Mr. Huebscher's --

4            THE COURT:  I assume they don't have forms --

5            See, one of the things --

6            At least, my understanding is is that law

7    enforcement generally likes their own forms, whether it's an

8    order of protection some of my matrimonial colleagues use on

9    occasion -- but they like their forms the way they like

10   them, and reading a New York State Supreme Court order is

11   not typically their preferred format, and they have their

12   own formats that they're used to.

13           So, I take it, from your various sojourns back --

14   between these agencies, there is no form for this kind of

15   protective relief.

16           MR. BUNIN:  There does not appear to be.

17           And, your Honor, interesting, though: -- you

18   mentioned, exactly, the forms that they use and what they

19   are used to doing with the type of warrants and removal

20   orders and other things that they're used to seeing -- the

21   Suffolk County Sheriff's office has a website and one of

22   the drop-down menus on the home page is for the Civil

23   Enforcement Bureau and the -- there's a nice paragraph

24   (simulating) on -- when you get to that page that describes

25   what they do and it says they deal with judgment

Proceedings                              24

1        enforcement, income executions, warrants of removal, which

2        it turns out -- I learned there's something other than what

3        we're talking about here -- warrants of eviction; and then

4        there's a tail-end phrase at the end of that paragraph that

5        says something like, "and all other orders of civil courts."

6              And when I was on the phone for about half-an-hour

7        with this employee of the Civil Enforcement Bureau, I had

8        the page open and I read that to her and she said, "Well, in

9        my 20 years-plus here at the Civil Enforcement Bureau, I --

10        I" -- she says -- "I understand what you're saying, I

11        understand what you said, but I, personally," she said,

12        "didn't have experience with this situation."

13              So the short answer to your question, Judge, is:

14        There is no form; and when we drafted the proposed order for

15        your Honor to consider in the event that your Honor grants

16        the motion, we tried to take that into account.

17              THE COURT:  Yeah, it is -- it's odd.  I mean, we'll

18        get to the merits of whether the order should be granted.

19              But when I initially heard the story, the kind of

20        activity that you're describing sounds more in the nature of

21        a breach of the peace, which is typically what the police

22        deal with, not the sheriff.  And the sheriff is typically,

23        you know, evictions and property-related things.

24              So this -- I guess, this falls between the spaces

25        somehow.

Proceedings                                     25

1                MR. BUNIN:  It does.

2                But one of the things that we thought about, that

3        Farrell Fritz and I discussed with the receiver, was to try

4        to make the order very clear -- the proposed order -- very

5        clear and very direct, so that if the Civil Enforcement

6        Bureau or the Suffolk County Attorney or a police officer

7        read the order, they would get in a line -- a couple of

8        lines -- exactly what the Court was ordering.

9                So --

10               THE COURT:  And so, did you run this language by

11       them and they said this would work?

12               MR. BUNIN:  They had the proposed order, and the

13       employee I spoke to read our papers, which -- which I --

14       which was great, but I couldn't get any further than that.

15               I mean, I think --

16               THE COURT:  Because I think the part of it that,

17       you know, I suspect would be a little more complicated for

18       them would be the first part you say, that is requiring them

19       to "place the receiver in possession of the real property,"

20       which doesn't seem very specific.  The other ones, which is,

21       you know, "prevent entry from others onto it," is more

22       specific.

23               I -- I -- I'm a little unsure about all this.

24               Look, I'm hopeful that --

25               I don't think there should be any reason --

1           Now that we're all here together and, you know,

2     Mr. Simpson's here, his counsel is here, there -- I will

3     really be shocked if there's a need for more than something

4     like this, because the one thing that it is clear I can do

5     and don't want to is issue a bench warrant, which I know

6     you've all asked me to do and I have resisted.

7           And I can't, for the life of me, imagine that

8     that's what anyone wants, as opposed to just --

9           You know, you can disagree with the order, but, for

10    now, it's just about property; it's not about freedom.  Just

11    leave the property alone until this is worked out; appeal my

12    order; do whatever you want.  But breaching the peace in the

13    face of this order would be so insanely dumb, because it

14    will have to be dealt with either by the authorities out

15    there or going to Rikers, which just strikes me as just an

16    impossible thing for someone in this position to even

17    contemplate putting themself at risk of.

18          So, you know, I think there -- I, obviously, will

19    let Mr. Simpson's side give a full-throated defense to

20    everything that's gone on.

21          But, you know, based on -- if the facts are the

22    way you've described them and there's no rebuttal to them,

23    something, obviously, has to be done, because I can't have

24    people and property put at risk and have, you know, shouting

25    matches getting in the way of court orders.  That's just not

1        the way this works.

2              So, again, I -- I -- you know, the contempt hearing

3        is next week.  I don't have any interest, in a civil case

4        like this, using confinement as an option unless I'm left

5        with literally no other choice.  So we'll see how today

6        works out.

7              But I'd be really surprised if you need more than

8        what you have proposed.  Even if the sheriff is not fully

9        satisfied with it, I -- I -- it's hard for me to believe

10       that the plaintiff is going to -- if it comes out that

11       way -- is going to continue to get in the way.

12             I mean, again, I'm happy to have him appeal, throw

13       the receivership order out or do whatever they want to do

14       with another court.  But I think we should keep it civil, in

15       both senses of that word.

16             MR. BUNIN:  I agree with your Honor, but I'm not

17       as -- I'm not as optimistic as your Honor is.

18             I mean, the statements that Mr. Simpson has made to

19       Mr. Huebscher at the property and to the police, which are

20       in the police report, that Mr. Huebscher has no authority at

21       1640 Montauk Highway, that he was dismissed, that -- and he

22       uses the word "dismissed" -- that this is a matter solely

23       for the federal court and it's these -- you know, this --

24       these were statements at the property; there have been many

25       similar statements by e-mail and --

1          THE COURT:  Well, look.  At the time, Mr. Simpson

2     didn't have counsel or I don't think was consulting with

3     counsel, I believe, and may have thought that, when you

4     remove a case to federal court, the slate is wiped clean and

5     the state court orders don't matter anymore.

6          I'm fairly confident that with the counsel advising

7     him, he's aware that that's not the way it works; I hope so,

8     anyway, because that's a hundred percent clear.  You can get

9     the federal court order to change -- you can get the federal

10    court to throw out state court orders; you can get them to

11    modify them; you can do a lot of things, but they don't

12    evaporate.

13          MR. BUNIN:  Right.

14          All right.  So with respect --

15          Well, let me get back to the -- briefly -- to the

16    argument of the motion.

17          So Eric Huebscher talked about his inability to

18    get on 225 Head of Pond Road and the 1640 Montauk Highway

19    properties for any length of time so that he could do what

20    he needs to do with them.

21          I would also add that on March 26th, very soon

22    after his appointment, we sent a letter to Mr. Simpson and

23    his counsel demanding that all the information, documents

24    and other items, like keys and codes, that were set forth in

25    the -- your Honor's -- receiver order be turned over, and we

Proceedings                                              29

1    gave the date, I think, of April 6th for that to happen.

2    And that includes a list of employees at 1640 Montauk

3    Highway; it includes the Certificates of Title; it includes

4    other assets; and then documents and things that are at

5    1640; includes keys and codes.  It includes bank accounts

6    and other financial information.

7            I mean, Mr. Huebscher, in addition to being able to

8    obtain the funds from two Citizens Bank accounts that were

9    used with respect to 1640 Montauk Highway, did get some bank

10   records from Citizens Bank and those bank records show that

11   Mr. Simpson continued to do business after the receiver

12   order was entered on March 11th by your Honor, as if

13   Mr. Huebscher didn't exist.

14           THE COURT:  Well, again, I think that --

15           My assumption is, given what I've read, that

16   they -- his -- position was that the receiver order was

17   essentially negated by the removal.  So if that's your view,

18   you would act that way.  I understand that.

19           All right, let me --

20           Can I move on to the other parties?

21           MR. BUNIN:  Of course, your Honor.

22           I would just -- I'd just want to reserve a little

23   bit of time to respond to Mr. Rajotte.

24           THE COURT:  Sure.

25           Before we get to the plaintiff, I want to see if

Proceedings                                    30

1    anybody else has anything to add.  I think -- again, this is

2    just the receiver motion; I'm not getting into anything

3    else.  Is there anything that any of the other parties want

4    to add?  I think I've had a fairly full record with respect

5    to this motion.

6              MR. SCHWARTZ:  Your Honor, Allen Schwartz.

7              Your Honor, Mr. Chassen joined the receiver's

8    motion.  At this point, I think we don't have anything

9    specific to add.  Obviously, we would want to reply,

10   depending on what Mr. Simpson has to say in opposition.

11             THE COURT:  Okay.  The one thing I wanted to --

12             Is Ms. Thorne still on?

13             MS. THORNE:  Yes, your Honor.

14             THE COURT:  One thing that I --

15             You know, this may be a little off the topic, but,

16   you know, I've read in a number of Mr. Simpson's writings

17   and --

18             I do understand, a part of what -- an important

19   part -- of the dynamic that's going on here and may be

20   motivating Mr. Simpson is that, you know, the various

21   revenue streams that went his way, either directly from AREH

22   or through JJ Arch, have, by a combination of these orders,

23   been interrupted.

24             And one thing I wanted to check into, because I --

25   again, your client is the -- now -- the manager of AREH.

Proceedings                                      31

1            Mr. Simpson, I'm correct, am I not, that he is the

2       majority owner of AREH, by equity?

3            MS. THORNE:  No, your Honor.

4            While Mr. Simpson is purportedly the 80 percent

5       owner, he actually doesn't have an 80 percent cash flow

6       until the Oak contributions are repaid, which they are very

7       far from.  But I'm not sure if that --

8            THE COURT:  But we're talking about two different

9       things.

10           So I remember there was a preferred return at some

11      point, but -- so your point is that nothing is --

12           (Sound heard in courtroom.)

13           THE COURT:  We're getting a lot of feedback from

14      your line, Ms. Thorne.  I'm not sure exactly why, but the --

15           So he has an 80 percent equity stake, but you're

16      saying that nothing has happened that would trigger the

17      proceeds flowing to him, despite whatever the business has

18      been over these years; for proceeds to go to Mr. Simpson at

19      all?

20           MS. THORNE:  No.

21           And apologies about the sound.  After this

22      exchange, I'll try to call in, so that will be better.

23           But, no, that has not been triggered.  And

24      Mr. Koevary may be able to speak to this better than I can,

25      but as I understand, there's still no cash flow.

Proceedings                                          32

1          THE COURT:  Mr. Koevary, do you have anything to

2     add?

3          Because I do understand the human element here and

4     that, you know, this case has been dragging on for quite a

5     while.  Now, again, a lot of that is the bouncing back and

6     forth between courts and everything else.

7          But I do have a situation in front of me, which I

8     am concerned about, that one of the litigants has been cut

9     off from all cash flow from a business that, at least at the

10    beginning of the case, was his livelihood, and I just need

11    to understand whether there are any sources of revenue that

12    he should be sharing in.

13         MR. KOEVARY:  I understand, your Honor, but I don't

14    have anything to add to what Ms. Thorne had to say.

15         My understanding is that Oak, essentially, has an

16    enormous, you know, preferred position that's nowhere close

17    to being realized.  I haven't heard anything -- I haven't

18    looked into this recently, but it would shock me, based on

19    my knowledge of the case, to think that there's anywhere --

20    they're anywhere near achieving that or whether that is

21    indeed even possible.  So it seems that -- as far as the

22    80 percent number, that strikes me as illusory, to think

23    that they'll ever actually see anything on that.

24         That's to the best of my knowledge, your Honor.

25         THE COURT:  How much has to be returned to Oak

Proceedings                                                    33

1      before it starts returning to equity?

2              Ms. Thorne, do you know?

3              MS. THORNE:  Your Honor, and I should just clarify:

4              It's not as though in the agreement there are a

5      certain number of membership interests; it really only

6      speaks to, sort of, the waterfall; and I believe that is --

7      on the AREH itself -- is the three million.  But, as your

8      Honor knows, there are the other agreements -- the other

9      operating agreements -- that relate to the different

10     properties, and so they differ somewhat there.

11             But I think our expectation, at this point, is that

12     it's doubtful they will ever get to that point, although --

13             THE COURT:  And Mr. Simpson, under the agreements,

14     has the right to information to check on all of this; right?

15             In other words, he has --

16             I assume, as a member of AREH, even though not the

17     managing member at the moment, he is entitled to information

18     sufficient for him to, you know, check your work, for lack

19     of a better word, as to whether distributions should be

20     coming his way?

21             MS. THORNE:  Yes.

22             I would say, where information has been requested,

23     we have provided that information, as long as that is in

24     conformance with what's in the documents themselves.  But

25     we've certainly made very extensive records available and

1      provided answers to Mr. Simpson.

2              THE COURT:  All right, I just wanted to put a flag

3      in the ground that I am -- that's on my radar, as well.

4      This is not a one-way street here.

5              You know, a lot of back-and-forth has been about

6      Oak's rights and Chassen's rights and all of that; and, you

7      know, despite some of the distractions that have gone on, I

8      do have a case where Mr. Simpson is still a plaintiff; and

9      even if he's a defendant, he has rights, as well.  And it

10     did become more clear at the evidentiary hearing than it had

11     been before, at least, that, you know, the interplay between

12     these two entities -- that AREH was -- was really the

13     revenue source for both entities for Mr. Simpson ...

14             So, you know, I think he does have a right to

15     ensure that that's being handled appropriately.

16             All right.  So let me turn to -- back to -- the

17     motion on enforcing the receivership order, which -- I don't

18     think the receivership order is ambiguous.

19             So, Mr. Rajotte, what's the response to that?

20             (Mr. Rajotte approached the podium.)

21             MR. RAJOTTE:  There is --

22             I have an ambiguity, based on discussion with

23     counsel who's not present today, on the meaning of the term

24     "JJ Arch Corporate Entity" -- or "Controlled Entity" and

25     "Controlled Property."

Proceedings                                    35

1              THE COURT:  You mean in the receivership order, you

2        have a --

3              MR. RAJOTTE:  Yes.

4              THE COURT:  -- an ambiguity?

5              MR. RAJOTTE:  Yes, your Honor.

6              Just because it -- on the conversation I had, I

7        just talked -- I was trying to figure out what all these

8        terms of art mean coming into this and I know that "JJ Arch

9        Controlled Entity" is a term of art that -- I believe --

10        that's used in the contracts and the operating agreements

11        for JJ Arch and for AREH, so I wanted this clarity.

12              Just looking at the order, it seems to say so on

13        the face of it, your Honor, that this receivership order is

14        just over those sole listed properties and entities; the

15        four properties and their associated, affiliated entities.

16              And what -- I was left, from that call, believing

17        that there was a possibility that, or an openness to, the

18        receiver being able to reach -- use -- those properties to

19        reach and to grab others that maybe weren't fully accounted

20        for.  We don't even know what they might be, exactly.

21              So that's why I wanted clarification.

22              I could provide further context to that --

23              THE COURT:  Does that ambiguity, to the extent it

24        exists, extend to the four properties that Mr. Huebscher was

25        just talking about?

Proceedings                    36

1          MR. RAJOTTE:  No, your Honor.  The -- the flip

2     side of the ambiguity.  We're not questioning that the

3     receivership applies to those four properties and their

4     associated entities.

5          THE COURT:  Okay.  That's what the motion is

6     largely about at this point.

7          MR. RAJOTTE:  Yes.  Yes, I understand.

8          And with -- with respect to that, if I may, my

9     mission here is really -- is multifold and -- but it starts

10    from coming, as an officer of the court, to the Court

11    saying, it's not my job here to praise Mr. Simpson but to

12    rehabilitate his cause.

13         THE COURT:  I thought you were going to go to

14    Shakespeare for a moment here, and that was not where you

15    ended up.  Okay.

16         MR. RAJOTTE:  And that's because I feel that this

17    motion is coming on the heels of what appear to be, from the

18    records that I've seen, material misstatements of fact made

19    by Mr. Chassen, co-moving on this, to this Court and to the

20    bankruptcy court, on separate occasions; specifically, on

21    March 20, '24.  And this is something for fuller briefing

22    but I'm just -- I -- I can't withhold observing that on

23    March 20 -- in March of 2024, Mr. Chassen affirmed to the

24    bankruptcy court that he needed its permission to be removed

25    from the work restrictions so that he could start making --

1    earning -- an income; that he wasn't allowed to work while

2    those restrictions were in place and then a year later,

3    February 25th, 2025, through testimony, stating that he had,

4    in fact, worked for Oak, starting -- for some period in

5    August 2023, when this all was happening.

6          I believe that there has been, procedurally,

7    just -- you know, just bullets are flying and there's a

8    number -- this situation is so complicated that I've had a

9    hard time just articulating it.  But I think it --

10         THE COURT:  Well, what's -- what's the complication

11   that would permit changing the locks at the properties that

12   are unambiguously covered by the receivership order?

13         MR. RAJOTTE:  I -- I could speak to that, too, of

14   course, your Honor; and, you know, reserving all ability

15   to -- to further flesh this out at your Honor's contempt

16   hearing on the 20th, if we look at the April 14th, 2025

17   police report that I supplied as, I think, one of the

18   final -- the second-to-final -- document in Exhibit A that

19   we received from the Southampton police, it -- it documents

20   the incident that --

21         By the way, which was called by -- Mr. Simpson

22   called; he just didn't start destroying the lock.

23         During that time, what you see in the full report,

24   that's -- that's what happened afterwards.  This -- after

25   Mr. Simpson was left to decide whether he, himself, would

Proceedings                                  38

1      want to drill a lock or not, with the police officer taking

2      no position because of him saying he didn't have authority,

3      it was a civil matter, going back to the station, receiving

4      an e-mail from Mr. Huebscher and realizing -- and -- and

5      then siding against Mr. Simpson.

6              It's not -- if you look at it as contemporaneously

7      happening, it's -- it doesn't look pretty for Mr. Simpson.

8      But, in fact, that statement by the officer is -- is -- was

9      put into the report after the incident and Mr. Simpson had

10     no knowledge of that; and he's prepared to, if necessary,

11     testify to that.

12             What he was left with was the understanding --

13             THE COURT:  So the -- the -- you're saying that his

14     position is that the locks changed themselves?

15             MR. RAJOTTE:  No, he's not -- he's not saying that

16     he didn't drill it.  He did drill the lock, and he would say

17     that.  But he did it under the belief that he had colorable

18     authority of law because the -- the police officer left,

19     and --

20             THE COURT:  So that's the part I don't understand,

21     really; is that if the --

22             You know, I understand if the argument is, he

23     thought the -- my -- order was no longer in effect.  It's

24     wrong, but at least I understand that.  But if he understood

25     it was in effect and just because the officer leaves, that

1          doesn't mean that you ask just violate a court's order.

2                    MR. RAJOTTE:  Well, when the officer left, the

3          officer left leaving the decision to Mr. Simpson ...

4                    (Discussion between Messrs. Rajotte and Simpson

5          outside the hearing of the reporter.)

6                    MR. RAJOTTE:  Okay.  Sorry.

7                    To clarify:  I was -- I had a thought that was

8          unconnected.  The officer informed Mr. Simpson on being told

9          that he was to call the Sheriff's office and according to

10         the Sheriff's office, a representative of which will be

11         included in our witness list, he was told that without writ

12         of execution, which was a critical missing step here, this

13         was purely, and as the officer said in the report, "a civil

14         matter," and he was not in violation of any laws and that

15         the -- the law enforcement had no authority to actually

16         enforce it without that writ.

17                   THE COURT:  Well, a writ of execution is for a

18         different circumstance.  You know, I think we're switching

19         the cart and the horse around a little.

20                   This isn't a situation where we were evicting

21         Mr. Simpson and he had certain due-process rights or

22         whatever that -- you know, this was a court order that I

23         think was clear that, although certainly not his preferred

24         result, was that from there forward, there was a receiver in

25         charge of the business and these properties.

Proceedings                                    40

1              So --

2              MR. RAJOTTE:  Yes.

3              THE COURT:  -- all I'm being --

4              This is not the contempt hearing; I'm not getting

5      into that.  All this is is to make it clear, if it hasn't

6      been before -- because we're not at the punitive stage

7      today.  But I'm actually looking for some confidence that

8      whatever it is that happened doesn't happen again and

9      that --

10             You know, I find it hard to believe that there

11     really was lack of clarity, at least as to these properties.

12     And, you know, candidly, the police shouldn't have been

13     called to begin with, because the receiver was there to,

14     basically, do his job.

15             And it was not a job that Mr. Simpson wanted done.

16     I get that.  The pathway to that would be appealing my order

17     and saying, "You know, the trial judge got it wrong and you

18     need to" -- you know, and -- you know, we get reversed when

19     we're wrong.  That's what happens.  But you can't use

20     self-help and you can't block a court officer, which is what

21     Mr. Huebscher is, from complying with what I ordered him to

22     do.

23             And to the extent that what I'm picking up from you

24     is, sort of, a -- you know -- a continuing view that this

25     would be okay to do again, I'm very concerned about that.

Proceedings                                    41

1           MR. RAJOTTE:  If -- if I may, your Honor, I don't

2      mean to imply that at all.

3           I come here -- it's my job to come here -- on

4      bended knee on behalf of my client.  It's not been an easy

5      job, but what you see here today, your Honor, is myself and

6      Mr. Simpson (indicating), personally, even though he didn't

7      necessarily need to be here, coming here to show respect to

8      the process and to the bench, which is what I seek to try to

9      convey: that I'm an honest broker.

10           And insofar as --

11           THE COURT:  Well, that's what we need, because, you

12      know, the Court's orders have to be followed unless they're

13      reversed or overturned on appeal; and they weren't here, it

14      seems to me, whether by a misguided view, maybe with bad

15      legal advice somewhere along the line.  I don't -- I doubt

16      it was you or Mr. Lorenc.  And, you know, this isn't that

17      complicated.

18           I've had -- I don't do a lot of receiverships, but

19      I've never had anything remotely like this before.  And, you

20      know, I don't really want the criminal authorities involved

21      in this; it's silly.  You know, and I -- I -- I don't want

22      to leave here with any misunderstanding.

23           I mean, I -- I take it -- I understand what is the

24      dynamic here and you're -- you're -- you're trying to lower

25      the temperature, which I agree with.  But if there is a

Proceedings                                    42

1    substantive argument about why it would be appropriate to

2    get in the way of the receivership, I haven't heard it yet.

3    But I'm -- you know, I'd -- I'm willing to listen.  But --

4              MR. RAJOTTE:  I would --

5              THE COURT:  -- what you're talking about so far

6    hasn't really gotten me there.

7              MR. RAJOTTE:  I understand.

8              And just to be clear, we're not taking the position

9    that there is no ambiguity -- that there's an ambiguity in

10   your order as to those four properties.  There is none.

11             THE COURT:  Okay.

12             MR. RAJOTTE:  There is none.

13             And if -- the admonitions of your Honor have been

14   discussed between an attorney and client and as far as, you

15   know, I'm standing here, it will be followed and enforced.

16             We come here seeking just that clarification as

17   to the technical meaning of "Controlled Properties" and

18   "Controlled Entities" -- "JJ Arch Controlled Properties" and

19   "Controlled Entities."

20             THE COURT:  And what properties are the ones that

21   you're thinking about at the moment?

22             MR. RAJOTTE:  The thing is, your Honor, I don't

23   know.  I just -- there's a very complicated corporate

24   structure and it's really hard to get a --

25             THE COURT:  Well, I think that the AREH business is

Proceedings                                              43

1    multi-tentacled.

2              MR. RAJOTTE:  Right.

3              THE COURT:  I hadn't -- it hadn't been clear to me

4    that the JJ Arch business was similarly complicated, but --

5              MR. RAJOTTE:  It's --

6              THE COURT:  If there is --

7              First of all, if there's some need for

8    clarification, the parties can talk about that and propose

9    a -- you can make a motion to clarify, to do whatever it is

10   you'd want to do, and I'm happy to deal with that in the

11   ordinary course, and that's just normal litigation.  I don't

12   think it has anything to do with the specifics that led to

13   us being here on this motion.

14             But if there's some clarification that you feel you

15   want, I'm not really in a position to understand it yet

16   because it's not been put in front of me.  But have at it.

17             I mean --

18             MR. RAJOTTE:  The only clarification I want is

19   procedural, and that is:  May this record reflect, if your

20   Honor so agrees, that should the receiver's reach extend

21   beyond those listed entities and properties as provided in

22   your Honor's order, that due notice be given to the Court

23   and Mr. Simpson (indicating).

24             (Pause.)

25             THE COURT:  And just so I'm --

Proceedings                                    44

1              Which paragraph of the order is it that you're

2       referring to; the definition of "JJ Arch Controlled Entity"?

3              MR. RAJOTTE:  Um-hmm.  Yes, your Honor.

4              THE COURT:  Well, they're listed.

5              MR. RAJOTTE:  They are listed.

6              But if you refer to, I believe, the very end of

7       the order, it says, "JJ Arch Controlled Entities in their

8       entirety," whereas after each time the property is listed,

9       you have the expression -- you have that term of art.

10      There's nothing that says, "collectively, the JJ Arch

11      Controlled Entities."

12             And just based on the discussion, unfortunately,

13      I -- you know, normally, I wouldn't bring something like

14      this up.  But just with seeking, in a meet-and-confer

15      capacity, clarification from movants' counsel, they couldn't

16      rule out that that term of art, or those terms of art, could

17      be used to -- I believe the expression was, "while the

18      receiver is going through books and records, if he finds

19      other businesses, to reach to those, as well."

20             So we just want notice before there's a reach.  We

21      think it's just fair and required.

22             THE COURT:  Okay.

23             MR. RAJOTTE:  And, by the way, with respect to the

24      incident at Motors, there was no notice that was provided

25      before Mr. Huebscher came.

Proceedings                                          45

1          And with respect to Head of Pond, completely agree,

2     your Honor:  I would have advised him otherwise, but I

3     didn't have any opportunity.

4          THE COURT:  What kind of notice do you think was

5     required, given the receivership order?

6          MR. RAJOTTE:  With re --

7          I think it's just some form of advance notice that

8     there's going to be a -- maybe even just a phone call.  I

9     have to check with what the CPLR says, specifically.

10          THE COURT:  Well, I mean, the --

11          MR. RAJOTTE:  I just want to save the auto

12     business.

13          THE COURT:  I -- I understand that --

14          I don't know whether you're referring to just

15     general social politeness, "Hey, I'm going to be there; just

16     make sure everything is ready for me," or whatever.  But the

17     order hereby appoints him as receiver over these --

18          MR. RAJOTTE:  Yes.

19          THE COURT:  -- these entities.

20          MR. RAJOTTE:  He -- he --

21          THE COURT:  Did something happen that -- that --

22          You know, the response, at least that I've heard,

23     was a fairly negative one to him even being there at all.  I

24     mean, Mr. Huebscher is somebody who has had experience with

25     these properties as part of the bankruptcy, so he knew who

1        he was; right?

2                MR. RAJOTTE:  Believe it or not, Mr. Simpson is a

3        first-time litigant.  He's never been sued before; before

4        this.  First time.  He doesn't know how to handle himself.

5        He didn't handle himself appropriately.

6                I'm saying, it wasn't a violation of law; it didn't

7        comply with the spirit and maybe even the letter of your

8        Honor's order.

9                And what we're here now [sic] is raising no

10       specific argument against enforcement except subject to

11       that one clarification: just that we would -- not even a

12       clarification but additional statement -- that we want

13       notice if the receiver's reach is to extend beyond those

14       entities and properties that are so listed.

15               And your Honor referred to "freedom" and

16       Mr. Simpson's liberty.  The most important thing to that,

17       and -- and for my ability to -- to represent him

18       effectively, honestly, is if he is able to maintain control

19       of Rêver Motors, which is a passion project of his.  There

20       is no -- a full accounting is available; no question on

21       that.  There are commitments that he has not been able to

22       provide for, over $400,000 in bills, receivables, in part --

23       or payable in part -- because there's a bank account that

24       was taken.  He has customers that have relied on his unique

25       artistry.

Proceedings                                         47

1            He is something of a savant; I mean, the way he's

2      so mechanically inclined, trained as an engineer, been

3      working on cars since he was 13.  And so he restores -- he

4      builds, from scratch, these automobiles.  For him to be

5      diminished in any way from that, that's --

6            THE COURT:  Well, the hope I had, and I think there

7      was a provision in here (indicating) to this effect, is of

8      him staying involved in it.  But I must say that the conduct

9      that I've seen makes me concerned about that -- you know --

10           MR. RAJOTTE:  Maybe -- maybe it could be structured

11     a different way -- he just felt that it was -- he felt

12     indignified in some way to not have full sovereignty over

13     it -- subject to the receivership and --

14           THE COURT:  Yeah, but that was --

15           Look, like I said, the order is what it is.  You

16     can disagree with it; you can try to get it overturned on

17     appeal.  You can't just change it on your own.

18           MR. RAJOTTE:  The -- I -- I agree.  Speaking of

19     events to the path up till now, I totally agree.

20           And let me assure you:  Whatever -- as far as I'm

21     concerned -- whatever order your Honor makes today, we will

22     not -- the only resistance would come in the form of an

23     appeal.  And --

24           THE COURT:  Of which there has been none.

25           MR. RAJOTTE:  Understood.

Proceedings                                    48

1              THE COURT:  I guess, there's a Notice of Appeal

2      that was filed --

3              MR. RAJOTTE:  That was -- yeah.

4              THE COURT:  -- by -- *pro se* on Friday.

5              MR. RAJOTTE:  Against advice.

6              But what -- what we would ask, then, your Honor, is

7      if you're -- if you were inclined to not alter the

8      receivership and its effect on --

9              THE COURT:  Well, I don't have a --

10             Just so it's clear, I'm willing to consider

11     clarifying anything that's unclear, but you have to -- you

12     have to make some sort of a very concise motion to say, "We

13     need this, and this how we want it clarified."

14             I don't really understand --

15             Look, as I look at it, there -- it defines two

16     different things:  "JJ Arch Controlled Entities," on the one

17     hand --

18             MR. RAJOTTE:  Um-hmm.

19             THE COURT:  -- and then it separately defines

20     certain things as "JJ Arch Controlled Properties."  I -- you

21     know, I don't really want to parse words at the -- at the

22     moment, but if -- if there is something that you are

23     genuinely concerned about; there's some --

24             MR. RAJOTTE:  Okay.

25             THE COURT:  -- whether it's another business that

1    I'm not aware of, or some other thing that whoever wrote

2    this -- I did not write this order; and, presumably, when

3    it was proposed, there was an ability to object and make

4    comments on it, and this reflected all of that process.

5              I don't -- I don't mind clarifying something if --

6    if -- if it's legitimately unclear.

7              I mean, frankly, though, if it turns out that there

8    are other businesses other than JJ Arch that we didn't

9    capture --

10             MR. RAJOTTE:  Absolutely.

11             THE COURT:  -- my -- I think it's more likely that

12   I would clarify it to make it clear that they are covered.

13             MR. RAJOTTE:  Understood.

14             THE COURT:  Because it wasn't -- it wasn't my

15   intention to leave a slice of it --

16             MR. RAJOTTE:  Right.

17             THE COURT:  -- outside the scope.

18             MR. RAJOTTE:  We weren't creating --

19             In fact, what we're trying to do here is avoid the

20   shell game that we believe is happening through 608941 New

21   Jersey [sic], Inc., that is 35 Oak, and the last thing that

22   we would do is come to this Court having subentities below

23   those that he was somehow in control or knew about.

24             THE COURT:  Oh, I see what you mean.

25             So you wanted to make sure that there's nothing

Proceedings                                          50

1       he's supposed to be managing that he's not?

2              MR. RAJOTTE:  Essentially, that's --

3              Yeah, that's the basis for our standing, yeah.

4              THE COURT:  Oh.  Well, that's fair.  I'm not aware

5       of that being the intention of anyone.

6              MR. RAJOTTE:  And I imply no negative intention.

7       It just struck me odd.

8              THE COURT:  So --

9              But just to round it up, as between both you and

10      your client, I should not expect there to be any further

11      breaches of the peace or damaging of property or changing

12      of locks or whatever might have happened in the past.  I --

13      based on whatever readings of the agreement or what

14      "removal" means, I should not expect to hear about any of

15      that again.

16             MR. RAJOTTE:  Your Honor, you should never have

17      asked -- needed to ask -- that question, and so my answer is

18      yes.

19             And to further affirm that fact, may Mr. Simpson

20      say a few words?

21             THE COURT:  Yes.

22             (Mr. Simpson approached the podium.)

23             MR. SIMPSON:  Thank you, your Honor.

24             So, first and foremost, not to confuse anyone with

25      *pro se* versus not, but Mr. Lorenc decided to --

1            THE COURT:  I thought you were just going to con --

2      assure me that that's not going to happen again.

3            MR. SIMPSON:  I -- as I said to you in a letter,

4      this gentleman's (indicating) been involved for three weeks.

5      He was hired to help me in the federal court; he was not

6      hired to be here.

7            This is a disaster, this case: 1500 items, 24

8      motions in two years.  He doesn't know this case.  I cannot

9      find a lawyer that would touch this case with a ten-foot

10     pole.

11           I'm sorry, Benjamin.

12           So Benjamin's here to help.  We've had arguments --

13     him and I -- that he's even here today, just to be --

14     crystal-clear clarity, because this case has gone so far --

15           And I appreciate what you said, your Honor.  It has

16     ruined my life.  Gone forever.  Every bill of mine is in

17     default.  My home is in default.  Everything.

18           So, to answer your question, the real thing that

19     Mr. Rajotte is telling you is, the JJ investment entities,

20     which are subject to a bankruptcy, which is an appeal that's

21     pending in front of the Bankruptcy Appellate Division; who,

22     by the way, is the Southern District; who, by the way, your

23     Honor, confirmed -- Mr. Koevary tried to attack it for the

24     third time, just on the 5th of May, saying that appeal is

25     live.

Proceedings                                    52

1          So that appeal in the Southern District, which is

2     0649, does not allow anything in this court to happen since

3     October.  Why is that?  And I went to the clerk's office

4     myself.  You know what the clerk's office told me?  "Nothing

5     happens until the appeal is resolved."  So that's number

6     one.

7          Number two:  Assuming that we're right on

8     jurisdiction, because what was presented to you here by

9     Mr. Southard were two documents that dismissed adversary

10    proceedings.  It didn't give you authority on this case.

11    Ask the Southern District yourself.

12         I'm sorry.  I'm sorry, Ben.

13         I have written letters to the Southern District

14    about these very issues since December.  I've been ignored.

15    Why is it no one has a good argument to tell me I'm wrong?

16    But they haven't.

17         The appeal is about control of JJ Arch, your Honor.

18         The bankruptcy was kiboshed by these (indicating)

19    folks.  Guess why?  Because the JJ investment entities

20    require consent, and that's what I asked you for months:

21    that Mr. Heyman (phonetic) come here and tell you.

22         So they cannot transact.  Your order does not give

23    him the right to transact.  Contrary to that it was your

24    intention, it was not at all functional, and I've said this

25    for six months now.

Proceedings                                        53

```
 1              And their goal and the order to show cause --
 2              To just illustrate to you, in the other action that
 3     was done by Mr. Borrok -- I'm sorry -- your Honor Borrok --
 4     Judge Borrok, what Judge Borrok granted, without any words
 5     or anything, was stripping me of rights.
 6              And we had a dialogue -- you and I -- in October,
 7     of those JJ investment entities.  There's a whole separate
 8     action on that.  That's been removed to federal court and
 9     it's not been remanded.
10              And when these folks, in the order to show cause,
11     expanded the relief to JJ Arch, which is what they did --
12              And if you recall, you and I and Mr. Lorenc had
13     this very conversation in mid-May, ex parte conversation
14     that I didn't ask for; Mr. Lorenc asked for.  My -- my fear
15     was that they were trying to do exactly what they're doing
16     right now.
17              They don't care about these four properties.  They
18     care -- "they," being Oak, which Chassen works for, which --
19     it did promise to this Court that Chassen would -- Chassen
20     would be -- the joint defense agreement would be issued
21     before an order was granted.  That's on the order.  But the
22     joint defense agreement got pushed a month afterwards.  So
23     the collusion was not dealt with.
24              But let's be crystal-clear:  JJ Arch investment
25     entities, every property has one.  Every property needs a
```

Proceedings                                54

1        consent to transact.  We have hundreds of millions of

2        dollars of fraudulent conveyances, hundreds of millions.

3        That's what happened here, your Honor, in front of your

4        eyes, and I don't think it's your intention.

5               But there is no removal as to those JJ investment

6        entities.  You know why?  Because, yes, JJ Arch does own

7        Arch.  Ms. Thorne is wrong.  And when you gave them control,

8        you know what it says about guaranteed payments and my

9        salary?  You -- you crossed out that motion entirely.  When

10       I asked for records, you crossed out my motion, too.

11              So these issues, unfortunately, have become a

12       federal matter.  So I removed all the cases to federal

13       court.  I removed all of them.

14              And, in fact, the reason the fee wasn't paid on

15       that issue is because you can't remand or remove something

16       that hasn't been remanded in the first place.  So there was

17       no remand.  It doesn't work like that.  Bankruptcy cases

18       don't get remanded; they get dismissed and disposed.

19              If you go onto ECF -- and I went to the clerk's

20       office myself -- and you look at the federal court and you

21       look at the JJ Arch bankruptcy, you will not see it say

22       "dismissed."  It's not.  There's an opinion of record that

23       suggests a dismissal.

24              And, as the clerk for this JJ Arch case told me

25       herself, Mary -- I have her last name in my notes -- she

Proceedings                                          55

1    said to me:  "Until the appeal is dealt with, there's

2    nothing to do in the case."  So I said to her, "What does

3    'nothing to do' mean?" and she said, "Exactly what I said:

4    Nothing to do.  It's just stopped."

5              So, when we made the appeal to that -- the S.D.N.Y.

6    on 6/24/2024, it didn't matter if the bankruptcy was

7    dismissed or not.

8              When Mr. Southard brought to you two documents,

9    if you read those orders from Judge Mastando, they're very

10   clear.  He refers to the main case and only orders the

11   dismissal of adversary proceedings.  He does not order that

12   the bankruptcy is in your hands or anyone's hands.  And I

13   checked this myself.  Okay?

14             So with that said --

15             THE COURT:  The case in front of me now is the

16   adversary proceeding.

17             MR. SIMPSON:  Excuse me?

18             THE COURT:  The case in front of me now is the

19   adversary proceeding.

20             MR. SIMPSON:  No.  It is explicit as to which

21   adversary proceedings he dismissed.  It's not just one.  The

22   ones are -- I can be explicit with you, give you numbers if

23   you'd like.  And this case in front of you now is the

24   control issue of JJ Arch, which was remanded on 6/10/24 and

25   we appealed it on 6/24/24.  And that appeal of the stay has

1    an interlocutory order; it had a stay on its filing.

2              So there's a reason that Mr. Koevary has attacked,

3    attacked, attacked, half a dozen times, into the bankruptcy

4    court and into the -- the appeals court in this case in

5    Southern District to try to get it wiped out.

6              THE COURT:  Well, we're going --

7              (Simultaneous speaking.)

8              THE COURT:  We're going beyond the scope of this.

9              MR. SIMPSON:  We're not.  We're not.  You have no

10   authority here.

11             THE COURT:  The only thing I would suggest is that

12   if you think that either one of the orders of the federal

13   court is wrong or anything that I've done is wrong, appeal

14   it.

15             MR. SIMPSON:  I did.

16             THE COURT:  Good.

17             MR. SIMPSON:  I did.  But just to be clear, it's

18   just the four properties.

19             (Simultaneous speaking.)

20             MR. SIMPSON:  That's --

21             I want to answer your Honor's question.

22             THE COURT:  Hang on.

23             Once you are represented by counsel --

24             MR. SIMPSON:  Well, I think --

25             THE COURT:  You've made your point.  I got it.

Proceedings                    57

1            MR. SIMPSON:  Well, my letters say it, but they're

2       not read or acknowledged.

3            The federal court actually wrote me earlier today,

4       just so you know, when I made the emergency complaint, and

5       they said that they were going to respond in due course.

6            So I asked your Honor --

7            And I can tell you, I love this gentleman

8       (indicating); he's wonderful, but he is not admitted in the

9       Southern District yet, so anything Southern District-wise,

10      I have to do on my own, *pro se*.  He's not admitted at the

11      moment; he will be soon, I hope.

12           As it relates to this hearing today -- right? --

13      him and I have had many arguments about this, because my

14      view is simple:  If you do look at the law, and maybe I'm

15      wrong, when there is a federal jurisdiction, even a receiver

16      order, it explicitly says that anything that would be

17      contained in such a matter would be dealt with by the

18      federal court.

19           Mr. Huebscher went to the federal court, asking

20      them to clarify, asking for them -- you know what they did,

21      your Honor?  They didn't respond to Mr. Huebscher at all.

22      They let him be because they weren't sure, okay?

23           There is a consolidation that deals with the

24      insurance case, which should be helping me.  There is a

25      consolidation of the six-five-four case which Judge Borrok

1    ordered, which deals with the JJ investment entities, which

2    is being consolidated as we speak unless they object to it.

3                I haven't heard any objection in the federal court

4    up until now.  They haven't heard us at all.

5                In fact, there was a --

6                MR. RAJOTTE:  If I could, your Honor, we would end

7    it here, if you will allow.

8                And my advice to Mr. Simpson was, "Neither have

9    they said no."  And I've cited him a number of reasons,

10   including the very famous case involving Martin Luther King,

11   for why, even if you disagree with a judge's orders, you

12   have every duty to follow it, and that is essential for the

13   rule of law.

14               THE COURT:  Yeah.

15               MR. SIMPSON:  For Mr. Huebscher to show up with

16   police officers --

17               MR. RAJOTTE:  With your Honor's permission, I'd

18   like to conclude -- have this conclude -- our statements.

19               THE COURT:  Yeah, look, I do -- I do understand,

20   and, you know, both the federal court and this Court have

21   other procedures and you can make appeals if we -- if you

22   think that the trial court got 'em wrong, and we're doing

23   our best.

24               And the one thing I did not hear in what you just

25   said was to confirm what your counsel said: is that

 1    regardless of what you think has gone wrong procedurally

 2    or substantively, that you are committed to following the

 3    orders as they are at the moment, until and unless they are

 4    reversed, because the -- the next time that we are together,

 5    where there is an unambiguous violation of any of these

 6    orders, the results could be potentially very severe, and

 7    there -- we should at least have common ground on -- you

 8    know, this is a civil commercial matter and let's try to

 9    keep it that way.

10          Mr. Huebscher has been appointed by me to do a job.

11    It's not one you agree with, substantively or procedurally;

12    I don't expect you to change your view on that.  But --

13          So, anyway, with that, let me turn back -- if

14    Mr. Bunin or anyone else wants to add anything ...

15          (Mr. Bunin returned to the podium.)

16          MR. BUNIN:  Thank you, your Honor.

17          Marty Bunin, Farrell Fritz, for Mr. Huebscher.

18          So I don't believe Mr. Simpson answered your

19    Honor's question.

20          So, at this point, the most recent change of locks

21    and destruction of the central alarm system at 225 Head of

22    Pond Road was by Mr. Simpson.  So, if Mr. Huebscher is to go

23    to 225 Head of Pond Road, let's say, this week, he will need

24    to change the locks and install a new alarm system.

25          Now, when Mr. Huebscher goes to 1640 Montauk

Proceedings                                     60

1    Highway, he's going to need to change the locks; he's going

2    to need to review the documentation and Certificates of

3    Title there; he's going to need to speak to the employees;

4    and he's going to be able to need -- to do what your Honor's

5    order specifies, which is take full managerial control and

6    authority over 1640 Montauk Highway and the Rêver Motors

7    business.

8            And I think it would be helpful if Mr. Simpson

9    would say, on the record now, that he will permit

10   Mr. Huebscher to do those things: change the locks, install

11   a new alarm system at 225 Head of Pond Road; take control

12   and authority over the Rêver Motors business and 1640

13   Montauk Highway and change the locks there.

14           THE COURT:  That's what I assumed that I had given

15   him leave to do when he stood up, and if he -- if he wishes

16   to retake the podium simply to answer that question, I'm

17   happy to have him do it.  If he does not want to limit

18   himself to that, then I'll -- I don't know what to assume he

19   will do.

20           MR. SIMPSON:  I'm happy to, more than happy to.

21           So the answer is --

22           THE COURT:  Just limited to that.

23           MR. SIMPSON:  It's a simple answer:

24           Yes, I absolutely disagree with the receiver.

25   Mr. Chassen is a thief and Mr. Chassen should be reviewed

Proceedings                                             61

1        for why a receiver's here, number one.

2               Number two:  If there's a receiver here, which --

3        by the way, they've alerted you to serious conflicts with

4        this receiver.  He's actually involved in 550 Metropolitan

5        on the other side of 550 Metropolitan.  How that can't be a

6        considered a conflict beats the heck out of me.  But, okay.

7        But to suggest that he needs to be there, there's two

8        conflicts.  He also hired Klestdat Winters.

9               THE COURT:  You're --

10              MR. SIMPSON:  But, okay.  The answer to your

11       question is yes.  So, as it relates to 225 Head of Pond --

12              THE COURT:  Much slower, and I'm just asking -- I'm

13       asking for your --

14              MR. SIMPSON:  I'm giving you the answer you want.

15       The answer is -- the answer is that for the 89th Street

16       property, he already did what he did.  I have tools that I'd

17       like to take out, that are mine, that belong to me.  Okay?

18              And this relates to the 550 Metropolitan:  I have

19       never even been, in my life.  I never said I was going to be

20       in the condo.  I don't have keys to it; Chassen did.

21              THE COURT:  I understand.

22              MR. SIMPSON:  So the answer's yes.

23              THE COURT:  I just want to, across the board, not

24       property by property --

25              MR. SIMPSON:  I can't.  I can't do it, your Honor.

Proceedings                               62

1        You know why?  Because 1640 Motors is not as simple as

2        you're making it out.  There's licenses in my name -- my

3        name -- with the -- the -- New York State.  There are IRS

4        issues to deal with that are tied to me, personally.

5        There's a line of credit for the car business that is tied

6        to me personally.  The tools there are mine.

7               Not one of those staff members will be at work

8        tomorrow if this man goes there to change the locks.  Most

9        of those speak English; they're all legitimate people.

10              I couldn't make payroll because he stole the money

11       from the bank.

12              So the answer is:  Sure, if you want to close that

13       business down, your Honor, yes, no problem.  But you will

14       close the business down.  If you give that order, you're

15       closing down 1640 Motors, because everyone's clients are

16       going to be here knocking your door down --

17              THE COURT:  Well, all I asked was that you not

18       change -- you cooperate in changing the locks, if that needs

19       to be done; you do not breach the peace in any way --

20              MR. SIMPSON:  Why does he have to change locks?

21       For what purposes?

22              If I want you to give him books and records, why

23       does he -- where does it say in the receiver order he should

24       change the locks to the property that's mine?

25              THE COURT:  Stop.  Stop for a moment.

Proceedings                                63

1          So you're saying, if he doesn't change the locks,

2    you will not re-enter on your own?

3          MR. SIMPSON:  So, as far as -- as far as the three

4    properties, as I've told you, I have -- I have not touched

5    550; I haven't touched 89th Street.  As you clarified, for

6    Head of Pond, although I don't agree with it, I will not

7    re-enter.  I will not re-enter.

8          THE COURT:  So you're bargaining with me, saying --

9          MR. SIMPSON:  I'm not bargaining with you.  It's

10   not -- I want my stuff.

11         THE COURT:  Hang on.

12         You're not going to comply with Rêver Motors?

13         MR. SIMPSON:  What's there to comply?  It doesn't

14   work.

15         THE COURT:  What normal litigants would do in a

16   situation that you're describing is, if you have certain

17   personal items --

18         MR. SIMPSON:  Yeah.

19         THE COURT:  -- that you think are outside the scope

20   of the receivership, your lawyer would call Mr. Bunin and

21   say, "As part of the changeover, there are certain things

22   that we would like to come in and remove and take control

23   of," and that can all be handled in a civilized way.

24         And, you know, if you want to challenge the

25   receivership order as to Rêver Motors, you can appeal it;

Proceedings                                          64

1      but it is what it is.  It may not be the order you want, but

2      all of these logistics things, where they, for whatever

3      reason, come to a flashpoint that involves talking about

4      things like the police cannot happen again.  They simply

5      cannot; and if they do, you're going to regret it.  It's not

6      a good idea.

7            All of the things you, kind of, talk about when you

8      describe things that make some sense are ones that people

9      work out between their lawyers, saying, you know, "I have X,

10     Y and Z that I need as an accommodation; can we work that

11     out?" and people work it out.  You just seem to have an

12     inability to work that way --

13           MR. SIMPSON:  My name's on every loan here.  I'm

14     fully at risk for everything.  This is all mine.  The whole

15     company is built upon me.

16           You have this misconstrued sense of lies that have

17     been brought to you by Chassen over and over again.

18           So keep doing it, your Honor.  Sure, we'll shut

19     it down tomorrow.  If I'm not there, those guys today are

20     not going to get work done.  Okay?  I run that place,

21     physically, with my hands.  You think I want to give up my

22     career of $3 million of real estate, managing tons of stuff?

23     So you can take it away from me, too?  So take it away.

24     It's fine.  I will do what you asked, your Honor, and it

25     will be shut down and I'll have more losses on my name.

Proceedings                                    65

1          Thank you to this Court, because the Court does not

2     listen to the practical nature of anything it does.  The

3     Court continues to take away without looking at the

4     practical side.  And what's really happening behind the

5     surface, you have a contingent of people that are colluding

6     to hurt me and destroy my life, but you don't care.

7          The police don't care, either.  And I've called the

8     State Police and I've called the sheriff, too, and the FBI.

9          I don't know what else to say.  I will comply.  I'm

10    not going to go to Rikers because the judge doesn't get it.

11         MR. RAJOTTE:  If I could, your Honor, we would --

12    and I know this may be premature, but -- would request your

13    Honor's guidance on requesting a stay of enforcement, if you

14    would consider that under CPLR 2201, just with respect to

15    the transitionary -- just with respect to the transition

16    of the receivership as it applies to the auto-restoration

17    business, with your Honor's order remaining in effect if

18    and until the parties can come to some meet-and-confer

19    resolution on Mr. Simpson's continuing role.

20         And this, by the way, was something I had tried

21    to do when I reached out to both Mr. Schwartz and

22    Mr. Pascarella, and they were not open to discussing it

23    until the Court were to hear the issue.

24         So I would just request a stay that's not absolute,

25    but just for an opportunity to meet and confer to see if I

Proceedings                                        66

1    can play some role in helping to defuse the situation.

2              THE COURT:  Yeah, I'm not staying anything, but

3    the -- I'm not.  This has already been stayed by self-help.

4              If you are going to propose things to the other

5    side that are reasonable and proportionate to protect

6    specific property interests and particular commercial

7    interests, you're certainly free to do that.  That's the way

8    this works.  But am I unwinding it because of the tantrum?

9    No.

10             MR. SIMPSON:  It's a fact, not a tantrum.  It's

11   just the facts.

12             (Mr. Bunin re-approached the podium.)

13             MR. BUNIN:  Your Honor, Marty Bunin again, for the

14   receiver.

15             So I understood Mr. Simpson's answer with respect

16   to 225 Head of Pond Road was that he would not re-enter that

17   property; I think he made that clear.

18             With respect to 1640 --

19             THE COURT:  So, in that sense --

20             I mean, look, I -- I don't want -- it's -- it's

21   kind of up to you whether changing the locks is something

22   that you want to do.  That's something that you do when you

23   believe the prior owner is going to re-enter.  I could

24   understand why you think he might, based on everything I've

25   heard today, but that's more likely the case at one of the

1        places.  I'm not going to get in the way of your discretion

2        on that.  If you think you need to do it, then do it.

3              MR. BUNIN:  Well, I think, though, the 225 Head of

4        Pond Road will be being -- will be marketed and shown by a

5        real estate broker who will need access.  Eric doesn't have

6        a key to that house now because Mr. Simpson changed the

7        lock.

8              So --

9              THE COURT:  Well, that has to be fixed.

10             MR. SIMPSON:  I'll give them now.

11             THE COURT:  So either you get the keys or you

12       change the locks.  But I'm tired of the, kind of, nonsense.

13       So ...

14             All right, don't --

15             MR. BUNIN:  Okay.  With respect to 1640, I -- I

16       think -- I'm not sure -- in fact, I am sure -- that

17       Mr. Simpson did not answer your Honor's question in the

18       affirmative: that he would permit Mr. Huebscher on the

19       property to take control of the business.  It's a --

20             THE COURT:  Well, look, the concern --

21             You know, to the extent that I'm reading through to

22       the bottom line, obviously, my intention is not to create a

23       receivership that will result in the business shutting down,

24       which is why I at least left open, at the time anyway, the

25       possibility of Mr. --

Proceedings                                                        68

1            MR. BUNIN:  Of course.

2            THE COURT:  -- Simpson remaining involved.

3            I don't know that your client has had enough of an

4       opportunity to even observe the business to know what to do

5       next.  But, you know, by entrusting this set of properties

6       in him, I'm assuming that he can get the lay of the land and

7       decide the best way to proceed.

8            There used to be a manager; I don't know if that

9       person still exists anymore.

10           But, you know, I'm -- you know, the -- I'm not

11      entrusting him with the U.S. nuclear arsenal --

12           MR. BUNIN:  Yes.

13           THE COURT:  -- where, you know, one false move is

14      going to lead to Armageddon.  And I doubt Mr. Huebscher is

15      going to go in and start certifying vehicles for road

16      worthiness.  So I'm assuming he will take reasonable steps

17      to ensure that the business is run in a commercially

18      reasonable way.

19           MR. BUNIN:  He will, for certain, do that, your

20      Honor.

21           And I think, as Mr. Schwartz pointed out in one

22      of the pleadings he filed, or perhaps it was a letter

23      supporting your Honor's choice of Mr. Huebscher as receiver,

24      Mr. Huebscher does have experience with car dealerships.  So

25      he's careful; he is --

Proceedings                                        69

1            THE COURT:  Now, these are, you know, as I
2      understand it, not standard vehicles.  So --
3            But, you know, get the lay of the land.  If he
4      needs expertise, whether it's from Mr. Simpson or someone
5      else, I'm sure he'll figure out that that's what he needs to
6      get.
7            MR. BUNIN:  If Mr. Simpson and his counsel are
8      going to cooperate, fine.  It's just that based on
9      experience to date, that's not something that, at least
10     before this hearing, Mr. Huebscher could reasonably expect.
11           I just want to make a couple responsive comments to
12     things that either -- that Mr. Simpson said and then I'd
13     like to discuss, briefly, the proposed order with your
14     Honor, if I might?
15           THE COURT:  Um-hmm.
16           MR. BUNIN:  So Mr. Simpson, when he spoke, made a
17     number of points about the bankruptcy case.
18           I just want to point out that that bankruptcy case
19     was dismissed and there's nothing pending in it.  I have the
20     decision (indicating) of Judge Mastando; it's 50 pages; and
21     at the end, he says, very succinctly:
22           "Conclusion.  Based upon the above analysis, the
23     court concludes that (1) cause to dismiss this case exists,"
24     and he gives the Bankruptcy Code section; "(2) this case
25     should be dismissed for bad faith; (3) the exception to

Proceedings                                          70

1        dismissal provided by" a different Bankruptcy Code section

2        "is not applicable; and" -- "and (4) each adversary

3        proceeding associated with this bankruptcy should be

4        dismissed.

5               "For these reasons, the dismissal motion is

6        granted.  It is so ordered."

7               So the bankruptcy case and all the adversary

8        proceedings associated with it were dismissed.  There was no

9        stay on appeal, so that bankruptcy case is over unless and

10       until there is a district court or higher court order

11       reinstating it.

12              Your Honor, with respect to the proposed order,

13       the first "Ordered" paragraph states that, or orders that:

14       "Mr. Simpson shall not directly or indirectly enter into any

15       of the properties, including Montauk Highway and 225 Head of

16       Pond Road; transact any business of Rêver Motors or any of

17       the other JJ Arch Controlled Entities" -- and, as your Honor

18       pointed out, "JJ Arch Controlled Entities" is a defined term

19       on page 2 of the receiver order -- and then "(3) do any act

20       or refrain from any act to interfere with the receiver's

21       taking custody, control, possession or managing of the

22       assets or documents or to harass or to interfere with the

23       receiver in any way or to refuse to cooperate with" --

24              THE COURT:  I don't have any problem with that part

25       of the order.

Proceedings                                              71

1               MR. BUNIN:  Okay.

2               THE COURT:  The part that I -- I don't really

3     under -- you know, the --

4               I think, if you reasonably believe that the

5     Sheriff's office can be helpful in the highly unlikely event

6     of any future breaches of the peace, my only issue with this

7     is whether they would understand it and it would be the kind

8     of simple order that they're used to.  I fear you may get

9     the same --

10              If, in the unlikely event that this happens again,

11    they'll be out in their car, reading this as well, saying,

12    "I'm not sure what this means."  You know, the "remove the

13    other party from the premises" seems clear enough.

14              Look, we're in a really bad spot if this happens

15    again.  And, you know, I genuinely hope that it does not.  I

16    don't know exactly what to think is likely to happen next.

17              But, you know, my objections to it were really more

18    a question of whether the Sheriff's office --

19              I now understand why you applied it to the

20    Sheriff's office, because my initial question was going to

21    be, "This seems like a police matter."  But you're reacting

22    to the fact that the police said it's not a police matter --

23              MR. BUNIN:  Very specifically.

24              THE COURT:  -- and that the Civil Enforcement

25    Bureau, whatever that is, are the folks who actually show up

Proceedings                                    72

1    at the scene and keep the peace.

2              MR. BUNIN:  That is my understanding, and --

3              THE COURT:  All right.  Then, fine.  You don't

4    really have to talk me into a lot of this.

5              MR. BUNIN:  I did want to make one specific

6    comment:  Your Honor said you had a bit of difficulty with

7    the "place the receiver in possession."

8              THE COURT:  I don't know what that's telling them

9    to do.

10             MR. BUNIN:  Well, I believe I can give your Honor

11   an example:

12             If Mr. Huebscher goes to 1640 Montauk Highway and

13   Mr. -- let's say -- Mr. Simpson (indicating) is not there

14   but a couple of employees are in the office and they're not

15   sure what to do; you know, they're not going to necessarily

16   read the receiver order or the -- an enforcement order.  If

17   the sheriff was there, they would read this (indicating) to

18   say, "place the receiver in possession," meaning, "tell the

19   employees that Mr. Huebscher is the appropriate party to

20   come here, to enter, to review and -- and take" --

21             THE COURT:  Well, what I'm inclined to do is order

22   Mr. Simpson to advise all personnel, at any of these

23   locations, to cooperate with the receiver in good faith and

24   put that on him, personally, to advise people that that's

25   what they're to do.

Proceedings                                               73

1                  MR. BUNIN:  Understood, your Honor.

2                  All right.  If -- one thing, your Honor, if I may

3          turn to my client for a moment:

4                  We were talking, before the hearing, about whether

5          Mr. Huebscher wanted a paragraph added to the order that

6          would essentially prohibit Mr. Simpson from coming within a

7          certain distance of him, as in 50 yards.

8                  THE COURT:  And order of protection?

9                  MR. BUNIN:  An order of --

10                 Yeah, essentially, an order of protection.

11                 MR. SIMPSON:  What's going on here?

12                 MR. RAJOTTE:  Your Honor, an order of protection

13         seems a bit -- seems a bit uncalled for at this point.  You

14         haven't given him a chance to show that he can --

15                 MR. SIMPSON:  It's my property.  What are we doing

16         here?

17                 MR. RAJOTTE:  This is all just part of a plan to

18         just --

19                 MR. SIMPSON:  Just to ruin my life, by that

20         Schwartz guy over there (indicating).

21                 MR. RAJOTTE:  Because they have someone who they

22         know is vulnerable to these kinds of attacks.

23                 (Discussion between Messrs. Simpson and Rajotte

24         outside the hearing of the reporter.)

25                 MR. BUNIN:  So I think, your Honor, we would ask

1    for not a full-blown protection order but some ordered

2    paragraph that requires Mr. Simpson to keep a distance.

3            You know, as you read and as Mr. Huebscher

4    mentioned, he felt it necessary to hire a private armed

5    guard for his second visit to the property at Montauk

6    Highway and Head of Pond Road.  After -- on his first visit,

7    when Mr. Simpson was yelling at -- at Mr. Huebscher, the --

8            MR. RAJOTTE:  If I could:  I believe Mr. Huebscher

9    would need to testify as a fact witness for something that

10   even approaches a protective order; and what I would implore

11   the Court is that there is a hearing coming up in the nature

12   of contempt in which this could all be addressed at the same

13   time:  Were there any violations --

14           MR. SIMPSON:  With a real judge.

15           MR. RAJOTTE:  Excuse me.

16           (Discussion between Messrs. Simpson and Rajotte

17   outside the hearing of the reporter.)

18           MR. RAJOTTE:  And this is all premature.

19           You see what it's done --

20           MR. SIMPSON:  Ruined my life.

21           MR. RAJOTTE:  -- what it's triggering.

22           No, what it's triggering is a person --

23           MR. SIMPSON:  He ruined my life.

24           MR. RAJOTTE:  -- who acts without the social grace

25   and decorum himself at this time, and they're taking

Proceedings                                    75

1    advantage of that.

2              THE COURT:  The record will reflect that

3    Mr. Simpson left the room.

4              MR. BUNIN:  Yes, your Honor.

5              So Mr. Huebscher asks that your Honor consider such

6    a paragraph.

7              The only other thing I would point out, unless

8    Mr. Huebscher wants to add something, is that when he went

9    to the property and Mr. Simpson was there and was yelling

10   at him and both parties called 911, the 911 operator could

11   hear Mr. Simpson yelling in the background and asked

12   Mr. Huebscher if Mr. Simpson was armed and Mr. Huebscher's

13   response was, he did not know --

14             THE COURT:  Yeah, this isn't the time for an

15   evidentiary hearing on this.  I -- you know, I'll think

16   about what to do in the order.

17             MR. BUNIN:  Thank you, your Honor.

18             THE COURT:  And I mean ...

19             MR. BUNIN:  May Mr. Huebscher address the Court,

20   briefly?

21             THE COURT:  Okay.

22             (Mr. Huebscher re-approached the podium.)

23             MR. KOEVARY:  Your Honor, very briefly --

24             THE COURT:  Hang on a second.  We have --

25             MR. KOEVARY:  Sorry.  I didn't realize.

Proceedings                                              76

1          THE COURT:  There seems to be a growing line at the

2    podium at the moment.

3          But go ahead.

4          MR. HUEBSCHER:  I apologize, your Honor.  I will be

5    very brief.

6          It would be my intention to be going back, this

7    week, to both locations.  I just have to coordinate it with

8    the locksmith company and the alarm company, because the

9    schedule has been a problem for me in the past.  But I would

10   be going back there.

11         The other thing I just wanted the Court to realize:

12   that in all four instances, these four properties, they're

13   all in default, accruing default interest rates that are at

14   24 percent.  So this business, if it is a business and I'm

15   not convinced that it is, if it exists at 1640 Montauk

16   Highway, it's a -- it's -- it hasn't satisfied its

17   obligations for a long period of time.  It's unclear to me

18   whether it does have the proper licensure that is required.

19   It has a paint shop that requires Department of Health; it

20   needs a repair number.  There -- there are licensure issues

21   that are potential.

22         I don't know if the employees are protected by

23   things like statutory workers' compensation and New York

24   State short-term disability.  I don't know if the taxes have

25   been paid.

Proceedings                                              77

1          I'll give you another example:  In one of the

2     e-mails that Mr. Simpson sent, I believe, over the weekend,

3     he referenced some issue with the IRS and that he's been in

4     conversation with the IRS.  I know nothing about that.

5          And the reason why I bring that up is that one of

6     the other things I failed to mention when I talked about the

7     efforts thus far is that I've -- I've also made contact with

8     the accountant that manages the tax issues relative to these

9     businesses, the LLCs, and we're working with them to try to

10    figure out how to resolve that.  Tax filings have not been

11    made, in some cases, since, I believe 2022.  There is monies

12    that are owed.  The accountants -- in order for them to

13    complete it, I'm working with them to be able to figure out

14    what the issues are with the IRS.

15         There's many entities that are involved as

16    investment arms of these entities.  It's a -- as your Honor

17    pointed out, it's -- it's a complex structure that I became

18    familiar with when I was the Subchapter 5 trustee in the

19    dismissed bankruptcy that Mr. Bunin talked about.

20         So it's going to be my intention to go back there

21    as quickly as possible, change all the locks, put in an

22    alarm system in both locations, meet with the employees and

23    figure out, you know, what's going on there, what business

24    there is, what outstanding restorations are in process,

25    etcetera.  But I have no idea, at this point, since my only

Proceedings                                              78

1    time that I've actually physically been in the premises was

2    on March 24th when Mr. Simpson, you know, became so agitated

3    that it required me to call the police.

4            And more than likely, I -- this next time, despite

5    Mr. Simpson's assurance today, at least about one

6    property -- I probably would go back with my armed security

7    force.

8            THE COURT:  I was going to suggest that, anyway.

9            MR. HUEBSCHER:  Yeah.

10           I have a group of folks I deal with that are NYPD

11   police officers or retired.  So the individual that was with

12   me is a former lieutenant here in the New York City Police

13   Department and he was armed and he came with me and he would

14   be coming back with me the next time, as well, your Honor.

15           Thank you.

16           THE COURT:  Mr. Koevary ...?

17           MR. KOEVARY:  Very briefly, your Honor.  Thank you.

18           I just wanted to make a few points because --

19   Mr. Bunin summed it up, but Mr. Simpson said a lot of things

20   that are inaccurate.  I don't think the Court wants to hear

21   from me now; this is more for the record than anything, but

22   if the Court ever wanted a full presentation of what

23   actually happened, I'm here.

24           THE COURT:  Yeah, I don't think I need it now.  I

25   recall the Court's orders pretty well.

1              MR. KOEVARY:  Okay.

2              THE COURT:  And the bankruptcy court and

3     the federal court are quite capable of taking care of

4     themselves, and if they think that this Court is encroaching

5     upon their territory, I have no doubt that they would let me

6     know, and I have no doubt that the Appellate Division would

7     do the same.  So, you know, we all operate within our

8     spheres and --

9              So I appreciate the offer, but at least I'm

10    comfortable that, based on the bankruptcy court's order, he

11    was kicking it back to me -- expressly kicking it back to

12    me -- to avoid delay, and that's how I took it and we'll

13    see.

14             Mr. Schwartz.

15             (Mr. Schwartz approached the podium.)

16             MR. SCHWARTZ:  Thank you, your Honor.

17             I'll be brief.  I don't want to go over things that

18    have already been said.

19             Your Honor, nothing that we witnessed today;

20    nothing from Mr. Simpson's behavior -- recent behavior, past

21    behavior -- gives me any confidence or should give the Court

22    any confidence that there's going to be any compliance with

23    this -- with this receiver order.

24             Your Honor may recall that the Notice of Removal --

25    the *pro se* Notice of Removal -- when Mr. Simpson was

Proceedings                                        80

1       represented by counsel, in its last iteration, was filed

2       right after the receiver order was entered and right before

3       a contempt hearing that was scheduled on March 27th, with

4       opposition due, you know, soon after that removal.

5              So this second removal, likewise, comes -- or this

6       third removal, I should say, in addition to the bankruptcy

7       removal; this third purported *pro se* removal -- comes again

8       right on the eve of motion -- of hearings seeking compliance

9       and enforcement of the various court orders.  Mr. Simpson

10      again tried to file this removal to avoid that hearing and

11      avoid complying, and nothing about his behavior, including

12      his comments and departure from the courtroom, should

13      suggest to the Court that there's going to be any likelihood

14      of compliance.

15             And I'd just like to also point out, your Honor:

16      The need for a receiver at the Rêver Motors business and

17      1640 Montauk, as -- as was shown at the evidentiary

18      hearing --

19             THE COURT:  Have I given any indication that I'm

20      reconsidering any of those?

21             MR. SCHWARTZ:  No.  No, your Honor.

22             THE COURT:  Unless you want to reargue and have

23      me --

24             MR. SCHWARTZ:  I don't want to reargue anything,

25      your Honor.

1          THE COURT:  -- have me come out the other way

2     somehow.

3          MR. SCHWARTZ:  I just want to point out, your

4     Honor, that Mr. Chassen is --

5          As the receiver said, there's 24 percent default

6     interest on that asset; there's a foreclosure pending in

7     which Mr. Chassen is a named defendant as a guarantor.

8          And all of these delays not only incur more --

9     all -- all of Mr. Simpson's conduct not only costs -- are

10    causing the receiver to engage in motion practice that is

11    going to ultimately cost the business money, from out of JJ

12    Arch, but Mr. Chassen is also suffering from, again, this

13    24 percent where the receiver is unable to take charge.

14         And I just want to also just remind the Court that

15    there was -- that the lender in that case also sought a

16    receiver and -- and --

17         THE COURT:  Yeah, I've -- I've got all of it.

18         The only thing I would ask is that if Mr. Simpson's

19    counsel reaches out in good faith to, you know, inquire

20    about any parts of the definitions of the order that they're

21    unsure about, that you have the normal kind of civil

22    conversation that one would expect, because, you know, it's

23    certainly possible that there is, you know, some defined

24    term that is of concern to them.

25         And, you know, I understand, you know, Mr. Simpson

Proceedings                                              82

1    runs hot sometimes; his counsel does not.  So you can work

2    through his counsel to, you know, try to discuss things

3    calmly.

4            You know, we'll see what the next days bring.  I

5    can only hope that there will be normal course of operations

6    going forward.  I'm sure that Mr. Huebscher and his counsel

7    will let me know if anything even slightly goes off-kilter.

8            I may mark up the order just a little bit.  It's

9    not unclear; I think Mr. Simpson knows what I expect of him;

10   and if he doesn't comply with it after all that happened

11   today, then my options, when we are talking about contempt

12   next week, become more clear and I would think that now

13   would be the time for extraordinarily good behavior.

14           And, you know, he's got counsel now to advise him.

15   It may not be easy, but I think, in the end of the day, once

16   everybody cools down, hopefully, you know, that will take

17   hold.

18           But I appreciate everybody's time.

19           The bottom line is, I'm going to grant this motion.

20   I may, as I said, play with the language in the order a bit,

21   but there's clearly been a failure to comply with the

22   receivership order.

23           And, when given a chance to assure the Court that

24   he would comply with it going forward, I think it's fair to

25   say, I did not get a straight answer, or simple answer, that

Proceedings                                    83

1    he would.  If I read between the lines, maybe once or twice

2    he came close to saying that.  I have to believe that

3    that's -- ultimately, he understands that and he has outlets

4    to, hopefully, make whatever legal arguments he wants to

5    make and see how they come out; but they should, obviously,

6    not be in any way a breach of the peace, and so I'll be

7    evaluating all the conduct hereafter.

8              And I do thank, again, Mr. Huebscher for hanging in

9    there on this under difficult circumstances.  I appreciate

10    your efforts and, frankly, it shouldn't have to be this

11    difficult.  So I apologize for that.  It's not what you

12    signed up for.

13              I could say the same for me.

14              (Laughter.)

15              THE COURT:  And thank you very much.

16              Please get a copy of the transcript.

17              Thank you, Mr. Lorenc, as well.  Good to see you

18    again.

19              And, Mr. Rajotte, I hope you hang in there with us

20    and you can do some good for your client here, I think, and

21    for the Court.

22              So, thank you.

23              MR. KOEVARY:  Thank you, your Honor.

24              MR. LORENC:  Thank you, your Honor.

25              MS. THORNE:  Thank you, your Honor.

Proceedings                                    84

1          MR. BUNIN:  Thank you, your Honor.

2          MR. SCHWARTZ:  Thank you, your Honor.

3          MR. RAJOTTE:  Thank you, your Honor.

4                    *      *      *

5          CERTIFIED to be a true and accurate transcript
   of the proceedings.

6

7

8          ALAN F. BOWIN, CSR, RMR, CRR
           Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$1200** [1] - 16:4
**$400,000** [1] - 46:22

## '

**'24** [1] - 36:21
**'em** [1] - 58:22
**'nothing** [1] - 55:3

## 0

**0649** [1] - 52:2

## 1

**1** [1] - 69:23
**11th** [2] - 19:11, 29:12
**12** [1] - 2:2
**13** [1] - 47:3
**1450** [1] - 10:1
**146** [3] - 13:18, 17:22, 18:1
**14th** [2] - 20:23, 37:16
**1500** [1] - 51:7
**158055/23** [1] - 2:1
**1640** [22] - 13:2, 16:10, 18:1, 19:19, 19:21, 20:12, 20:23, 27:21, 28:18, 29:2, 29:5, 29:9, 59:25, 60:6, 60:12, 62:1, 62:15, 66:18, 67:15, 72:12, 76:15, 80:17
**1st** [1] - 8:4

## 2

**2** [2] - 69:24, 70:19
**20** [4] - 21:25, 24:9, 36:21, 36:23
**2009** [1] - 8:4
**2022** [1] - 77:11
**2023** [1] - 37:5
**2024** [1] - 36:23
**2025** [3] - 2:2, 37:3, 37:16
**20th** [1] - 37:16
**2201** [1] - 65:14
**225** [15] - 12:25, 15:1, 15:22, 17:23, 19:18, 19:22, 20:2, 28:18, 59:21, 59:23, 60:11, 61:11, 66:16, 67:3, 70:15
**23,000** [1] - 16:18
**24** [4] - 51:7, 76:14, 81:5, 81:13
**24th** [3] - 15:12, 20:13, 78:2
**25th** [1] - 37:3
**26th** [1] - 28:21
**27th** [1] - 80:3
**28** [1] - 10:1

## 3

**3** [4] - 1:1, 64:22, 69:25, 70:19
**30** [1] - 8:17
**321a** [2] - 6:22, 6:25
**35** [1] - 49:21

## 4

**4** [1] - 70:2
**454** [1] - 8:4

## 5

**5** [1] - 77:18
**50** [2] - 69:20, 73:7
**550** [8] - 12:23, 13:8, 14:25, 17:22, 61:4, 61:5, 61:18, 63:5
**5th** [1] - 51:24

## 6

**6/10/24** [1] - 55:24
**6/24/2024** [1] - 55:6
**6/24/24** [1] - 55:25
**60** [1] - 2:1
**608941** [4] - 1:18, 2:23, 4:22, 49:20
**64** [1] - 8:4
**6th** [1] - 29:1

## 8

**80** [4] - 31:4, 31:5, 31:15, 32:22
**89th** [7] - 12:24, 13:18, 14:2, 14:3, 17:22, 61:15, 63:5

## 9

**911** [3] - 20:18, 75:10

## A

**A.D.3d** [1] - 8:4
**abandoned** [1] - 13:21
**ability** [3] - 37:14, 46:17, 49:3
**able** [15] - 13:8, 13:12, 13:13, 16:14, 18:24, 19:20, 20:16, 22:16, 29:7, 31:24, 35:18, 46:18, 46:21, 60:4, 77:13
**absent** [1] - 5:23
**absolute** [1] - 65:24
**absolutely** [2] - 49:10, 60:24
**abusive** [1] - 8:8
**acceptable** [1] - 22:16
**access** [2] - 19:20, 67:5
**accommodation** [1] - 64:10
**according** [1] - 39:9
**account** [3] - 16:17, 24:16, 46:23
**accountant** [1] - 77:8
**accountants** [1] - 77:12
**accounted** [1] - 35:19
**accounting** [1] - 46:20
**accounts** [2] - 29:5, 29:8
**accruing** [1] - 76:13
**accurate** [1] - 84:5
**achieving** [1] - 32:20
**acknowledged** [1] - 57:2
**act** [5] - 7:1, 17:4, 29:18, 70:19, 70:20
**action** [6] - 7:1, 7:6, 8:1, 23:1, 53:2, 53:8
**active** [5] - 13:15, 13:16, 14:15, 18:2, 18:7
**activity** [2] - 17:21, 24:20
**acts** [1] - 74:24
**add** [10] - 9:22, 11:1, 28:21, 30:1, 30:4, 30:9, 32:2, 32:14, 59:14, 75:8
**added** [2] - 22:7, 73:5
**addition** [3] - 21:16, 29:7, 80:6
**additional** [2] - 15:24, 46:12
**additionally** [1] - 16:14
**address** [2] - 16:19, 75:19
**addressed** [1] - 74:12
**admitted** [2] - 57:8, 57:10
**admonitions** [1] - 42:13
**advance** [2] - 5:11, 45:7
**advantage** [1] - 75:1
**adversary** [7] - 52:9, 55:11, 55:16, 55:19, 55:21, 70:2, 70:7
**advice** [3] - 41:15, 48:5, 58:8
**advise** [3] - 72:22, 72:24, 82:14
**advised** [1] - 45:2
**advising** [1] - 28:6
**affiliated** [1] - 35:15
**affirm** [1] - 50:19
**affirmation** [1] - 19:23, 21:2
**affirmed** [1] - 36:23
**afternoon** [8] - 4:1, 4:4, 4:10, 4:14, 4:16, 4:19, 5:2, 12:16
**afterwards** [2] - 37:24, 53:22
**agencies** [1] - 23:14
**agency** [1] - 21:9
**agitated** [1] - 78:2
**agree** [7] - 27:16, 41:25, 45:1, 47:18, 47:19, 59:11, 63:6
**agreed** [2] - 15:20, 18:14
**agreement** [4] - 33:4, 50:13, 53:20, 53:22
**agreements** [4] - 33:8, 33:9, 33:13, 35:10
**agrees** [2] - 7:19, 43:20
**ahead** [2] - 17:12, 76:3
**ALAN** [2] - 3:8, 84:8
**alarm** [9] - 15:24, 16:3, 20:4, 20:11, 59:21, 59:24, 60:11, 76:8, 77:22
**alerted** [1] - 61:3
**Allen** [2] - 4:15, 30:6
**ALLEN** [1] - 2:17
**allow** [2] - 52:2, 58:7
**allowed** [1] - 37:1
**alone** [1] - 26:11
**alter** [1] - 48:7
**ambiguity** [6] - 34:22, 35:4, 35:23, 36:2, 42:9
**ambiguous** [1] - 34:18
**ample** [1] - 7:20
**analysis** [1] - 69:22
**anew** [1] - 11:12
**answer** [16] - 24:13, 50:17, 51:18, 56:21, 60:16, 60:21, 60:23, 61:10, 61:14, 61:15, 62:12, 66:15, 67:17, 82:25
**answer's** [1] - 61:22
**answered** [1] - 59:18
**answers** [1] - 34:1
**anyway** [4] - 28:8, 59:13, 67:24, 78:8
**apart** [1] - 13:4
**apologies** [1] - 31:21
**apologize** [3] - 17:13, 76:4, 83:11
**appeal** [18] - 10:15, 26:11, 27:12, 41:13, 47:17, 47:23, 51:20, 51:24, 52:1, 52:5, 52:17, 55:1, 55:5, 55:25, 56:13, 63:25, 70:9
**Appeal** [1] - 48:1
**appealed** [1] - 55:25
**appealing** [1] - 40:16
**appeals** [2] - 56:4, 58:21
**appear** [2] - 23:16, 36:17
**appearance** [2] - 4:8, 6:21
**Appearances** [1] - 3:1
**appeared** [1] - 20:17
**Appellate** [2] - 51:21, 79:6
**applicable** [1] - 70:2
**applied** [1] - 71:19
**applies** [2] - 36:3, 65:16
**Appointed** [1] - 3:4
**appointed** [5] - 12:7, 12:17, 19:15, 21:5, 59:10
**appointing** [1] - 20:20
**appointment** [2] - 12:21, 28:22
**appoints** [1] - 45:17
**appreciate** [8] - 5:25, 6:3, 6:9, 19:4, 51:15, 79:9, 82:18, 83:9
**approached** [9] - 11:6, 12:3, 12:15, 19:6, 34:20, 50:22, 66:12, 75:22, 79:15
**approaches** [1] - 74:10
**appropriate** [3] - 11:13, 42:1, 72:19
**appropriately** [3] - 10:7, 34:15, 46:5
**approval** [1] - 19:25
**April** [3] - 20:23, 29:1, 37:16
**ARCH** [1] - 1:3, 1:3, 1:4, 1:9, 1:9, 1:10, 1:16, 1:21, 1:24
**Arch** [25] - 2:20, 4:21, 30:22, 34:24, 35:8, 35:11, 42:18, 43:4,

44:2, 44:7, 44:10, 48:16, 48:20, 49:8, 52:17, 53:11, 53:24, 54:6, 54:7, 54:21, 54:24, 55:24, 70:17, 70:18, 81:12
**AREH** [9] - 4:20, 30:21, 30:25, 31:2, 33:7, 33:16, 34:12, 35:11, 42:25
**ARGUMENT** [1] - 2:1
**argument** [6] - 10:11, 28:16, 38:22, 42:1, 46:10, 52:15
**arguments** [3] - 51:12, 57:13, 83:4
**Armageddon** [1] - 68:14
**armed** [5] - 18:17, 74:4, 75:12, 78:6, 78:13
**arms** [1] - 77:16
**arsenal** [1] - 68:11
**art** [5] - 35:8, 35:9, 44:9, 44:16
**articulating** [1] - 37:9
**artistry** [1] - 46:25
**assessment** [1] - 12:22
**asset** [1] - 81:6
**assets** [2] - 29:4, 70:22
**associated** [4] - 35:15, 36:4, 70:3, 70:8
**assume** [4] - 10:17, 23:4, 33:16, 60:18
**assumed** [1] - 60:14
**Assuming** [1] - 52:7
**assuming** [2] - 68:6, 68:16
**assumption** [1] - 29:15
**assurance** [1] - 78:5
**assure** [3] - 47:20, 51:2, 82:23
**Astoria** [2] - 8:3, 8:11
**attached** [2] - 20:7, 21:1
**attack** [1] - 51:23
**attacked** [1] - 56:2, 56:3
**attacks** [1] - 73:22
**attendance** [1] - 4:2
**Attorney** [1] - 25:6
**attorney** [2] - 7:1, 42:14
**Attorney's** [2] - 22:2, 22:8
**Attorney(s** [3] - 2:9,

2:11, 2:16
**Attorneys** [3] - 2:19, 2:23, 3:4
**audible** [1] - 5:22
**August** [1] - 37:5
**authorities** [2] - 26:14, 41:20
**authority** [9] - 17:2, 27:20, 38:2, 38:18, 39:15, 52:10, 56:10, 60:6, 60:12
**auto** [2] - 45:11, 65:16
**auto-restoration** [1] - 65:16
**automobiles** [1] - 47:4
**available** [2] - 33:25, 46:20
**Avenue** [7] - 12:23, 12:25, 13:8, 14:3, 14:4, 14:25, 17:22
**avoid** [4] - 49:19, 79:12, 80:10, 80:11
**aware** [5] - 7:10, 10:11, 28:7, 49:1, 50:4

## B

**back-and-forth** [1] - 34:5
**background** [1] - 75:11
**bad** [3] - 41:14, 69:25, 71:14
**bank** [5] - 29:5, 29:9, 29:10, 46:23, 62:11
**Bank** [5] - 16:15, 16:17, 29:8, 29:10
**BANK** [1] - 1:6
**Bankruptcy** [3] - 51:21, 69:24, 70:1
**bankruptcy** [19] - 36:20, 36:24, 45:25, 51:20, 52:18, 54:17, 54:21, 55:6, 55:12, 56:3, 69:17, 69:18, 70:3, 70:7, 70:9, 77:19, 79:2, 79:10, 80:6
**bare** [1] - 7:17
**bargaining** [2] - 63:8, 63:9
**base** [1] - 13:11
**based** [9] - 26:21, 32:18, 34:22, 44:12, 50:13, 66:24, 69:8, 69:22, 79:10
**basis** [4] - 7:21, 19:21, 19:24, 50:3
**beats** [1] - 61:6

became [2] - 77:17, 78:2
become [4] - 17:6, 34:10, 54:11, 82:12
becomes [1] - 9:5
begin [2] - 12:6, 40:13
beginning [1] - 32:10
behalf [1] - 1:9, 1:9, 4:15, 4:22, 5:3, 11:2, 11:8, 11:24, 12:5, 19:7, 41:4
behavior [5] - 79:20, 79:21, 80:11, 82:13
behind [1] - 65:4
belief [1] - 38:17
belong [1] - 61:17
below [1] - 49:22
Ben [1] - 52:12
bench [2] - 26:5, 41:8
bended [1] - 41:4
BENJAMIN [1] - 2:10
Benjamin [2] - 4:5, 51:11
Benjamin's [1] - 51:12
best [4] - 7:8, 32:24, 58:23, 68:7
better [3] - 31:22, 31:24, 33:19
between [14] - 13:3, 14:2, 14:21, 23:14, 24:24, 32:6, 34:11, 39:4, 42:14, 50:9, 64:9, 73:23, 74:16, 83:1
beyond [6] - 7:5, 8:23, 23:3, 43:21, 46:13, 56:8
bids [2] - 13:15, 14:15
bill [1] - 51:16
bills [1] - 46:22
bit [7] - 13:7, 29:23, 72:6, 73:13, 82:8, 82:20
block [1] - 40:20
blown [1] - 74:1
board [3] - 13:9, 13:12, 61:23
books [1] - 44:18, 62:22
BOONE [1] - 2:23
Borrok [5] - 53:3, 53:4, 57:25
bottom [2] - 67:22, 82:19
bouncing [1] - 32:5
BOWIN [1] - 3:8, 84:8
breach [3] - 24:21, 62:19, 83:6
breaches [2] - 50:11, 71:6

breaching [1] - 26:12
brief [3] - 12:19, 76:5, 79:17
briefing [2] - 5:16, 36:21
briefly [6] - 18:11, 28:15, 69:13, 75:20, 75:23, 78:17
bring [3] - 44:13, 77:5, 82:4
bringing [1] - 17:16
broker [6] - 15:8, 16:7, 19:25, 41:9, 67:5
Brooklyn [1] - 12:23
brought [4] - 18:17, 18:19, 55:8, 64:17
brownstone [1] - 13:24
builds [1] - 47:4
built [1] - 64:15
bullets [1] - 37:7
BUNIN [33] - 3:4, 5:2, 11:23, 12:4, 19:7, 21:19, 23:16, 25:1, 25:12, 27:16, 28:13, 29:21, 59:16, 66:13, 67:3, 67:15, 68:1, 68:12, 68:19, 69:7, 69:16, 71:1, 71:23, 72:2, 72:5, 72:10, 73:1, 73:9, 73:25, 75:4, 75:17, 75:19, 84:1
Bunin [15] - 5:3, 11:24, 12:3, 12:4, 19:2, 19:6, 19:7, 59:14, 59:15, 59:17, 63:20, 66:12, 66:13, 77:19, 78:19
Bureau [12] - 21:14, 21:18, 21:23, 22:12, 22:20, 22:25, 23:1, 23:23, 24:7, 24:9, 25:6, 71:25
business [28] - 16:21, 16:22, 17:19, 18:2, 29:11, 31:17, 32:9, 39:25, 42:25, 43:4, 45:12, 48:25, 60:7, 60:12, 62:5, 62:13, 62:14, 65:17, 67:19, 67:23, 68:4, 68:17, 70:16, 76:14, 77:23, 80:16, 81:11
businesses [4] - 15:17, 44:19, 49:8, 77:9
BY [6] - 2:10, 2:12, 2:17, 2:20, 2:24, 3:4

## C

**calmly** [1] - 82:3
**candidly** [1] - 40:12
**cannot** [4] - 51:8, 52:22, 64:4, 64:5
**capable** [1] - 79:3
**capacity** [1] - 44:15
**capture** [1] - 49:9
**car** [3] - 62:5, 68:24, 71:11
**care** [6] - 5:6, 53:17, 53:18, 65:6, 65:7, 79:3
**career** [1] - 64:22
**careful** [1] - 68:25
**cars** [2] - 18:20, 47:3
**cart** [1] - 39:19
**carved** [1] - 8:6
**case** [50] - 5:13, 6:21, 7:12, 7:13, 7:14, 7:15, 7:18, 7:19, 7:22, 8:9, 8:14, 8:19, 8:21, 8:25, 9:3, 9:11, 10:8, 10:13, 10:14, 11:12, 27:3, 28:4, 32:4, 32:10, 32:19, 34:8, 51:7, 51:8, 51:9, 51:14, 52:10, 54:24, 55:2, 55:10, 55:15, 55:18, 55:23, 56:4, 57:24, 57:25, 58:10, 66:25, 69:17, 69:18, 69:23, 69:24, 70:7, 70:9, 81:15
**cases** [3] - 54:12, 54:17, 77:11
**cash** [2] - 31:5, 31:25, 32:9
**causing** [1] - 81:10
**central** [2] - 15:25, 59:21
**Centre** [1] - 2:1
**certain** [8] - 6:14, 33:5, 39:21, 48:20, 63:16, 63:21, 68:19, 73:7
**certainly** [4] - 33:25, 39:23, 66:7, 81:23
**Certificates** [3] - 20:15, 29:3, 60:2
**CERTIFIED** [1] - 84:5
**certifying** [1] - 68:15
**challenge** [3] - 17:9, 17:12, 63:24
**chance** [2] - 73:14, 82:23
**change** [10] - 10:8, 13:19, 16:6, 16:18, 28:9, 47:17, 59:12,

59:20, 59:24, 60:1, 60:10, 60:13, 62:8, 62:18, 62:20, 62:24, 63:1, 67:12, 77:21
**changed** [12] - 15:2, 15:6, 15:7, 15:23, 16:2, 16:19, 19:23, 20:3, 20:8, 20:9, 38:14, 67:6
**changeover** [1] - 63:21
**changing** [4] - 37:11, 50:11, 62:18, 66:21
**charge** [2] - 39:25, 81:13
**Chase** [1] - 16:15
**CHASSEN** [2] - 1:6, 1:8
**Chassen** [15] - 2:16, 4:15, 30:7, 36:19, 36:23, 53:18, 53:19, 60:25, 61:20, 64:17, 81:4, 81:7, 81:12
**Chassen's** [1] - 34:6
**check** [4] - 30:24, 33:14, 33:18, 45:9
**checked** [1] - 55:13
**choice** [3] - 6:8, 27:5, 68:23
**circumstance** [1] - 39:18
**circumstances** [1] - 83:9
**cited** [1] - 58:9
**Citizens** [4] - 16:15, 16:17, 29:8, 29:10
**City** [1] - 78:12
**Civil** [12] - 21:14, 21:17, 21:23, 22:12, 22:19, 22:24, 22:25, 23:22, 24:7, 24:9, 25:5, 71:24
**civil** [11] - 17:5, 20:21, 21:8, 21:13, 24:5, 27:3, 27:14, 38:3, 39:13, 59:8, 81:21
**CIVIL** [1] - 1:1
**civilized** [1] - 63:23
**clarification** [8] - 35:21, 42:16, 43:8, 43:14, 43:18, 44:15, 46:11, 46:12
**clarified** [2] - 48:13, 63:5
**clarify** [5] - 33:3, 39:7, 43:9, 49:12, 57:20
**clarifying** [2] - 48:11, 49:5
**clarity** [3] - 35:11, 40:11, 51:14

**clean** [3] - 13:20, 14:12, 28:4
**cleaning** [1] - 14:8
**clear** [20] - 8:24, 9:2, 25:4, 25:5, 26:4, 28:8, 34:10, 39:23, 40:5, 42:8, 43:3, 48:10, 49:12, 51:14, 53:24, 55:10, 56:17, 66:17, 71:13, 82:12
**clearly** [1] - 82:21
**clerk** [1] - 54:24
**clerk's** [4] - 7:3, 52:3, 52:4, 54:19
**client** [9] - 11:2, 11:8, 30:25, 41:4, 42:14, 50:10, 68:3, 73:3, 83:20
**clients** [1] - 62:15
**close** [4] - 32:16, 62:12, 62:14, 83:2
**closing** [1] - 62:15
**co** [1] - 36:19
**co-moving** [1] - 36:19
**Code** [2] - 69:24, 70:1
**codes** [2] - 28:24, 29:5
**COHEN** [1] - 2:5
**colleagues** [1] - 23:8
**collectively** [1] - 44:10
**colluding** [1] - 65:5
**collusion** [1] - 53:23
**colorable** [1] - 38:17
**combination** [1] - 30:22
**comfortable** [1] - 79:10
**coming** [9] - 9:18, 33:20, 35:8, 36:10, 36:17, 41:7, 73:6, 74:11, 78:14
**comment** [1] - 72:6
**comments** [3] - 49:4, 69:11, 80:12
**commercial** [3] - 17:21, 59:8, 66:6
**commercially** [1] - 68:17
**commitments** [1] - 46:21
**committed** [1] - 59:2
**common** [1] - 59:7
**company** [3] - 64:15, 76:8
**compel** [1] - 9:20
**Compel** [1] - 2:2
**compensation** [1] - 76:23
**complaint** [1] - 57:4
**complete** [1] - 77:13
**completely** [2] - 14:6,

45:1
**complex** [1] - 77:17
**compliance** [4] - 9:20, 79:22, 80:8, 80:14
**complicated** [5] - 25:17, 37:8, 41:17, 42:23, 43:4
**complication** [1] - 37:10
**comply** [7] - 46:7, 63:12, 63:13, 65:9, 82:10, 82:21, 82:24
**complying** [2] - 40:21, 80:11
**con** [1] - 51:1
**concern** [2] - 67:20, 81:24
**concerned** [5] - 32:8, 40:25, 47:9, 47:21, 48:23
**concise** [1] - 48:12
**conclude** [2] - 58:18
**concludes** [1] - 69:23
**conclusion** [1] - 69:22
**condition** [2] - 13:21, 18:2
**condo** [2] - 13:10, 61:20
**conduct** [4] - 10:10, 47:8, 81:9, 83:7
**confer** [3] - 44:14, 65:18, 65:25
**conferred** [1] - 18:21
**confidence** [3] - 40:7, 79:21, 79:22
**confident** [1] - 28:6
**confinement** [1] - 27:4
**confirm** [1] - 58:25
**confirmed** [1] - 51:23
**conflict** [1] - 61:6
**conflicts** [2] - 61:3, 61:8
**conformance** [1] - 33:24
**confuse** [1] - 50:24
**consent** [3] - 7:2, 52:20, 54:1
**consider** [4] - 24:15, 48:10, 65:14, 75:5
**considered** [1] - 61:6
**considering** [1] - 8:15
**consolidated** [1] - 58:2
**consolidation** [2] - 57:23, 57:25
**constructed** [1] - 17:2
**construction** [1] - 14:11
**consulting** [1] - 28:2
**contact** [6] - 13:8,

13:12, 21:13, 21:17, 22:8, 77:7
**contacted** [1] - 21:12
**contained** [2] - 20:15, 57:17
**contemplate** [1] - 26:17
**contemporaneously** [1] - 38:6
**contempt** [7] - 9:19, 27:2, 37:15, 40:4, 74:12, 80:3, 82:11
**context** [1] - 35:22
**contingent** [1] - 65:5
**continue** [2] - 7:22, 27:11
**continued** [2] - 3:1, 29:11
**continues** [1] - 65:3
**continuing** [3] - 19:20, 40:24, 65:19
**contracts** [1] - 35:10
**contrary** [1] - 52:23
**contributions** [1] - 31:6
**control** [16] - 15:14, 16:11, 16:12, 16:16, 18:25, 21:6, 46:18, 49:23, 52:17, 54:7, 55:24, 60:5, 60:11, 63:22, 67:19, 70:21
**Controlled** [14] - 34:24, 34:25, 35:9, 42:17, 42:18, 42:19, 44:2, 44:7, 44:11, 48:16, 48:20, 70:17, 70:18
**conversation** [1] - 35:6, 53:13, 77:4, 81:22
**convey** [1] - 41:9
**conveyances** [1] - 54:2
**convinced** [1] - 76:15
**cools** [1] - 82:16
**cooperate** [4] - 62:18, 69:8, 70:23, 72:23
**cooperative** [1] - 14:23
**coordinate** [1] - 76:7
**copy** [2] - 8:18, 83:16
**Corcoran** [1] - 13:13
**corporate** [1] - 42:23
**Corporate** [1] - 34:24
**correct** [5] - 10:1, 11:23, 17:20, 18:6, 31:1
**correspondence** [1] - 9:23
**cost** [1] - 81:11

**costs** [1] - 81:9
**counsel** [23] - 5:1, 5:14, 5:19, 6:2, 6:20, 6:21, 7:4, 26:2, 28:2, 28:3, 28:6, 28:23, 34:23, 44:15, 56:23, 58:25, 69:7, 80:1, 81:19, 82:1, 82:2, 82:6, 82:14
**Counterclaim** [5] - 1:11, 1:14, 2:9, 2:12, 2:16
**counterclaim** [1] - 9:5
**country** [1] - 8:6
**County** [8] - 17:8, 21:14, 21:23, 22:2, 22:8, 22:19, 23:21, 25:6
**COUNTY** [1] - 1:1
**couple** [6] - 5:5, 6:17, 25:7, 69:11, 72:14
**course** [6] - 29:21, 37:14, 43:11, 57:5, 68:1, 82:5
**court** [57] - 7:2, 7:7, 7:8, 7:10, 7:13, 7:16, 7:18, 7:19, 7:22, 8:2, 8:3, 8:13, 8:14, 8:25, 9:11, 9:24, 10:3, 10:4, 10:6, 10:8, 10:14, 12:7, 19:15, 26:25, 27:14, 27:23, 28:4, 28:5, 28:9, 28:10, 36:10, 36:20, 36:24, 39:22, 40:20, 51:5, 52:2, 53:8, 54:13, 54:20, 56:4, 56:13, 57:3, 57:18, 57:19, 58:3, 58:20, 58:22, 69:23, 70:10, 79:2, 79:3, 80:9
**Court** [32] - 3:4, 3:8, 7:11, 9:4, 11:9, 11:18, 12:8, 23:2, 23:10, 25:8, 36:10, 36:19, 43:22, 49:22, 53:19, 58:20, 65:1, 65:3, 65:23, 74:11, 75:19, 76:11, 78:20, 78:22, 79:4, 79:21, 80:13, 81:14, 82:23, 83:21, 84:8
**COURT** [134] - 1:1, 4:1, 4:7, 4:12, 4:24, 5:5, 5:23, 6:7, 6:12, 9:17, 11:3, 11:10, 11:20, 12:1, 12:10, 13:22, 13:25, 14:5, 14:18, 17:11, 17:17, 18:5, 18:7, 19:4,

21:17, 23:4, 24:17, 25:10, 25:16, 28:1, 29:14, 29:24, 30:11, 30:14, 31:8, 31:13, 32:1, 32:25, 33:13, 34:2, 35:1, 35:4, 35:23, 36:5, 36:13, 37:10, 38:13, 38:20, 39:17, 40:3, 41:11, 42:5, 42:11, 42:20, 42:25, 43:3, 43:6, 43:25, 44:4, 44:22, 45:4, 45:10, 45:13, 45:19, 45:21, 47:6, 47:14, 47:24, 48:1, 48:4, 48:9, 48:19, 48:25, 49:11, 49:14, 49:17, 49:24, 50:4, 50:8, 50:21, 51:1, 55:15, 55:18, 56:6, 56:8, 56:11, 56:16, 56:22, 56:25, 58:14, 58:19, 60:14, 60:22, 61:9, 61:12, 61:21, 61:23, 62:17, 62:25, 63:8, 63:11, 63:15, 63:19, 66:2, 66:19, 67:9, 67:11, 67:20, 68:2, 68:13, 69:1, 69:15, 70:24, 71:2, 71:24, 72:3, 72:8, 72:21, 73:8, 75:2, 75:14, 75:18, 75:21, 75:24, 76:1, 78:8, 78:16, 78:24, 79:2, 80:19, 80:22, 81:1, 81:17, 83:15
**court's** [3] - 8:15, 39:1, 79:10
**Court's** [2] - 41:12, 78:25
**court-appointed** [2] - 12:7, 19:15
**Court-Appointed** [1] - 3:4
**courtroom** [2] - 31:12, 80:12
**courts** [3] - 8:5, 24:5, 32:6
**covered** [2] - 37:12, 49:12
**CPLR** [3] - 6:22, 45:9, 65:14
**create** [1] - 67:22
**creating** [1] - 49:18
**credit** [1] - 62:5
**criminal** [1] - 41:20
**critical** [1] - 39:12
**crossed** [2] - 54:9, 54:10

**CRR** [2] - 3:8, 84:8
**crystal** [2] - 51:14, 53:24
**crystal-clear** [2] - 51:14, 53:24
**CSR** [2] - 3:8, 84:8
**custody** [4] - 15:14, 16:16, 18:25, 70:21
**customers** [1] - 46:24
**cut** [1] - 32:8

## D

**damaged** [1] - 20:1
**damaging** [1] - 50:11
**dangle** [1] - 9:11
**date** [3] - 15:23, 29:1, 69:9
**dates** [2] - 15:4, 15:5
**days** [2] - 8:17, 82:4
**deal** [5] - 23:25, 24:22, 43:10, 62:4, 78:10
**dealerships** [1] - 68:24
**deals** [2] - 57:23, 58:1
**dealt** [4] - 26:14, 53:23, 55:1, 57:17
**December** [1] - 52:14
**decide** [2] - 37:25, 68:7
**decided** [2] - 16:5, 50:25
**decision** [2] - 39:3, 69:20
**decorum** [2] - 11:18, 74:25
**default** [5] - 51:17, 76:13, 81:5
**defendant** [5] - 8:24, 9:3, 9:5, 34:9, 81:7
**Defendant** [5] - 1:25, 2:9, 2:9, 2:11, 2:12, 2:16, 2:19
**Defendant-Counterclaim** [1] - 2:16
**Defendant-Defendant** [1] - 2:19
**defendants** [2] - 4:13, 9:3
**Defendants** [4] - 1:7, 1:14, 1:17, 1:22
**defense** [3] - 26:19, 53:20, 53:22
**defined** [2] - 70:18, 81:23
**defines** [2] - 48:15, 48:19
**definition** [1] - 44:2
**definitions** [1] - 81:20

**defuse** [1] - 66:1
**delay** [1] - 79:12
**delays** [1] - 81:8
**delivery** [1] - 22:24
**demanding** [1] - 28:23
**Department** [4] - 7:25, 21:11, 76:19, 78:13
**Department's** [1] - 20:5
**departure** [1] - 80:12
**Dept** [1] - 8:4
**derivatively** [4] - 1:2, 1:3, 1:8, 1:9
**describe** [1] - 64:8
**described** [7] - 19:13, 19:17, 19:23, 20:6, 20:13, 20:23, 26:22
**describes** [2] - 21:4, 23:24
**describing** [2] - 24:20, 63:16
**despite** [3] - 31:17, 34:7, 78:4
**destroy** [1] - 65:6
**destroyed** [2] - 16:3, 20:10
**destroying** [1] - 37:22
**destruction** [1] - 59:21
**detail** [1] - 21:4
**dialogue** [1] - 53:6
**die** [1] - 10:14
**differ** [1] - 33:10
**different** [6] - 31:8, 33:9, 39:18, 47:11, 48:16, 70:1
**difficult** [3] - 13:7, 83:9, 83:11
**difficulty** [1] - 72:6
**diminished** [1] - 47:5
**dire** [1] - 19:13
**direct** [1] - 25:5
**directing** [1] - 22:6
**directly** [2] - 30:21, 70:14
**disability** [1] - 76:24
**disagree** [4] - 26:9, 47:16, 58:11, 60:24
**disaster** [1] - 51:7
**discretion** [1] - 67:1
**discuss** [2] - 69:13, 82:2
**discussed** [2] - 25:3, 42:14
**discussing** [1] - 65:22
**Discussion** [2] - 73:23, 74:16
**discussion** [3] - 34:22, 39:4, 44:12

**discussions** [1] - 13:16
**dismiss** [1] - 69:23
**dismissal** [4] - 54:23, 55:11, 70:1, 70:5
**dismissed** [12] - 27:21, 27:22, 52:9, 54:18, 54:22, 55:7, 55:21, 69:19, 69:25, 70:4, 70:8, 77:19
**disposed** [1] - 54:18
**dispute** [1] - 8:2
**dissolved** [1] - 10:4
**distance** [2] - 73:7, 74:2
**distractions** [1] - 34:7
**distributions** [1] - 33:19
**district** [2] - 10:4, 70:10
**District** [7] - 51:22, 52:1, 52:11, 52:13, 56:5, 57:9
**District-wise** [1] - 57:9
**divests** [1] - 8:2
**Division** [2] - 51:21, 79:6
**do'** [1] - 55:3
**docket** [1] - 7:9
**document** [1] - 37:18
**documentation** [1] - 60:2
**documents** [8] - 16:12, 28:23, 29:4, 33:24, 37:19, 52:9, 55:8, 70:22
**dollars** [1] - 54:2
**done** [10] - 10:7, 14:11, 14:14, 26:23, 40:15, 53:3, 56:13, 62:19, 64:20, 74:19
**door** [1] - 62:16
**doubt** [4] - 41:15, 68:14, 79:5, 79:6
**doubtful** [1] - 33:12
**down** [9] - 23:22, 62:13, 62:14, 62:15, 62:16, 64:19, 64:25, 67:23, 82:16
**dozen** [1] - 56:3
**drafted** [1] - 24:14
**dragging** [1] - 32:4
**drawer** [1] - 20:15
**drill** [2] - 38:1, 38:16
**drop** [1] - 23:22
**drop-down** [1] - 23:22
**due** [4] - 39:21, 43:22, 57:5, 80:4
**due-process** [1] - 39:21

**duly** [1] - 21:4
**dumb** [1] - 26:13
**duplicative** [1] - 8:8
**during** [2] - 10:10, 37:23
**duty** [1] - 58:12
**dynamic** [2] - 30:19, 41:24

## E

**e-mail** [2] - 27:25, 38:4
**e-mailed** [1] - 22:19
**e-mails** [1] - 77:2
**early** [1] - 21:20
**earning** [1] - 37:1
**easier** [2] - 11:4, 13:5
**easily** [1] - 14:10
**East** [5] - 12:24, 13:18, 14:2, 14:3, 17:22
**east** [2] - 12:24, 14:4
**easy** [2] - 41:4, 82:15
**ECF** [1] - 54:19
**effect** [8] - 10:3, 10:18, 18:24, 38:23, 38:25, 47:7, 48:8, 65:17
**effectively** [3] - 5:9, 7:2, 46:18
**efforts** [2] - 77:7, 83:10
**egregious** [1] - 8:10
**either** [8] - 7:16, 20:1, 26:14, 30:21, 56:12, 65:7, 67:11, 69:12
**element** [1] - 32:3
**eliminate** [1] - 9:24
**emergency** [1] - 57:4
**employee** [4] - 20:14, 20:15, 24:7, 25:13
**employees** [9] - 18:7, 18:10, 21:24, 29:2, 60:3, 72:14, 72:19, 76:22, 77:22
**encounter** [1] - 15:17
**encountered** [1] - 20:14
**encroaching** [1] - 79:4
**end** [6] - 24:4, 44:6, 58:6, 69:21, 82:15
**ended** [1] - 36:15
**enforce** [4] - 10:23, 19:10, 19:14, 39:16
**enforced** [1] - 42:15
**enforcement** [11] - 17:4, 20:21, 21:9, 21:13, 23:7, 24:1, 39:15, 46:10, 65:13, 72:16, 80:9

Enforcement [12] - 21:14, 21:17, 21:23, 22:12, 22:19, 22:25, 23:1, 23:23, 24:7, 24:9, 25:5, 71:24
enforcing [1] - 34:17
engage [1] - 81:10
engaged [2] - 13:13, 15:2, 19:24
engaging [1] - 14:24
engineer [1] - 47:2
English [1] - 62:9
enormous [1] - 32:16
ensure [2] - 34:15, 68:17
enter [8] - 4:7, 63:2, 63:7, 66:16, 66:23, 70:14, 72:20
entered [8] - 13:14, 16:1, 19:11, 22:6, 22:9, 23:2, 29:12, 80:2
entirely [1] - 54:9
entirety [1] - 44:8
entities [17] - 17:18, 34:12, 34:13, 35:14, 35:15, 36:4, 43:21, 45:19, 46:14, 51:19, 52:19, 53:7, 53:25, 54:6, 58:1, 77:15, 77:16
Entities [7] - 42:18, 42:19, 44:7, 44:11, 48:16, 70:17, 70:18
entitled [1] - 33:17
Entity [4] - 34:24, 35:9, 44:2
entrusting [2] - 68:5, 68:11
entry [1] - 25:21
equity [5] - 17:10, 17:14, 31:2, 31:15, 33:1
Eric [7] - 4:17, 5:3, 12:5, 12:17, 19:8, 28:17, 67:5
ESQ [6] - 2:10, 2:12, 2:17, 2:20, 2:24, 3:4
essential [1] - 58:12
essentially [9] - 6:24, 7:14, 19:12, 20:24, 29:17, 32:15, 50:2, 73:6, 73:10
Estate [2] - 2:20, 4:21
ESTATE [5] - 1:4, 1:9, 1:16, 1:21, 1:24
estate [7] - 15:2, 15:8, 16:7, 19:25, 64:22, 67:5
etcetera [1] - 77:25

evaluating [1] - 83:7
evaporate [1] - 28:12
eve [1] - 80:8
event [3] - 24:15, 71:5, 71:10
events [2] - 16:8, 47:19
evicting [1] - 39:20
eviction [1] - 24:3
evictions [1] - 24:23
evidentiary [5] - 5:12, 6:1, 34:10, 75:15, 80:17
ex [1] - 53:13
Exactly [1] - 55:3
exactly [7] - 22:15, 23:18, 25:8, 31:14, 35:20, 53:15, 71:16
example [2] - 72:11, 77:1
except [2] - 7:2, 46:10
exception [1] - 69:25
exceptions [1] - 8:6
exchange [1] - 31:22
excuse [2] - 55:17, 74:15
execution [2] - 39:12, 39:17
executions [1] - 24:1
Exhibit [1] - 37:18
exist [1] - 29:13
exists [4] - 35:24, 68:9, 69:23, 76:15
expanded [1] - 53:11
expect [6] - 50:10, 50:14, 59:12, 69:10, 81:22, 82:9
expectation [1] - 33:11
expense [1] - 15:24
experience [4] - 24:12, 45:24, 68:24, 69:9
experienced [1] - 21:24
expertise [1] - 69:4
explicit [2] - 55:20, 55:22
explicitly [1] - 57:16
expression [2] - 44:9, 44:17
expressly [1] - 79:11
extend [3] - 35:24, 43:20, 46:13
extensive [1] - 33:25
extent [4] - 9:25, 35:23, 40:23, 67:21
extraordinarily [1] - 82:13
extremely [1] - 6:2

eyes [1] - 54:4

F

face [3] - 17:19, 26:13, 35:13
fact [13] - 16:5, 21:20, 36:18, 37:4, 38:8, 49:19, 50:19, 54:14, 58:5, 66:10, 67:16, 71:22, 74:9
facts [2] - 26:21, 66:11
fail [1] - 7:21
failed [1] - 77:6
failure [1] - 82:21
fair [3] - 44:21, 50:4, 82:24
fairly [3] - 28:6, 30:4, 45:23
faith [3] - 69:25, 72:23, 81:19
falls [1] - 24:24
false [1] - 68:13
familiar [2] - 17:6, 77:18
familiarity [1] - 15:16
family [2] - 14:20, 14:21
famous [1] - 58:10
far [12] - 7:10, 8:19, 31:7, 32:21, 42:5, 42:14, 47:20, 51:14, 63:3, 77:7
Farrell [6] - 5:3, 11:24, 12:4, 19:7, 25:3, 59:17
FARRELL [1] - 3:3
FBI [2] - 15:19, 65:8
fear [2] - 53:14, 71:8
February [1] - 37:3
federal [29] - 7:7, 7:8, 7:9, 7:13, 7:18, 7:22, 8:13, 8:15, 8:25, 10:8, 10:14, 27:23, 28:4, 28:9, 51:5, 53:8, 54:12, 54:20, 56:12, 57:3, 57:15, 57:18, 57:19, 58:3, 58:20, 79:3
Federal [2] - 8:3, 8:11
fee [1] - 54:14
feedback [1] - 31:13
felt [4] - 18:22, 47:11, 74:4
few [2] - 50:20, 78:18
fiduciary [2] - 12:7, 19:16
figure [5] - 35:7, 69:5, 77:10, 77:13, 77:23
file [1] - 80:10

filed [9] - 5:7, 8:17, 9:9, 19:2, 21:21, 22:18, 48:2, 68:22, 80:1
filing [2] - 7:5, 56:1
filings [5] - 6:14, 6:23, 6:24, 7:4, 77:10
final [2] - 37:18
financial [1] - 29:6
fine [3] - 64:24, 69:8, 72:3
firm [1] - 15:2
First [1] - 7:25
FIRST [1] - 1:6
first [13] - 6:20, 8:20, 13:6, 15:11, 18:11, 25:18, 43:7, 46:3, 46:4, 50:24, 54:16, 70:13, 74:6
first-time [1] - 46:3
five [1] - 57:25
fixed [1] - 67:9
flag [1] - 34:2
flashpoint [1] - 64:3
flesh [1] - 37:15
flip [1] - 36:1
flow [3] - 31:5, 31:25, 32:9
flowing [1] - 31:17
flying [1] - 37:7
focusing [1] - 8:7
folks [4] - 52:19, 53:10, 71:25, 78:10
follow [1] - 58:12
followed [3] - 8:5, 41:12, 42:15
following [1] - 59:2
foot [1] - 51:9
force [5] - 10:3, 10:18, 18:15, 18:23, 78:7
foreclosure [1] - 81:6
foremost [1] - 50:24
forever [1] - 51:16
forgot [1] - 14:19
form [4] - 23:14, 24:14, 45:7, 47:22
format [1] - 23:11
formats [1] - 23:12
former [1] - 78:12
forms [4] - 23:4, 23:7, 23:9, 23:18
forth [3] - 28:24, 32:6, 34:5
forward [4] - 14:25, 39:24, 82:6, 82:24
four [10] - 12:22, 35:15, 35:24, 36:3, 42:10, 53:17, 56:18, 57:25, 76:12
frankly [2] - 49:7,

83:10
fraudulent [1] - 54:2
free [2] - 6:7, 66:7
freedom [2] - 26:10, 46:15
Friday [4] - 6:15, 6:24, 9:9, 48:4
FRITZ [1] - 3:3
Fritz [6] - 5:3, 11:24, 12:4, 19:7, 25:3, 59:17
frivolous [1] - 8:8
Frome [1] - 4:20
FROME [1] - 2:19
front [10] - 10:22, 15:4, 15:8, 32:7, 43:16, 51:21, 54:3, 55:15, 55:18, 55:23
full [11] - 10:3, 21:6, 22:24, 26:19, 30:4, 37:23, 46:20, 47:12, 60:5, 74:1, 78:22
full-blown [1] - 74:1
full-throated [1] - 26:19
fuller [1] - 36:21
fully [3] - 27:8, 35:19, 64:14
functional [1] - 52:24
funds [2] - 16:17, 29:8
future [1] - 71:6

G

game [1] - 49:20
general [3] - 8:1, 8:6, 45:15
generally [1] - 23:7
gentleman [1] - 57:7
gentleman's [1] - 51:4
genuinely [2] - 48:23, 71:15
Giambone [1] - 20:25
GIAMBONE [1] - 21:1
given [9] - 16:5, 18:16, 29:15, 43:22, 45:5, 60:14, 73:14, 80:19, 82:23
goal [1] - 53:1
grab [1] - 35:19
grace [1] - 74:24
grant [3] - 5:10, 5:14, 82:19
granted [7] - 5:10, 5:24, 6:4, 24:18, 53:4, 53:21, 70:6
grants [1] - 24:15
great [1] - 25:14
ground [3] - 5:11, 34:3, 59:7

**group** [1] - 78:10
**GROUP** [1] - 2:8
**growing** [1] - 76:1
**guaranteed** [1] - 54:8
**guarantor** [1] - 81:7
**guard** [1] - 74:5
**guess** [3] - 24:24, 48:1, 52:19
**guidance** [1] - 65:13
**guy** [1] - 73:20
**guys** [1] - 64:19

## H

**half** [3] - 13:3, 24:6, 56:3
**half-an-hour** [1] - 24:6
**hand** [1] - 48:17
**handle** [2] - 46:4, 46:5
**handled** [2] - 34:15, 63:23
**hands** [3] - 55:12, 64:21
**hang** [4] - 56:22, 63:11, 75:24, 83:19
**hanging** [2] - 5:25, 83:8
**happy** [5] - 27:12, 43:10, 60:17, 60:20
**harass** [1] - 70:22
**hard** [4] - 27:9, 37:9, 40:10, 42:24
**HAYNES** [1] - 2:23
**Head** [18] - 12:25, 15:1, 15:22, 17:23, 19:18, 19:22, 20:2, 28:18, 45:1, 59:21, 59:23, 60:11, 61:11, 63:6, 66:16, 67:3, 70:15, 74:6
**health** [1] - 76:19
**hear** [7] - 7:22, 12:2, 50:14, 58:24, 65:23, 75:11, 78:20
**heard** [9] - 10:24, 24:19, 31:12, 32:17, 42:2, 45:22, 58:3, 58:4, 66:25
**hearing** [21] - 5:12, 6:1, 6:8, 6:13, 9:18, 11:16, 27:2, 34:10, 37:16, 39:5, 40:4, 57:12, 69:10, 73:4, 73:24, 74:11, 74:17, 75:15, 80:3, 80:10, 80:18
**hearings** [1] - 80:8
**heck** [1] - 61:6
**heels** [1] - 36:17
**held** [1] - 9:4

**help** [4] - 40:20, 51:5, 51:12, 66:3
**helpful** [3] - 6:2, 60:8, 71:5
**helping** [2] - 57:24, 66:1
**hereafter** [1] - 83:7
**hereby** [1] - 45:17
**herself** [1] - 54:25
**Heyman** [1] - 52:21
**higher** [1] - 70:10
**highly** [1] - 71:5
**Highway** [17] - 13:2, 18:1, 19:19, 19:21, 20:12, 20:23, 27:21, 28:18, 29:3, 29:9, 60:1, 60:6, 60:13, 70:15, 72:12, 74:6, 76:16
**himself** [5] - 37:25, 46:4, 46:5, 60:18, 74:25
**hip** [1] - 12:13
**hire** [1] - 74:4
**hired** [5] - 13:19, 14:12, 51:5, 51:6, 61:8
**Hirshmark** [1] - 14:22
**history** [2] - 8:10, 11:12
**hmm** [3] - 44:3, 48:18, 69:15
**hold** [1] - 82:17
**Holdings** [2] - 2:20, 4:21
**HOLDINGS** [5] - 1:4, 1:10, 1:16, 1:21, 1:24
**home** [3] - 16:2, 23:22, 51:17
**honest** [1] - 41:9
**honestly** [1] - 46:18
**Honor** [101] - 4:4, 4:9, 4:10, 4:14, 4:16, 4:19, 5:2, 6:6, 6:9, 9:16, 11:2, 11:19, 11:23, 12:6, 12:7, 12:16, 17:1, 17:13, 18:6, 19:9, 21:5, 21:20, 22:10, 22:22, 23:17, 24:15, 27:16, 27:17, 29:12, 29:21, 30:6, 30:7, 30:13, 31:3, 32:13, 32:24, 33:3, 33:8, 35:5, 35:13, 36:1, 37:14, 41:1, 41:5, 42:13, 42:22, 43:20, 44:3, 45:2, 46:15, 47:21, 48:6, 50:16, 50:23,

51:15, 51:23, 52:17, 53:3, 54:3, 57:6, 57:21, 58:6, 59:16, 61:25, 62:13, 64:18, 64:24, 65:11, 66:13, 68:20, 69:14, 70:12, 70:17, 72:6, 72:10, 73:1, 73:2, 73:12, 73:25, 75:4, 75:5, 75:17, 75:23, 76:4, 77:16, 78:14, 78:17, 79:16, 79:19, 79:24, 80:15, 80:21, 80:25, 81:4, 83:23, 83:24, 83:25, 84:1, 84:2, 84:3
**Honor's** [14] - 19:10, 19:24, 28:25, 37:15, 43:22, 46:8, 56:21, 58:17, 59:19, 60:4, 65:13, 65:17, 67:17, 68:23
**HONORABLE** [1] - 2:5
**hope** [6] - 28:7, 47:6, 57:11, 71:15, 82:5, 83:19
**hopeful** [2] - 17:11, 25:24
**hopefully** [2] - 82:16, 83:4
**horse** [1] - 39:19
**hot** [1] - 82:1
**hour** [1] - 24:6
**house** [1] - 67:6
**HUEBSCHER** [13] - 4:16, 12:12, 12:16, 13:24, 14:6, 14:20, 17:13, 17:20, 18:6, 18:9, 19:5, 76:4, 78:9
**Huebscher** [54] - 4:17, 5:4, 12:5, 12:7, 12:15, 12:17, 19:8, 19:12, 19:15, 19:23, 20:3, 20:6, 20:13, 20:16, 20:22, 21:4, 21:12, 22:13, 27:19, 27:20, 28:17, 29:7, 29:13, 35:24, 38:4, 40:21, 44:25, 45:24, 57:19, 57:21, 58:15, 59:10, 59:17, 59:22, 59:25, 60:10, 67:18, 68:14, 68:23, 68:24, 69:10, 72:12, 72:19, 73:5, 74:3, 74:7, 74:8, 75:5, 75:8, 75:12, 75:19, 75:22, 82:6, 83:8
**Huebscher's** [2] -

23:3, 75:12
**human** [1] - 32:3
**hundred** [1] - 28:8
**hundreds** [2] - 54:1, 54:2
**hurt** [1] - 65:6

## I

**idea** [2] - 64:6, 77:25
**identifier** [1] - 6:11
**identify** [1] - 15:4
**ignored** [1] - 52:14
**illusory** [1] - 32:22
**illustrate** [1] - 53:2
**imagine** [1] - 26:7
**implore** [1] - 74:10
**imply** [2] - 41:2, 50:6
**important** [2] - 30:18, 46:16
**imposes** [1] - 17:2
**impossible** [1] - 26:16
**impressive** [1] - 11:15
**improper** [1] - 6:25
**in-force** [1] - 18:15
**inability** [2] - 28:17, 64:12
**inaccurate** [1] - 78:20
**Inc** [2] - 4:23, 49:21
**INC** [2] - 1:18, 2:23
**incident** [3] - 37:20, 38:9, 44:24
**inclined** [3] - 47:2, 48:7, 72:21
**included** [1] - 39:11
**includes** [5] - 29:2, 29:3, 29:5
**including** [6] - 17:7, 20:25, 22:20, 58:10, 70:15, 80:11
**income** [2] - 24:1, 37:1
**incur** [1] - 81:8
**incurring** [1] - 15:24
**indeed** [1] - 32:21
**Index** [1] - 2:1
**indicating** [4] - 41:6, 47:7, 51:4, 52:18, 57:8, 69:20, 72:13, 72:17
**indicating)** [3] - 4:6, 43:23, 73:20
**indication** [1] - 80:19
**indignified** [1] - 47:12
**indirectly** [1] - 70:14
**individual** [1] - 78:11
**individually** [2] - 1:2, 1:8
**information** [6] - 28:23, 29:6, 33:14,

33:17, 33:22, 33:23
**informed** [1] - 39:8
**initial** [3] - 6:12, 8:18, 71:20
**initiated** [1] - 7:7
**injunctions** [1] - 10:2
**inquire** [1] - 81:19
**insanely** [1] - 26:13
**inside** [2] - 17:25, 18:12
**insofar** [1] - 41:10
**inspect** [1] - 20:16
**install** [2] - 59:24, 60:10
**installed** [2] - 16:3, 20:4
**instances** [1] - 76:12
**insurance** [1] - 57:24
**intention** [8] - 49:15, 50:5, 50:6, 52:24, 54:4, 67:22, 76:6, 77:20
**interest** [4] - 11:17, 27:3, 76:13, 81:6
**interesting** [1] - 23:17
**interests** [3] - 33:5, 66:6, 66:7
**interfere** [2] - 70:20, 70:22
**interlocutory** [1] - 56:1
**interplay** [1] - 34:11
**interpret** [1] - 20:20
**interrupted** [1] - 30:23
**introduce** [1] - 15:13
**invalidated** [1] - 10:6
**Investment** [1] - 14:22
**investment** [7] - 51:19, 52:19, 53:7, 53:24, 54:5, 58:1, 77:16
**investor** [1] - 14:19
**involved** [7] - 12:22, 41:20, 47:8, 51:4, 61:4, 68:2, 77:15
**involves** [1] - 64:3
**involving** [1] - 58:10
**IRS** [4] - 62:3, 77:3, 77:4, 77:14
**issue** [7] - 16:25, 26:5, 54:15, 55:24, 65:23, 71:6, 77:3
**issued** [2] - 19:11, 53:20
**issues** [8] - 6:17, 6:18, 52:14, 54:11, 62:4, 76:20, 77:8, 77:14
**items** [4] - 12:19, 28:24, 51:7, 63:17
**iteration** [1] - 80:1

7

**itself** [1] - 33:7

## J

**JARED** [2] - 1:6, 1:8
**Jared** [2] - 2:16, 4:15
**JEFFREY** [3] - 1:2,
1:13, 1:21
**Jeffrey** [3] - 2:9, 2:12,
4:5
**Jersey** [1] - 49:21
**JJ** [33] - 1:3, 1:4, 1:9,
1:10, 1:16, 1:21,
30:22, 34:24, 35:8,
35:11, 42:18, 43:4,
44:2, 44:7, 44:10,
48:16, 48:20, 49:8,
51:19, 52:17, 52:19,
53:7, 53:11, 53:24,
54:5, 54:6, 54:21,
54:24, 55:24, 58:1,
70:17, 70:18, 81:11
**job** [8] - 7:21, 19:15,
36:11, 40:14, 40:15,
41:3, 41:5, 59:10
**JOEL** [1] - 2:5
**joined** [1] - 30:7
**joint** [2] - 53:20, 53:22
**Jonathan** [1] - 4:20
**JONATHAN** [1] - 2:20
**judge** [3] - 40:17,
65:10, 74:14
**Judge** [6] - 24:13,
53:4, 55:9, 57:25,
69:20
**judge's** [1] - 58:11
**judgment** [1] - 23:25
**jumping** [1] - 11:12
**jurisdiction** [5] - 7:23,
8:2, 9:12, 52:8,
57:15
**jurisdictional** [1] -
10:21
**Justice** [1] - 2:5
**justice** [1] - 11:17

## K

**keep** [5] - 27:14, 59:9,
64:18, 72:1, 74:2
**key** [1] - 67:6
**keys** [5] - 13:13,
28:24, 29:5, 61:20,
67:11
**kiboshed** [1] - 52:18
**kicking** [2] - 79:11
**kilter** [1] - 82:7
**kind** [9] - 22:15, 23:14,
24:19, 45:4, 64:7,
66:21, 67:12, 71:7,

81:21
**kinds** [1] - 73:22
**King** [1] - 58:10
**Klestdat** [1] - 61:8
**knee** [1] - 41:4
**knocking** [1] - 62:16
**knowledge** [4] - 7:9,
32:19, 32:24, 38:10
**knows** [2] - 33:8, 82:9
**KOEVARY** [8] - 2:20,
4:19, 32:13, 75:23,
75:25, 78:17, 79:1,
83:23
**Koevary** [6] - 4:20,
31:24, 32:1, 51:23,
56:2, 78:16

## L

**lack** [2] - 33:18, 40:11
**land** [3] - 15:15, 68:6,
69:3
**lane** [1] - 8:4
**LANE** [1] - 2:8
**language** [4] - 20:10,
22:15, 25:10, 82:20
**largely** [1] - 36:6
**last** [6] - 7:6, 13:14,
14:19, 49:21, 54:25,
80:1
**late** [1] - 8:12
**laughter** [1] - 83:14
**law** [7] - 17:3, 23:6,
38:18, 39:15, 46:6,
57:14, 58:13
**LAW** [3] - 2:8, 2:11,
2:15
**laws** [1] - 39:14
**lawyer** [2] - 51:9,
63:20
**lawyers** [1] - 64:9
**lay** [3] - 15:15, 68:6,
69:3
**lead** [1] - 68:14
**learned** [1] - 24:2
**learning** [2] - 11:13,
11:14
**least** [14] - 10:11,
17:19, 17:23, 23:6,
32:9, 34:11, 38:24,
40:11, 45:22, 59:7,
67:24, 69:9, 78:5,
79:9
**leave** [6] - 15:21,
18:24, 26:11, 41:22,
49:15, 60:15
**leaves** [1] - 38:25
**leaving** [1] - 39:3
**lectern** [2] - 11:4, 12:2
**led** [1] - 43:12

**left** [13] - 4:6, 13:21,
14:7, 14:9, 27:4,
35:16, 37:25, 38:12,
38:18, 39:2, 39:3,
67:24, 75:3
**legal** [3] - 16:12,
41:15, 83:4
**legitimate** [1] - 62:9
**legitimately** [2] - 9:10,
49:6
**lender** [3] - 13:17,
14:16, 81:15
**length** [2] - 21:24,
28:19
**leslie** [1] - 4:22
**LESLIE** [1] - 2:24
**letter** [4] - 28:22, 46:7,
51:3, 68:22
**letters** [2] - 52:13,
57:1
**Lexington** [3] - 12:25,
14:3, 14:4
**liberty** [1] - 46:16
**licenses** [1] - 62:2
**licensure** [3] - 18:3,
76:18, 76:20
**lies** [1] - 64:16
**lieutenant** [1] - 78:12
**life** [7] - 26:7, 51:16,
61:19, 65:6, 73:19,
74:20, 74:23
**likelihood** [1] - 80:13
**likely** [4] - 49:11,
66:25, 71:16, 78:4
**likewise** [1] - 80:5
**limit** [1] - 60:17
**limited** [1] - 60:22
**line** [8] - 4:25, 25:7,
31:14, 41:15, 62:5,
67:22, 76:1, 82:19
**lines** [2] - 25:8, 83:1
**list** [4] - 15:3, 16:8,
29:2, 39:11
**listed** [7] - 14:14,
35:14, 43:21, 44:4,
44:5, 44:8, 46:14
**listen** [2] - 42:3, 65:2
**literally** [1] - 27:5
**litigant** [2] - 6:23, 46:3
**litigants** [2] - 32:8,
63:15
**litigation** [1] - 43:11
**live** [1] - 51:25
**livelihood** [1] - 32:10
**LLC** [13] - 1:3, 1:4,
1:9, 1:10, 1:13, 1:16,
1:21, 1:21, 1:24,
2:11, 2:20
**LLCs** [1] - 77:9
**LLP** [2] - 2:19, 2:23

**loan** [2] - 14:21, 64:13
**Loan** [1] - 8:4
**located** [1] - 13:1
**location** [1] - 19:19
**locations** [3] - 72:23,
76:7, 77:22
**lock** [9] - 19:24, 20:2,
20:4, 20:8, 20:10,
37:22, 38:1, 38:16,
67:7
**locks** [22] - 13:19,
15:2, 15:6, 15:23,
16:2, 16:6, 37:11,
38:14, 50:12, 59:20,
59:24, 60:1, 60:10,
60:13, 62:8, 62:18,
62:20, 62:24, 63:1,
66:21, 67:12, 77:21
**locksmith** [1] - 76:8
**logistics** [1] - 64:2
**look** [16] - 9:18, 25:24,
28:1, 37:16, 38:6,
38:7, 47:15, 48:15,
54:20, 54:21, 57:14,
58:19, 66:20, 67:20,
71:14
**looked** [2] - 18:21,
32:18
**looking** [4] - 7:25,
35:12, 40:7, 65:3
**Lorenc** [10] - 4:7, 4:11,
5:7, 5:20, 5:24,
41:16, 50:25, 53:12,
53:14, 83:17
**LORENC** [6] - 2:11,
2:12, 4:9, 6:6, 6:9,
83:24
**Lorenc's** [1] - 6:11
**losses** [1] - 64:25
**love** [1] - 57:7
**lower** [1] - 41:24
**Luther** [1] - 58:10

## M

**MAIDEN** [1] - 2:8
**mail** [3] - 16:20, 27:25,
38:4
**mailed** [1] - 22:19
**mails** [1] - 77:2
**main** [1] - 55:10
**maintain** [1] - 46:18
**majority** [1] - 31:2
**man** [2] - 18:11, 62:8
**manager** [2] - 30:25,
68:8
**managerial** [1] - 60:5
**managers** [1] - 18:8
**manages** [1] - 77:8
**managing** [6] - 1:3,

1:3, 33:17, 50:1,
64:22, 70:21
**Manhattan** [2] - 12:24,
16:15
**manner** [1] - 14:9
**March** [10] - 15:12,
19:11, 20:13, 28:21,
29:12, 36:21, 36:23,
78:2, 80:3
**mark** [1] - 82:8
**market** [1] - 14:13
**marketed** [1] - 67:4
**MARTIN** [1] - 3:4
**Martin** [1] - 58:10
**Marty** [5] - 11:24, 12:4,
19:7, 59:17, 66:13
**marty** [1] - 5:3
**Mary** [1] - 54:25
**Mastando** [2] - 55:9,
69:20
**matches** [1] - 26:25
**material** [1] - 36:18
**matrimonial** [1] - 23:8
**matter** [15] - 9:6,
12:18, 17:5, 20:21,
21:13, 27:22, 28:5,
38:3, 39:14, 54:12,
55:6, 57:17, 59:8,
71:21, 71:22
**matters** [1] - 4:18
**mean** [21] - 18:1, 18:5,
24:17, 25:15, 27:12,
27:18, 29:7, 35:1,
35:8, 39:1, 41:2,
41:23, 43:17, 45:10,
45:24, 47:1, 49:7,
49:24, 55:3, 66:20,
75:18
**meaning** [3] - 34:23,
42:17, 72:18
**means** [2] - 50:14,
71:12
**mechanically** [1] -
47:2
**meet** [4] - 44:14,
65:18, 65:25, 77:22
**meet-and-confer** [2] -
44:14, 65:18
**member** [5] - 1:3, 1:3,
1:9, 1:10, 33:16,
33:17
**members** [1] - 62:7
**membership** [1] - 33:5
**mention** [1] - 77:6
**mentioned** [2] - 23:18,
74:4
**mentions** [1] - 21:5
**menus** [1] - 23:22
**merits** [1] - 24:18
**Messrs** [3] - 39:4,

73:23, 74:16
**met** [1] - 15:17
**Metropolitan** [7] -
12:23, 13:8, 14:25,
17:22, 61:4, 61:5,
61:18
**Microsoft** [3] - 2:13,
2:21, 2:24
**mid** [1] - 53:13
**mid-May** [1] - 53:13
**might** [5] - 11:3,
35:20, 50:12, 66:24,
69:14
**mile** [1] - 13:3
**Mill** [3] - 13:1, 13:2,
19:18
**million** [2] - 33:7,
64:22
**millions** [2] - 54:1,
54:2
**mind** [2] - 12:1, 49:5
**mine** [5] - 51:16,
61:17, 62:6, 62:24,
64:14
**minimum** [1] - 7:17
**misconstrued** [1] -
64:16
**misguided** [1] - 41:14
**missing** [1] - 39:12
**mission** [1] - 36:9
**misstatements** [1] -
36:18
**misunderstanding** [1]
- 41:22
**modified** [1] - 10:4
**modify** [1] - 28:11
**moment** [9] - 33:17,
36:14, 42:21, 48:22,
57:11, 59:3, 62:25,
73:3, 76:2
**money** [2] - 62:10,
81:11
**monies** [1] - 77:11
**monitoring** [1] - 15:25
**Montauk** [18] - 13:2,
18:1, 19:19, 19:21,
20:12, 20:23, 27:21,
28:18, 29:2, 29:9,
59:25, 60:6, 60:13,
70:15, 72:12, 74:5,
76:15, 80:17
**month** [1] - 53:22
**months** [2] - 52:20,
52:25
**morning** [2] - 22:3,
22:22
**most** [4] - 12:19,
46:16, 59:20, 62:8
**motion** [36] - 2:2, 5:7,
5:9, 5:14, 5:24, 6:5,

9:19, 9:20, 10:22,
10:25, 12:6, 19:2,
19:9, 19:14, 20:7,
22:21, 22:24, 24:16,
28:16, 30:2, 30:5,
30:8, 34:17, 36:5,
36:17, 43:9, 43:13,
48:12, 54:9, 54:10,
70:5, 80:8, 81:10,
82:19
**motions** [1] - 51:8
**motivating** [1] - 30:20
**motors** [1] - 44:24
**Motors** [16] - 13:1,
15:12, 16:10, 17:17,
18:2, 18:5, 19:19,
46:19, 60:6, 60:12,
62:1, 62:15, 63:12,
63:25, 70:16, 80:16
**movant** [1] - 11:21
**movants'** [1] - 44:15
**move** [4] - 10:22,
10:25, 29:20, 68:13
**moving** [3] - 14:25,
21:2, 36:19
**MR** [153] - 4:4, 4:9,
4:14, 4:16, 4:19, 5:2,
6:6, 6:9, 9:16, 11:1,
11:5, 11:7, 11:11,
11:23, 12:4, 12:12,
12:16, 13:24, 14:6,
14:20, 17:13, 17:20,
18:6, 18:9, 19:5,
19:7, 21:19, 23:16,
25:1, 25:12, 27:16,
28:13, 29:21, 30:6,
32:13, 34:21, 35:3,
35:5, 36:1, 36:7,
36:16, 37:13, 38:15,
39:2, 39:6, 40:2,
41:1, 42:4, 42:7,
42:12, 42:22, 43:2,
43:5, 43:18, 44:3,
44:5, 44:23, 45:6,
45:11, 45:18, 45:20,
46:2, 47:10, 47:18,
47:25, 48:3, 48:5,
48:18, 48:24, 49:10,
49:13, 49:16, 49:18,
50:2, 50:6, 50:16,
50:23, 51:3, 55:17,
55:20, 56:9, 56:15,
56:17, 56:20, 56:24,
57:1, 58:6, 58:15,
58:17, 59:16, 60:20,
60:23, 61:10, 61:14,
61:22, 61:25, 62:20,
63:3, 63:9, 63:13,
63:18, 64:13, 65:11,
66:10, 66:13, 67:3,

67:10, 67:15, 68:1,
68:12, 68:19, 69:7,
69:16, 71:1, 71:23,
72:2, 72:5, 72:10,
73:1, 73:9, 73:11,
73:12, 73:15, 73:17,
73:19, 73:21, 73:25,
74:8, 74:14, 74:15,
74:18, 74:20, 74:21,
74:23, 74:24, 75:4,
75:17, 75:19, 75:23,
75:25, 76:4, 78:9,
78:17, 79:1, 79:16,
80:21, 80:24, 81:3,
83:23, 83:24, 84:1,
84:2, 84:3
**MS** [7] - 4:22, 30:13,
31:3, 31:20, 33:3,
33:21, 83:25
**multi** [1] - 43:1
**multi-tentacled** [1] -
43:1
**multifold** [1] - 36:9
**multiple** [1] - 8:20
**must** [2] - 8:17, 47:8
**Mute** [1] - 4:25

## N

**N.Y** [1] - 2:1
**name** [6] - 14:19, 21:5,
54:25, 62:2, 62:3,
64:25
**name's** [1] - 64:13
**named** [1] - 81:7
**nature** [4] - 13:22,
24:20, 65:2, 74:11
**near** [1] - 32:20
**necessarily** [2] - 41:7,
72:15
**necessary** [2] - 38:10,
74:4
**need** [22] - 5:18,
19:13, 26:3, 27:7,
32:10, 40:18, 41:7,
41:11, 43:7, 48:13,
59:23, 60:1, 60:2,
60:3, 60:4, 64:10,
67:2, 67:5, 74:9,
78:24, 80:16
**needed** [3] - 22:1,
36:24, 50:17
**needs** [7] - 28:20,
53:25, 61:7, 62:18,
69:4, 69:5, 76:20
**negated** [1] - 29:17
**negative** [2] - 45:23,
50:6
**never** [6] - 10:6, 41:19,
46:3, 50:16, 61:19

**NEW** [2] - 1:1, 1:1
**new** [2] - 59:24, 60:11
**New** [8] - 2:1, 17:7,
21:11, 23:10, 49:20,
62:3, 76:23, 78:12
**next** [12] - 9:19, 22:3,
22:21, 22:22, 27:3,
59:4, 68:5, 71:16,
78:4, 78:14, 82:4,
82:12
**nice** [1] - 23:23
**NJ** [3] - 1:18, 2:23,
4:22
**Nominal** [2] - 1:17,
2:19
**nominal** [1] - 1:25
**none** [3] - 42:10,
42:12, 47:24
**nonsense** [1] - 67:12
**normal** [4] - 43:11,
63:15, 81:21, 82:5
**normally** [1] - 44:13
**noted** [2] - 6:21, 8:1
**notes** [1] - 54:25
**Nothing** [1] - 55:4
**nothing** [11] - 31:11,
31:16, 44:10, 49:25,
52:4, 55:2, 69:19,
77:4, 79:19, 79:20,
80:11
**notice** [6] - 43:22,
44:20, 44:24, 45:4,
45:7, 46:13
**Notice** [3] - 48:1,
79:24, 79:25
**Notices** [1] - 6:15
**nowhere** [3] - 7:14,
7:16, 32:16
**nuclear** [1] - 68:11
**number** [12] - 8:5,
30:16, 32:22, 33:5,
37:8, 52:5, 52:7,
58:9, 61:1, 61:2,
69:17, 76:20
**numbers** [1] - 55:22
**NYPD** [1] - 78:10

## O

**Oak** [6] - 31:6, 32:15,
32:25, 37:4, 49:21,
53:18
**Oak's** [1] - 34:6
**object** [2] - 49:3, 58:2
**objected** [1] - 21:7
**objection** [3] - 5:20,
5:23, 58:3
**objections** [2] - 5:17,
71:17
**obligations** [1] - 76:17

**observations** [1] -
11:14
**observe** [1] - 68:4
**observing** [1] - 36:22
**obtain** [1] - 29:8
**obtained** [1] - 15:20
**obviously** [6] - 8:9,
26:18, 26:23, 30:9,
67:22, 83:5
**occasion** [1] - 23:9
**occasions** [1] - 36:20
**occurs** [1] - 6:22
**October** [2] - 52:3,
53:6
**odd** [2] - 24:17, 50:7
**OF** [3] - 1:1, 1:1
**off-kilter** [1] - 82:7
**offer** [1] - 79:9
**office** [19] - 7:3, 7:8,
20:5, 21:15, 21:23,
22:2, 22:7, 22:8,
22:20, 23:21, 39:9,
39:10, 52:3, 52:4,
54:20, 71:5, 71:18,
71:20, 72:14
**Officer** [1] - 20:25
**officer** [12] - 18:14,
25:6, 36:10, 38:1,
38:8, 38:18, 38:25,
39:2, 39:3, 39:8,
39:13, 40:20
**officers** [1] - 18:19,
20:25, 58:16, 78:11
**Official** [2] - 3:8, 84:8
**Olshan** [1] - 4:20
**OLSHAN** [1] - 2:19
**on-screen** [1] - 6:11
**once** [6] - 6:22, 7:4,
8:12, 56:23, 82:15,
83:1
**one** [43] - 6:20, 9:22,
12:22, 12:23, 12:25,
13:1, 14:24, 17:17,
17:18, 18:11, 18:13,
21:24, 23:5, 23:21,
25:2, 26:4, 30:11,
30:14, 30:24, 32:8,
34:4, 37:17, 45:23,
46:11, 48:16, 52:6,
52:15, 53:25, 55:21,
56:12, 58:24, 59:11,
61:1, 62:7, 66:25,
68:13, 68:21, 72:5,
73:2, 77:1, 77:5,
78:5, 81:22
**one-way** [1] - 34:4
**ones** [6] - 6:19, 13:5,
25:20, 42:20, 55:22,
64:8
**ongoing** [1] - 17:19

open [5] - 7:19, 11:16, 24:8, 65:22, 67:24
opened [4] - 7:9, 7:13, 7:18, 20:15
opening [1] - 11:7
openness [1] - 35:17
operate [3] - 15:17, 18:3, 79:7
operating [2] - 33:9, 35:10
operations [1] - 82:5
operator [1] - 75:10
opinion [1] - 54:22
opportunity [3] - 45:3, 65:25, 68:4
opposed [2] - 21:8, 26:8
opposition [3] - 21:3, 30:10, 80:4
optimistic [1] - 27:17
option [1] - 27:4
options [1] - 82:11
ORAL [1] - 2:1
orally [1] - 5:15
order [101] - 5:8, 9:21, 10:5, 10:7, 10:12, 10:23, 13:14, 16:15, 16:16, 17:1, 18:15, 18:22, 19:10, 19:14, 20:20, 21:3, 21:6, 21:21, 22:6, 22:9, 22:15, 22:18, 22:20, 22:22, 23:2, 23:8, 23:10, 24:14, 24:18, 25:4, 25:7, 25:12, 26:9, 26:12, 26:13, 27:13, 28:9, 28:25, 29:12, 29:16, 34:17, 34:18, 35:1, 35:12, 35:13, 37:12, 38:23, 39:1, 39:22, 40:16, 42:10, 43:22, 44:1, 44:7, 45:5, 45:17, 46:8, 47:15, 47:21, 49:2, 52:22, 53:1, 53:10, 53:21, 55:11, 56:1, 57:16, 60:5, 62:14, 62:23, 63:25, 64:1, 65:17, 69:13, 70:10, 70:12, 70:19, 70:25, 71:8, 72:16, 72:21, 73:5, 73:8, 73:9, 73:10, 73:12, 74:1, 74:10, 75:16, 77:12, 79:10, 79:23, 80:2, 81:20, 82:8, 82:20, 82:22
Ordered [1] - 70:13
ordered [4] - 40:21, 58:1, 70:6, 74:1

ordering [1] - 25:8
orders [19] - 9:24, 10:2, 10:14, 23:20, 24:5, 26:25, 28:5, 28:10, 30:22, 41:12, 55:9, 55:10, 56:12, 58:11, 59:3, 59:6, 70:13, 78:25, 80:9
ordinary [1] - 43:11
otherwise [1] - 45:2
outlets [1] - 83:3
outside [5] - 39:5, 49:17, 63:19, 73:24, 74:17
outstanding [1] - 77:24
overnight [1] - 22:23
overturned [2] - 41:13, 47:16
owed [1] - 77:12
own [7] - 18:17, 23:7, 23:12, 47:17, 54:6, 57:10, 63:2
owner [3] - 31:2, 31:5, 66:23

## P

P.C [1] - 3:3
page [5] - 20:20, 23:22, 23:24, 24:8, 70:19
pages [1] - 69:20
paid [2] - 54:14, 76:25
paint [1] - 76:19
papers [7] - 5:16, 5:24, 12:20, 21:2, 22:21, 22:24, 25:13
paragraph [7] - 23:23, 24:4, 44:1, 70:13, 73:5, 74:2, 75:6
paralyzed [1] - 16:8
parcel [1] - 19:3
parse [1] - 48:21
PART [1] - 1:1
part [13] - 19:3, 25:16, 25:18, 30:18, 30:19, 38:20, 45:25, 46:22, 46:23, 63:21, 70:24, 71:2, 73:17
parte [1] - 53:13
particular [1] - 66:6
parties [5] - 29:20, 30:3, 43:8, 65:18, 75:10
parts [1] - 81:20
party [6] - 6:25, 7:1, 7:16, 14:19, 71:13, 72:19
Pascarella [1] - 65:22

passion [1] - 46:19
past [3] - 50:12, 76:9, 79:20
path [1] - 47:19
pathway [1] - 40:16
Pause [1] - 43:24
payable [1] - 46:23
payments [1] - 54:8
payroll [1] - 62:10
peace [7] - 24:21, 26:12, 50:11, 62:19, 71:6, 72:1, 83:6
Peldman [2] - 14:20, 14:21
pending [5] - 8:3, 8:21, 51:21, 69:19, 81:6
people [4] - 14:12, 18:7, 26:24, 62:9, 64:8, 64:11, 65:5, 72:24
percent [8] - 28:8, 31:4, 31:5, 31:15, 33:22, 76:14, 81:5, 81:13
perhaps [1] - 68:22
period [2] - 37:4, 76:17
permission [2] - 36:24, 58:17
permit [8] - 7:15, 9:10, 9:13, 12:8, 19:15, 37:11, 60:9, 67:18
permitting [2] - 7:3, 8:23
person [3] - 7:1, 68:9, 74:22
personal [1] - 63:17
personally [5] - 24:11, 41:6, 62:4, 62:6, 72:24
personnel [1] - 72:22
persuade [1] - 22:25
petition [2] - 8:16
petitions [1] - 8:7
phone [2] - 24:6, 45:8
phonetic [1] - 52:21
photos [1] - 14:13
phrase [1] - 24:4
physically [2] - 64:21, 78:1
picking [1] - 40:23
pictures [2] - 14:8, 16:7
place [7] - 16:9, 25:19, 37:2, 54:16, 64:20, 72:7, 72:18
places [1] - 67:1
Plaintiff [6] - 1:11, 2:9, 2:11, 2:16, 2:23, 4:5

plaintiff [10] - 1:19, 4:3, 8:24, 9:5, 9:6, 10:13, 10:24, 27:10, 29:25, 34:8
Plaintiff-Defendant [2] - 2:9, 2:11
Plaintiffs [1] - 1:5
plan [1] - 73:17
play [2] - 66:1, 82:20
pleading [1] - 8:18
pleadings [1] - 68:22
pleasure [1] - 11:10
PLLC [1] - 2:15
plus [1] - 24:9
podium [12] - 11:6, 12:3, 12:15, 19:6, 34:20, 50:22, 59:15, 60:16, 66:12, 75:22, 76:2, 79:15
point [19] - 9:22, 15:7, 16:23, 17:17, 19:1, 30:8, 31:11, 33:11, 33:12, 36:6, 56:25, 59:20, 69:18, 73:13, 75:7, 77:25, 80:15, 81:3
pointed [3] - 68:21, 70:18, 77:17
points [3] - 10:19, 69:17, 78:18
pole [1] - 51:10
police [40] - 15:4, 15:18, 15:19, 15:20, 16:2, 17:6, 18:14, 18:19, 18:20, 20:6, 20:9, 20:11, 20:18, 20:19, 20:25, 21:1, 21:3, 21:8, 21:10, 22:13, 24:21, 25:6, 27:19, 27:20, 37:17, 37:19, 38:1, 38:18, 40:12, 58:16, 64:4, 65:7, 71:21, 71:22, 78:3, 78:11
Police [4] - 20:5, 21:10, 65:8, 78:12
politeness [1] - 45:15
Pond [1] - 12:25, 15:1, 15:22, 17:23, 19:18, 19:22, 20:2, 28:18, 45:1, 59:22, 59:23, 60:11, 61:11, 63:6, 66:16, 67:4, 70:16, 74:6
position [10] - 7:12, 14:13, 18:23, 26:16, 29:16, 32:16, 38:2, 38:14, 42:8, 43:15
possession [5] - 21:6, 25:19, 70:21, 72:7,

72:18
possibility [2] - 35:17, 67:25
possible [3] - 32:21, 77:21, 81:23
potential [1] - 76:21
potentially [1] - 59:6
practical [2] - 65:2, 65:4
practice [1] - 81:10
praise [1] - 36:11
predominant [1] - 16:25
preferred [4] - 23:11, 31:10, 32:16, 39:23
prejudicial [1] - 5:12
preliminary [2] - 5:5, 10:19
premature [2] - 65:12, 74:18
premises [7] - 13:13, 15:21, 16:12, 17:22, 18:25, 71:13, 78:1
prepared [2] - 5:14, 38:10
present [2] - 12:6, 34:23
presentation [1] - 78:22
presented [2] - 12:20, 52:8
president [2] - 13:9, 13:12
presumably [1] - 49:2
pretty [2] - 38:7, 78:25
prevent [1] - 25:21
preview [1] - 22:11
private [1] - 74:4
privilege [1] - 11:8
pro [8] - 6:23, 7:4, 7:8, 48:4, 50:25, 57:10, 79:25, 80:7
problem [4] - 7:11, 62:13, 70:24, 76:9
problems [1] - 8:20
procedural [4] - 7:14, 9:22, 10:21, 43:19
procedurally [4] - 6:24, 37:6, 59:1, 59:11
procedures [1] - 58:21
proceed [1] - 68:7
proceeding [3] - 55:16, 55:19, 70:3
proceedings [6] - 10:2, 52:10, 55:11, 55:21, 70:8, 84:5
proceeds [2] - 31:17, 31:18
process [5] - 5:17,

39:21, 41:8, 49:4, 77:24
**prohibit** [1] - 73:6
**project** [1] - 46:19
**promise** [1] - 53:19
**proper** [1] - 76:18
**Properties** [3] - 42:17, 42:18, 48:20
**properties** [28] - 12:22, 13:6, 16:20, 16:22, 17:10, 17:14, 19:18, 28:19, 33:10, 35:14, 35:15, 35:18, 35:24, 36:3, 37:11, 39:25, 40:11, 42:10, 42:20, 43:21, 45:25, 46:14, 53:17, 56:18, 63:4, 68:5, 70:15, 76:12
**Property** [1] - 34:25
**property** [44] - 13:10, 13:11, 13:15, 13:16, 13:17, 13:20, 13:23, 14:2, 14:12, 14:14, 14:15, 14:18, 14:24, 15:2, 15:6, 15:9, 17:3, 17:25, 19:1, 19:20, 20:8, 24:23, 25:19, 26:10, 26:11, 26:24, 27:19, 27:24, 44:8, 50:11, 53:25, 61:16, 61:24, 62:24, 66:6, 66:17, 67:19, 73:15, 74:5, 75:9, 78:6
**property-related** [1] - 24:23
**proportionate** [1] - 66:5
**propose** [2] - 43:8, 66:4
**proposed** [9] - 3:4, 19:24, 24:14, 25:4, 25:12, 27:8, 49:3, 69:13, 70:12
**protect** [1] - 66:5
**protected** [1] - 76:22
**protection** [5] - 23:8, 73:8, 73:10, 73:12, 74:1
**protective** [2] - 23:15, 74:10
**provide** [3] - 11:13, 35:22, 46:22
**provided** [5] - 33:23, 34:1, 43:21, 44:24, 70:1
**provision** [1] - 47:7
**punitive** [1] - 40:6
**purely** [1] - 39:13

**purported** [1] - 80:7
**purportedly** [2] - 10:13, 31:4
**purpose** [2] - 15:12, 19:14
**purposes** [1] - 62:21
**pushed** [1] - 53:22
**put** [8] - 15:24, 19:25, 26:24, 34:2, 38:9, 43:16, 72:24, 77:21
**puts** [1] - 15:8
**putting** [1] - 26:17

## Q

**quarter** [1] - 13:3
**questioning** [1] - 36:2
**quickly** [1] - 77:21
**quite** [3] - 8:10, 32:4, 79:3

## R

**radar** [1] - 34:3
**raise** [1] - 6:17
**raised** [2] - 6:13, 9:23
**raises** [1] - 7:11
**raising** [1] - 46:9
**rajotte** [1] - 9:13
**RAJOTTE** [60] - 2:10, 4:4, 9:16, 11:1, 11:5, 11:7, 11:11, 34:21, 35:3, 35:5, 36:1, 36:7, 36:16, 37:13, 38:15, 39:2, 39:6, 40:2, 41:1, 42:4, 42:7, 42:12, 42:22, 43:2, 43:5, 43:18, 44:3, 44:5, 44:23, 45:6, 45:11, 45:18, 45:20, 46:2, 47:10, 47:18, 47:25, 48:3, 48:5, 48:18, 48:24, 49:10, 49:13, 49:16, 49:18, 50:2, 50:6, 50:16, 58:6, 58:17, 65:11, 73:12, 73:17, 73:24, 74:8, 74:15, 74:18, 74:21, 74:24, 84:3
**Rajotte** [11] - 4:5, 9:15, 11:6, 29:23, 34:19, 34:20, 39:4, 51:19, 73:23, 74:16, 83:19
**Rajotte's** [1] - 21:2
**rang** [1] - 20:4
**rates** [1] - 76:13
**rather** [1] - 5:16
**re** [9] - 15:23, 45:6,

63:2, 63:7, 66:12, 66:16, 66:23, 75:22
**re-approached** [2] - 66:12, 75:22
**re-changed** [1] - 15:23
**re-enter** [5] - 63:2, 63:7, 66:16, 66:23
**reach** [6] - 35:18, 35:19, 43:20, 44:19, 44:20, 46:13
**reached** [1] - 65:21
**reaches** [1] - 81:19
**reacting** [1] - 71:21
**read** [12] - 21:3, 24:8, 25:7, 25:13, 29:15, 30:16, 55:9, 57:2, 72:16, 72:17, 74:3, 83:1
**reading** [3] - 23:10, 67:21, 71:11
**readings** [1] - 50:13
**ready** [2] - 16:7, 45:16
**REAL** [5] - 1:3, 1:9, 1:16, 1:21, 1:24
**Real** [2] - 2:20, 4:21
**real** [10] - 15:2, 15:8, 16:7, 19:25, 25:19, 51:18, 64:22, 67:5, 74:14
**realize** [2] - 75:25, 76:11
**realized** [1] - 32:17
**realizing** [1] - 38:4
**really** [22] - 7:3, 12:21, 13:20, 19:13, 26:3, 27:7, 33:5, 34:12, 36:9, 38:21, 40:11, 41:20, 42:6, 42:24, 43:15, 48:14, 48:21, 65:4, 71:2, 71:14, 71:17, 72:4
**reargue** [2] - 80:22, 80:24
**reason** [6] - 7:20, 25:25, 54:14, 56:2, 64:3, 77:5
**reasonable** [3] - 66:5, 68:16, 68:18
**reasonably** [2] - 69:10, 71:4
**reasons** [4] - 6:4, 9:8, 58:9, 70:5
**rebuttal** [1] - 26:22
**receipt** [1] - 8:17
**receivables** [1] - 46:22
**received** [1] - 37:19
**receiver** [44] - 4:17, 5:4, 10:22, 11:21, 11:25, 12:5, 12:17, 19:8, 19:10, 19:16,

20:21, 21:5, 25:3, 25:19, 28:25, 29:11, 29:16, 30:2, 35:18, 39:24, 40:13, 44:18, 45:17, 57:15, 60:24, 61:2, 61:4, 62:23, 66:14, 68:23, 70:19, 70:23, 72:7, 72:16, 72:18, 72:23, 79:23, 80:2, 80:16, 81:5, 81:10, 81:13, 81:16
**Receiver** [1] - 3:4
**receiver's** [5] - 30:7, 43:20, 46:13, 61:1, 70:20
**receivership** [25] - 9:21, 10:5, 10:12, 12:9, 16:16, 17:1, 17:15, 18:15, 18:22, 27:13, 34:17, 34:18, 35:1, 35:13, 36:3, 37:12, 42:2, 45:5, 47:13, 48:8, 63:20, 63:25, 65:16, 67:23, 82:22
**receiverships** [1] - 41:18
**receiving** [1] - 38:3
**recent** [2] - 59:20, 79:20
**recently** [1] - 32:18
**recollection** [1] - 5:8
**reconsidering** [1] - 80:20
**reconstruction** [1] - 14:10
**record** [10] - 6:21, 11:1, 11:14, 16:19, 30:4, 43:19, 54:22, 60:9, 75:2, 78:21
**records** [8] - 18:3, 29:10, 33:25, 36:18, 44:18, 54:10, 62:22
**recovering** [1] - 12:13
**refer** [1] - 44:6
**referenced** [1] - 77:3
**referred** [3] - 22:13, 22:14, 46:15
**referring** [2] - 44:2, 45:14
**refers** [1] - 55:10
**reflect** [2] - 43:19, 75:2
**reflected** [1] - 49:4
**refrain** [1] - 70:20
**refuse** [1] - 70:23
**regardless** [1] - 59:1
**regret** [1] - 64:5
**rehabilitate** [1] - 36:12
**reinstating** [1] - 70:11

**rejected** [1] - 8:12
**relate** [1] - 33:9
**related** [1] - 24:23
**relates** [3] - 57:12, 61:11, 61:18
**relative** [1] - 77:8
**relied** [1] - 46:24
**relief** [3] - 7:16, 23:15, 53:11
**remain** [1] - 10:3
**remained** [1] - 6:11
**remaining** [2] - 65:17, 68:2
**remand** [3] - 8:15, 54:15, 54:17
**remanded** [4] - 53:9, 54:16, 54:18, 55:24
**remember** [1] - 31:10
**remind** [1] - 81:14
**remotely** [1] - 41:19
**removal** [22] - 8:1, 8:3, 8:7, 8:11, 8:16, 8:22, 8:23, 9:24, 10:3, 10:6, 23:19, 24:1, 29:17, 50:14, 54:5, 80:4, 80:5, 80:6, 80:7, 80:10
**Removal** [2] - 6:16, 79:24, 79:25
**remove** [8] - 8:25, 9:3, 9:7, 10:17, 28:4, 54:15, 63:22, 71:12
**removed** [8] - 7:12, 10:13, 15:9, 20:1, 36:24, 53:8, 54:12, 54:13
**renewal** [1] - 5:9
**repaid** [1] - 31:6
**repair** [1] - 76:20
**replaced** [1] - 20:2
**reply** [1] - 30:9
**report** [13] - 12:8, 15:20, 16:2, 19:12, 20:6, 20:11, 21:1, 21:3, 27:20, 37:17, 37:23, 38:9, 39:13
**reporter** [3] - 39:5, 73:24, 74:17
**Reporter** [2] - 3:8, 84:8
**reports** [1] - 15:4
**represent** [1] - 46:17
**representative** [1] - 39:10
**represented** [2] - 56:23, 80:1
**REPUBLIC** [1] - 1:6
**request** [3] - 22:1, 65:12, 65:24
**requested** [1] - 33:22

**requesting** [1] - 65:13
**require** [1] - 52:20
**required** [4] - 44:21, 45:5, 76:18, 78:3
**requirements** [1] - 17:3
**requires** [3] - 9:10, 74:2, 76:19
**requiring** [1] - 25:18
**reserve** [1] - 29:22
**reserving** [1] - 37:14
**residential** [3] - 13:25, 14:1
**resistance** [2] - 15:18, 47:22
**resisted** [1] - 26:6
**resolution** [1] - 65:19
**resolve** [2] - 14:24, 77:10
**resolved** [1] - 52:5
**respect** [21] - 11:18, 13:5, 13:18, 15:1, 19:17, 19:21, 19:22, 20:12, 28:14, 29:9, 30:4, 36:8, 41:7, 44:23, 45:1, 65:14, 65:15, 66:15, 66:18, 67:15, 70:12
**respond** [5] - 9:13, 9:15, 29:23, 57:5, 57:21
**response** [4] - 5:22, 34:19, 45:22, 75:13
**responsive** [1] - 69:11
**restate** [1] - 5:15
**restoration** [1] - 65:16
**restorations** [1] - 77:24
**restores** [1] - 47:3
**restrictions** [2] - 36:25, 37:2
**result** [2] - 39:24, 67:23
**results** [1] - 59:6
**resume** [2] - 14:9, 14:10
**retail** [1] - 13:11
**retake** [1] - 60:16
**retired** [1] - 78:11
**return** [1] - 31:10
**returned** [2] - 32:25, 59:15
**returning** [1] - 33:1
**revenue** [3] - 30:21, 32:11, 34:13
**reversed** [4] - 10:16, 40:18, 41:13, 59:4
**review** [2] - 60:2, 72:20
**reviewed** [1] - 60:25

**rights** [5] - 34:6, 34:9, 39:21, 53:5
**Rikers** [2] - 26:15, 65:10
**risk** [3] - 26:17, 26:24, 64:14
**RMR** [2] - 3:8, 84:8
**Road** [12] - 12:25, 19:18, 19:22, 20:2, 28:18, 59:22, 59:23, 60:11, 66:16, 67:4, 70:16, 74:6
**road** [1] - 68:15
**rob** [1] - 4:11
**ROBERT** [2] - 2:10, 2:12
**role** [2] - 65:19, 66:1
**room** [1] - 75:3
**round** [1] - 50:9
**ruin** [1] - 73:19
**ruined** [3] - 51:16, 74:20, 74:23
**rule** [4] - 8:1, 8:6, 44:16, 58:13
**rules** [1] - 7:15
**run** [3] - 25:10, 64:20, 68:17
**runs** [1] - 42:9
**Rêver** [14] - 13:1, 15:12, 16:10, 17:17, 18:1, 18:5, 19:19, 46:19, 60:6, 60:12, 63:12, 63:25, 70:16, 80:16

**S**

**S.D.N.Y** [1] - 55:5
**salary** [1] - 54:9
**satisfied** [2] - 27:9, 76:16
**savant** [1] - 47:1
**save** [1] - 45:11
**Savings** [1] - 8:4
**saw** [1] - 5:7
**scene** [1] - 72:1
**schedule** [1] - 76:9
**scheduled** [2] - 6:14, 80:3
**Schwartz** [7] - 4:15, 30:6, 65:21, 68:21, 73:20, 79:14, 79:15
**SCHWARTZ** [9] - 2:15, 2:17, 4:14, 30:6, 79:16, 80:21, 80:24, 81:3, 84:2
**scope** [3] - 49:17, 56:8, 63:19
**scratch** [1] - 47:4
**screen** [1] - 6:11

**se** [8] - 6:23, 7:4, 7:8, 48:4, 50:25, 57:10, 79:25, 80:7
**second** [10] - 15:23, 18:13, 18:16, 18:17, 20:10, 20:22, 37:18, 74:5, 75:24, 80:5
**second-to-final** [1] - 37:18
**Section** [1] - 10:1
**section** [2] - 69:24, 70:1
**secured** [2] - 13:16, 14:16
**security** [2] - 18:17, 78:6
**see** [15] - 22:15, 23:5, 27:5, 29:25, 32:23, 37:23, 41:5, 49:24, 54:21, 65:25, 74:19, 79:13, 82:4, 83:5, 83:17
**seeing** [1] - 23:20
**seek** [2] - 7:16, 41:8
**seeking** [3] - 42:16, 44:14, 80:8
**seem** [2] - 25:20, 64:11
**self** [2] - 40:20, 66:3
**self-help** [2] - 40:20, 66:3
**sell** [1] - 13:15
**sense** [3] - 64:8, 64:16, 66:19
**senses** [1] - 27:15
**sent** [2] - 28:22, 77:2
**separate** [2] - 36:20, 53:7
**separately** [1] - 48:19
**sergeant** [1] - 22:4
**serious** [1] - 61:3
**serve** [1] - 16:14
**served** [1] - 22:23
**set** [3] - 22:24, 28:24, 68:5
**severe** [1] - 59:6
**Shakespeare** [1] - 36:14
**shall** [1] - 70:14
**sharing** [1] - 32:12
**shell** [1] - 49:20
**Sheriff** [1] - 17:8
**sheriff** [5] - 24:22, 27:8, 65:8, 72:17
**Sheriff's** [9] - 21:14, 21:23, 22:20, 23:21, 39:9, 39:10, 71:5, 71:18, 71:20
**shock** [1] - 32:18
**shocked** [1] - 26:3

**shop** [1] - 76:19
**short** [2] - 24:13, 76:24
**short-term** [1] - 76:24
**shouting** [1] - 26:24
**show** [12] - 5:8, 21:21, 22:18, 22:21, 22:23, 29:10, 41:7, 53:1, 53:10, 58:15, 71:25, 73:14
**shown** [2] - 67:4, 80:17
**shut** [2] - 64:18, 64:25
**shutting** [1] - 67:23
**sic** [2] - 46:9, 49:21
**side** [6] - 14:3, 26:19, 36:2, 61:5, 65:4, 66:5
**siding** [1] - 38:5
**sign** [3] - 15:8, 20:1
**signed** [2] - 22:22, 83:12
**significant** [1] - 15:17
**silly** [1] - 41:21
**SIMCO** [1] - 1:13
**similar** [2] - 7:6, 27:25
**similarly** [3] - 8:21, 16:10, 43:4
**simple** [5] - 57:14, 60:23, 62:1, 71:8, 82:25
**simply** [2] - 60:16, 64:4
**Simpson** [13] - 2:9, 2:12, 4:6, 4:11, 38:7, 39:4, 50:22, 59:18, 68:2, 69:7, 73:23, 74:16, 78:19
**simpson** [62] - 6:20, 6:22, 15:5, 15:13, 15:18, 16:1, 17:3, 18:24, 20:1, 20:7, 20:17, 21:7, 27:18, 28:1, 28:22, 29:11, 30:10, 30:20, 31:1, 31:4, 31:18, 33:13, 34:1, 34:8, 34:13, 36:11, 37:21, 37:25, 38:5, 38:9, 39:3, 39:8, 39:21, 40:15, 41:6, 43:23, 46:2, 50:19, 58:8, 59:22, 60:8, 67:6, 67:17, 69:4, 69:12, 69:16, 70:14, 72:13, 72:22, 73:6, 74:2, 74:7, 75:3, 75:9, 75:11, 75:12, 77:2, 78:2, 79:25, 80:9, 81:25, 82:9

**SIMPSON** [34] - 1:2, 1:13, 1:21, 50:23, 51:3, 55:17, 55:20, 56:9, 56:15, 56:17, 56:20, 56:24, 57:1, 58:15, 60:20, 60:23, 61:10, 61:14, 61:22, 61:25, 62:20, 63:3, 63:9, 63:13, 63:18, 64:13, 66:10, 67:10, 73:11, 73:15, 73:19, 74:14, 74:20, 74:23
**Simpson's** [11] - 18:16, 26:2, 26:19, 30:16, 46:16, 65:19, 66:15, 78:5, 79:20, 81:9, 81:18
**simulating** [1] - 23:24
**Simultaneous** [2] - 56:7, 56:19
**situation** [7] - 7:15, 24:12, 32:7, 37:8, 39:20, 63:16, 66:1
**situations** [1] - 8:7
**six** [2] - 52:25, 57:25
**six-five-four** [1] - 57:25
**slate** [1] - 28:4
**slice** [1] - 49:15
**slightly** [1] - 82:7
**slower** [1] - 61:12
**small** [1] - 13:11
**smoke** [1] - 10:12
**social** [2] - 45:15, 74:24
**sojourns** [1] - 23:13
**sole** [1] - 35:14
**solely** [2] - 5:11, 27:22
**someone** [4] - 13:19, 26:16, 69:4, 73:21
**sometimes** [1] - 62:1
**somewhat** [2] - 22:1, 33:10
**somewhere** [2] - 13:3, 41:15
**soon** [3] - 28:21, 57:11, 80:4
**sorry** [6] - 39:6, 51:11, 52:12, 53:3, 75:25
**sort** [7] - 8:11, 13:6, 13:21, 15:15, 33:6, 40:24, 48:12
**sorts** [1] - 10:16
**sought** [2] - 8:22, 81:15
**Sound** [1] - 31:12
**sound** [1] - 31:21
**sounded** [1] - 6:16
**sounds** [1] - 24:20
**source** [1] - 34:13

sources [1] - 32:11
south [1] - 14:3
Southampton [6] -
17:5, 18:19, 20:5,
21:10, 22:13, 37:19
Southard [2] - 52:9,
55:8
Southern [7] - 51:22,
52:1, 52:11, 52:13,
56:5, 57:9
sovereignty [1] -
47:12
space [2] - 13:11,
14:17
spaces [1] - 24:24
speaking [4] - 4:25,
47:18, 56:7, 56:19
speaks [1] - 33:6
specific [8] - 15:4,
22:6, 25:20, 25:22,
30:9, 46:10, 66:6,
72:5
specifically [3] -
36:20, 45:9, 71:23
specifics [1] - 43:12
specifies [1] - 60:5
spent [1] - 7:25
spheres [1] - 79:8
spirit [1] - 46:7
spoken [1] - 17:7
spot [1] - 71:14
staff [1] - 62:7
stage [1] - 40:6
stake [1] - 31:15
stalemate [1] - 19:1
standard [1] - 69:2
standing [2] - 42:15,
50:3
standstill [1] - 16:23
start [6] - 4:2, 13:5,
16:20, 36:25, 37:22,
68:15
started [1] - 20:17
starting [2] - 4:2, 37:4
starts [2] - 33:1, 36:9
state [6] - 8:2, 9:24,
10:2, 22:14, 28:5,
28:10
STATE [1] - 1:1
State [6] - 17:7, 21:11,
23:10, 62:3, 65:8,
76:24
statement [2] - 38:8,
46:12
statements [4] -
27:18, 27:24, 27:25,
58:18
states [1] - 70:13
States [1] - 9:4
stating [1] - 37:3

station [1] - 38:3
status [1] - 12:8
statute [2] - 8:23, 9:2
statutory [1] - 76:23
stay [7] - 5:18, 6:7,
55:25, 56:1, 65:13,
65:24, 70:9
stayed [1] - 66:3
staying [2] - 47:8, 66:2
step [1] - 39:12
steps [1] - 68:16
still [7] - 9:6, 11:13,
11:14, 30:12, 31:25,
34:8, 68:9
stole [1] - 62:10
stood [1] - 60:15
stop [2] - 62:25
stopped [1] - 55:4
story [1] - 24:19
straight [1] - 82:25
streams [1] - 30:21
street [1] - 34:4
Street [7] - 2:1, 12:24,
13:18, 14:2, 14:3,
61:15, 63:5
strikes [2] - 26:15,
32:22
stripping [1] - 53:5
struck [1] - 50:7
structure [2] - 42:24,
77:17
structured [1] - 47:10
stuff [2] - 63:10, 64:22
Subchapter [1] -
77:18
subentities [1] - 49:22
subject [4] - 19:24,
46:10, 47:13, 51:20
subsequent [4] - 15:3,
15:7, 15:23, 16:1
substantive [2] - 6:19,
42:1
substantively [2] -
59:2, 59:11
substitute [2] - 5:14,
5:19
succinctly [1] - 69:21
sued [1] - 46:3
suffering [1] - 81:12
sufficient [1] - 33:18
Suffolk [8] - 17:8,
21:14, 21:22, 22:2,
22:8, 22:19, 23:21,
25:6
suggest [4] - 56:11,
61:7, 78:8, 80:13
suggestion [2] -
18:18, 18:20
suggests [1] - 54:23

suing [1] - 1:3
summed [1] - 78:19
supervisor [2] - 22:2,
22:5
supplied [1] - 37:17
supporting [1] - 68:23
supposed [1] - 50:1
SUPREME [1] - 1:1
Supreme [2] - 9:4,
23:10
surface [1] - 65:5
surgery [1] - 12:13
surprised [1] - 27:7
suspect [1] - 25:17
switching [1] - 39:18
syndicated [1] - 14:21
system [8] - 15:24,
16:3, 20:4, 20:11,
59:21, 59:24, 60:11,
77:22

## T

tail [1] - 24:4
tail-end [1] - 24:4
tantrum [2] - 66:8,
66:10
tax [2] - 77:8, 77:10
taxes [1] - 76:24
Teams [3] - 2:13, 2:21,
2:24
technical [1] - 42:17
temperature [1] -
41:25
temporary [1] - 4:17
ten [3] - 8:12, 20:20,
51:9
ten-foot [1] - 51:9
ten-page [1] - 20:20
tentacled [1] - 43:1
tentative [1] - 12:13
term [7] - 34:23, 35:9,
44:9, 44:16, 70:18,
76:24, 81:24
TERM [1] - 1:1
terms [2] - 35:8, 44:16
territory [1] - 79:5
testify [2] - 38:11, 74:9
testimony [1] - 37:3
THE [135] - 1:1, 4:1,
4:7, 4:12, 4:24, 5:5,
5:23, 6:7, 6:12, 9:17,
11:3, 11:10, 11:20,
12:1, 12:10, 13:22,
13:25, 14:1, 14:5,
14:18, 17:11, 17:17,
18:5, 18:7, 19:4,
21:17, 23:4, 24:17,
25:10, 25:16, 28:1,
29:14, 29:24, 30:11,

30:14, 31:8, 31:13,
32:1, 32:25, 33:13,
34:2, 35:1, 35:4,
35:23, 36:5, 36:13,
37:10, 38:13, 38:20,
39:17, 40:3, 41:11,
42:5, 42:11, 42:20,
42:25, 43:3, 43:6,
43:25, 44:4, 44:22,
45:4, 45:10, 45:13,
45:19, 45:21, 47:6,
47:14, 47:24, 48:1,
48:4, 48:9, 48:19,
48:25, 49:11, 49:14,
49:17, 49:24, 50:4,
50:8, 50:21, 51:1,
55:15, 55:18, 56:6,
56:8, 56:11, 56:16,
56:22, 56:25, 58:14,
58:19, 60:14, 60:22,
61:9, 61:12, 61:21,
61:23, 62:17, 62:25,
63:8, 63:11, 63:15,
63:19, 66:2, 66:19,
67:9, 67:11, 67:20,
68:2, 68:13, 69:1,
69:15, 70:24, 71:2,
71:24, 72:3, 72:8,
72:21, 73:8, 75:2,
75:14, 75:18, 75:21,
75:24, 76:1, 78:8,
78:16, 78:24, 79:2,
80:19, 80:22, 81:1,
81:17, 83:15
themself [1] - 26:17
themselves [3] -
33:24, 38:14, 79:4
they've [2] - 14:23,
61:3
thief [1] - 60:25
thinking [1] - 42:21
Third [1] - 14:2
third [5] - 14:19, 16:6,
51:24, 80:6, 80:7
third-party [1] - 14:19
Thorne [4] - 4:22,
30:12, 31:14, 32:14,
33:2, 54:7
THORNE [8] - 2:24,
4:22, 30:13, 31:3,
31:20, 33:3, 33:21,
83:25
three [8] - 8:22, 14:15,
18:19, 18:20, 20:25,
33:7, 51:4, 63:3
threshold [1] - 6:18
throated [1] - 26:19
throw [2] - 27:12,
28:10
tied [2] - 62:4, 62:5

tired [1] - 67:12
Title [3] - 20:16, 29:3,
60:3
titles [1] - 15:14
today [20] - 9:19, 9:20,
10:11, 16:5, 17:12,
19:3, 21:21, 27:5,
34:23, 40:7, 41:5,
47:21, 51:13, 57:3,
57:12, 64:19, 66:25,
78:5, 79:19, 82:11
today's [1] - 19:2
together [2] - 26:1,
59:4
tomorrow [2] - 62:8,
64:19
tons [1] - 64:22
took [2] - 16:16, 79:12
tools [2] - 61:16, 62:6
topic [1] - 30:15
totally [1] - 47:19
touch [1] - 51:9
touched [2] - 63:4,
63:5
Town [2] - 20:5, 21:10
trained [1] - 47:2
transact [4] - 52:22,
52:23, 54:1, 70:16
transcript [2] - 83:16,
84:5
transition [2] - 13:6,
65:15
transitionary [1] -
65:15
trial [2] - 40:17, 58:22
tried [6] - 12:21,
21:20, 24:16, 51:23,
65:20, 80:10
trigger [1] - 31:16
triggered [1] - 31:23
triggering [2] - 74:21,
74:22
troopers [3] - 17:7,
21:11, 22:14
true [1] - 84:5
trustee [1] - 77:18
try [10] - 10:15, 14:24,
25:3, 31:22, 41:8,
47:16, 56:5, 59:8,
77:9, 82:2
trying [4] - 35:7,
41:24, 49:19, 53:15
turn [3] - 34:16, 59:13,
73:3
turned [1] - 28:25
turns [2] - 24:2, 49:7
twice [1] - 83:1
two [17] - 14:15,
16:22, 17:10, 17:14,
17:24, 19:17, 29:8,

31:8, 34:12, 48:15,
51:8, 52:7, 52:9,
55:8, 61:2, 61:7
**type** [1] - 23:19
**typically** [3] - 23:11,
24:21, 24:22

## U

**U.S** [1] - 68:11
**ultimately** [2] - 81:11,
83:3
**um-hmm** [3] - 44:3,
48:18, 69:15
**unable** [5] - 16:23,
20:16, 21:7, 22:25,
81:13
**unambiguous** [1] -
59:5
**unambiguously** [1] -
37:12
**uncalled** [1] - 73:13
**unclear** [4] - 48:11,
49:6, 76:17, 82:9
**unconnected** [1] -
39:8
**undeniably** [1] - 8:16
**under** [7] - 6:22, 10:1,
33:13, 38:17, 65:14,
71:3, 83:9
**understood** [5] -
38:24, 47:25, 49:13,
66:15, 73:1
**unfortunately** [3] -
22:16, 44:12, 54:11
**uninhabitable** [1] -
14:7
**unique** [1] - 46:24
**United** [1] - 9:4
**unless** [12] - 5:17,
7:17, 10:20, 22:9,
23:1, 27:4, 41:12,
58:2, 59:3, 70:9,
75:7, 80:22
**unlikely** [2] - 71:5,
71:10
**unsigned** [1] - 22:21
**unsure** [2] - 25:23,
81:21
**untimely** [2] - 8:17,
8:21
**unusual** [1] - 22:1
**unwilling** [1] - 17:4
**unwinding** [1] - 66:8
**up** [19] - 9:18, 10:12,
20:1, 36:15, 40:23,
44:14, 47:19, 50:9,
58:4, 58:15, 60:15,
64:21, 66:21, 71:25,
74:11, 77:5, 78:19,

82:8, 83:12
**update** [1] - 19:4
**USC** [1] - 10:1
**uses** [1] - 27:22
**utmost** [1] - 11:18

## V

**vacant** [6] - 14:5, 14:6,
17:22, 17:23
**value** [1] - 17:15
**variety** [1] - 9:8
**various** [2] - 23:13,
30:20, 80:9
**vehicles** [3] - 15:14,
68:15, 69:2
**versus** [1] - 50:25
**via** [3] - 2:13, 2:21,
2:24
**view** [5] - 29:17,
40:24, 41:14, 57:14,
59:12
**violate** [1] - 39:1
**violation** [3] - 39:14,
46:6, 59:5
**violations** [1] - 74:13
**visit** [3] - 15:11, 74:5,
74:6
**volatility** [1] - 18:16
**vulnerable** [1] - 73:22

## W

**wants** [6] - 10:9, 26:8,
59:14, 75:8, 78:20,
83:4
**warrant** [1] - 26:5
**warrants** [3] - 23:19,
24:1, 24:3
**Water** [3] - 13:1, 13:2,
19:18
**waterfall** [1] - 33:6
**website** [1] - 23:21
**week** [6] - 9:19, 13:14,
27:3, 59:23, 76:7,
82:12
**weekend** [2] - 6:13,
77:2
**weeks** [1] - 51:4
**whereas** [1] - 44:8
**whole** [2] - 53:7, 64:14
**willing** [3] - 22:5, 42:3,
48:10
**Winters** [1] - 61:8
**wiped** [2] - 28:4, 56:5
**wise** [1] - 57:9
**wishes** [1] - 60:15
**withdraw** [1] - 5:8
**withdrawing** [2] -
5:11, 5:21

**withhold** [1] - 36:22
**WITNESS** [1] - 14:1
**witness** [2] - 39:11,
74:9
**witnessed** [1] - 79:19
**WOLOSKY** [1] - 2:19
**Wolosky** [1] - 4:20
**wonderful** [1] - 57:8
**word** [3] - 27:15,
27:22, 33:19
**words** [5] - 20:19,
33:15, 48:21, 50:20,
53:4
**workers'** [1] - 76:23
**works** [5] - 27:1, 27:6,
28:7, 53:18, 66:8
**worthiness** [1] - 68:16
**writ** [3] - 39:11, 39:16,
39:17
**write** [1] - 49:2
**writings** [1] - 30:16
**written** [1] - 52:13
**wrote** [2] - 49:1, 57:3

## Y

**yards** [1] - 73:7
**year** [1] - 37:2
**years** [6] - 8:12, 8:22,
21:25, 24:9, 31:18,
51:8
**years-plus** [1] - 24:9
**yelling** [4] - 20:18,
74:7, 75:9, 75:11
**YJ** [1] - 1:13
**YORK** [2] - 1:1, 1:1
**York** [7] - 2:1, 17:7,
21:11, 23:10, 62:3,
76:23, 78:12
**young** [1] - 18:11
**yourself** [1] - 52:11